IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA

        vs.                   Criminal No. 19-134

TERRY K. SUGGS, JR.

       and

JERMAINE K. CLARK


-----

Transcript of Arraignment and Detention Hearing held on
Friday, May 24, 2019, in the United States District Court,
700 Grant Street, Pittsburgh, PA  15219, before Honorable
Cynthia Reed Eddy, Chief Magistrate Judge.

-----

**APPEARANCES:**

| | |
|---|---|
| For the Government: | U.S. Attorney's Office<br>by Rebecca Silinski, Esq. |
| For the Defendant<br>Suggs: | Robert M. Gamburg, Esq. |
| For the Defendant<br>Clark: | Kenneth Haber, Esq., and<br>Anne Marie Mancuso, Esq. |
| Court Reporter: | Noreen A. Re, RMR, CRR<br>700 Grant Street<br>Suite 5300<br>Pittsburgh, PA  15219 |


Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

-----

**IN OPEN COURT - DEFENDANTS PRESENT WITH COUNSEL**

-----

1

2

3

4

5        **THE COURT:**  This is the time scheduled for the joint

6   arraignment in the matters of United States of America versus

7   Terry Kenneth Suggs, Jr., at 19-134 and United States of

8   America versus Jermaine Kyle Clark at Criminal No. 19-134.

9            Would counsel for the government please enter her

10  appearance.

11           **MS. SILINSKI:**  Good afternoon, Your Honor.  Assistant

12  United States Attorney Rebecca Silinski appearing on behalf of

13  the government.  And seated with me at counsel table is FBI

14  Special Agent Darcos Cruz, C-R-U-Z.

15           **THE COURT:**  Thank you.  And counsel for Mr. Clark?

16           **MR. HABER:**  Your Honor, Kenneth Haber here for

17  Mr. Clark.

18           **MS. MANCUSO:**  May it please the Court, Anne Marie

19  Mancuso here today, also on behalf of Mr. Clark.

20           **THE COURT:**  Thank you.  And on behalf of Mr. Suggs?

21           **MR. GAMBURG:**  Good afternoon, Your Honor.  Robert

22  Gamburg on behalf of Mr. Suggs.

23           **THE COURT:**  Robert?

24           **MR. GAMBURG:**  Gamburg, G-A-M-B-U-R-G, Your Honor.

25           **THE COURT:**  Thank you.  Please be seated.  And I

1     understand that no one has an objection to handling this as a

2     joint arraignment; is that correct?

3             MR. GAMBURG:  That's correct.

4             MR. HABER:  Correct.

5             THE COURT:  Very well, then.  Have the Defendants

6     received a copy of the indictment?  Mr. Haber?

7             MR. HABER:  Yes, Your Honor.

8             THE COURT:  Mr. Gamburg?

9             MR. GAMBURG:  Yes, Your Honor.

10            THE COURT:  Have both counsel had an opportunity to

11    review the indictment with their clients?

12            MR. HABER:  Yes, Your Honor.

13            MR. GAMBURG:  Yes, Your Honor.

14            THE COURT:  Would either Defendant like to have the

15    indictment read to them today?

16            MR. HABER:  Your Honor, we would waive reading.

17            MR. GAMBURG:  We would also waive reading of the

18    indictment, Your Honor.

19            THE COURT:  I'm going to ask counsel to briefly

20    summarize the indictment and the maximum penalties, please.

21            MS. SILINSKI:  Yes, Your Honor.  As to the three-

22    count indictment charged in this matter, both Defendants are

23    charged in conspiracy to distribute and possess with intent to

24    distribute 5 kilograms or more of a mixture and substance

25    containing cocaine and 500 grams or more of a mixture or

substance containing a detectable amount of methamphetamine.

Both Defendants are charged respectively at Count 2 to Mr. Clark and at Count 3 to Mr. Suggs with a substantive offense of possession with intent to distribute.

As to all three of the counts, Your Honor, each count carries with it a maximum penalty of a term of imprisonment of not less than 10 years to a maximum of life, a fine not to exceed $10 million and a term of supervised release of at least 5 years.  Additionally, if the Defendant has a prior conviction for a second serious drug felony or serious violent felony, that a final term of imprisonment of not less than 15 years to maximum of life and a fine not to exceed $20 million and a term of supervised release of at least 10 years.  Additionally, a mandatory assessment as to each count.  Restitution is not applicable, and forfeiture is applicable as set forth in the indictment.

THE COURT:  Thank you.  Mr. Suggs, do you understand the charges against you, sir?

DEFENDANT SUGGS:  Yes, ma'am.

THE COURT:  And do you understand the maximum penalties?

DEFENDANT SUGGS:  Yes, ma'am.

THE COURT:  Mr. Gamburg, how does your client plead?

MR. GAMBURG:  Not guilty, Your Honor.

THE COURT:  Does he wish to retain his right to a

1    trial by jury?

2           MR. GAMBURG:  Yes, Your Honor.

3           THE COURT:  I have here a receipt for the Rule 16

4    material, Miss Silinski.  Does this complete discovery?

5           MS. SILINSKI:  Your Honor, at this time it's noted in

6    the Rule 16 as to both Defendants that due to the volume of

7    the jail calls that have been obtained by the government, we

8    are still trying to put them onto discs to provide to counsel.

9    Additionally, due to the sensitive nature and concerns with

10   regards to witness safety, there will be a rolling production,

11   consistent with the government's obligations.

12          THE COURT:  And how many days do you foresee for

13   trial?

14          MS. SILINSKI:  I would anticipate four days, Your

15   Honor.

16          THE COURT:  Additional time for Mr. Suggs?

17          MR. GAMBURG:  No, Your Honor.

18          THE COURT:  And has Mr. Suggs been processed by the

19   marshals?

20          THE MARSHAL:  Yes, Your Honor.

21          THE COURT:  I have a motion for extension of time to

22   file pretrial motions by both Defendants.  I'll grant those

23   motions.  Pretrial motions are due on July 8th.  If you need

24   an extension of time, you'll need to file a motion with Judge

25   Conti.

1              Now, as to Mr. Clark, do you understand the charges

2      against you, sir?

3              DEFENDANT CLARK:  Yes, Your Honor.

4              THE COURT:  And do you understand the maximum

5      penalties?

6              DEFENDANT CLARK:  Yes, Your Honor.

7              THE COURT:  Mr. Haber, how does your client plead?

8              MR. HABER:  Not guilty, Your Honor.

9              THE COURT:  And does he wish to retain his right to

10     trial by jury?

11             MR. HABER:  Yes, Your Honor.

12             THE COURT:  Mr. Haber, is the discovery situation the

13     same for your client?

14             MR. HABER:  I believe it is.

15             MS. SILINSKI:  With the caveat, Your Honor, that, in

16     addition, Mr. Clark will be receiving what's known as ping

17     data that has been obtained by law enforcement.  However, at

18     the same time that's still being placed onto a medium to

19     transport to them.

20             THE COURT:  And also an estimate of four days for

21     trial?

22             MS. SILINSKI:  Correct, Your Honor.

23             THE COURT:  Additional time, Mr. Haber?

24             MR. HABER:  One day, Your Honor.

25             THE COURT:  Has Mr. Clark been processed by the

1    marshals?

2              THE MARSHAL:  Yes, Your Honor.

3              THE COURT:  Anything further as to the arraignment of

4    either Defendant on behalf of the government?

5              MS. SILINSKI:  No, Your Honor.

6              THE COURT:  Anything on behalf of either of the

7    Defendants pertaining to arraignment?

8              MR. GAMBURG:  No, Your Honor.

9              MR. HABER:  No, Your Honor.

10             THE COURT:  So the government is seeking detention in

11   these cases, and I understand that the parties are agreeable

12   to a joint detention hearing; is that correct?

13             MS. SILINSKI:  On behalf of the government, yes, Your

14   Honor.

15             MR. HABER:  Correct on behalf of Mr. Clark, Your

16   Honor.

17             MR. GAMBURG:  Yes, Your Honor, on behalf of

18   Mr. Suggs.

19             THE COURT:  Ms. Silinski, are these presumption

20   cases?

21             MS. SILINSKI:  Yes, Your Honor, they are presumption

22   cases pursuant to the Bail Reform Act in that both Defendants

23   have been charged with a violation of the Controlled Substance

24   Act, which carries a maximum penalty of ten years or more.

25             THE COURT:  Do you wish to present any evidence at

1       this time?  Or are you waiting for rebuttal?

2               MS. SILINSKI:  Your Honor, at this time I would only

3       proffer that the indictment has a finding of probable cause

4       that both Defendants have committed the offenses.  We would

5       additionally proffer and point out for the Court the risk

6       assessment -- an assessment of danger is founded in the

7       reports as to each of the Defendants.  Specifically noting for

8       the Court, here we have a situation where there is a

9       confidential informant.

10              And as to at least Mr. Suggs, Mr. Suggs has a prior

11      felony conviction of retaliating against a witness victim.

12      Both Defendants have prior felony offenses and drug

13      convictions as well.  As to any additional evidence, since

14      this is a detention hearing, I'll wait until after the

15      Defendants have put on the record any information pertaining

16      to rebutting that.

17              THE COURT:  Okay.  Mr. Haber, any evidence that you

18      would like to present to rebut the presumption, sir?

19              MR. HABER:  Your Honor, I would like to do so mostly

20      by proffer, if there is no objection.

21              MS. SILINSKI:  No, Your Honor.

22              THE COURT:  You may proceed.

23              MR. HABER:  Thank you, Your Honor.

24              THE COURT:  And give me just a moment so I'm looking

25      at the right report.

1          (Pause.)

2          MR. HABER:  Your Honor, Mr. Gamburg and I have

3    spoken.  And with the Court's permission, if there is no

4    objection by the prosecution, he was going to proceed first.

5          THE COURT:  Sure.  That's fine.  I see you standing

6    back there, so that's fine.  Go ahead.

7          MR. GAMBURG:  We had briefly discussed it before

8    court.

9          THE COURT:  That's fine.  Go ahead.  So do you want

10   to call a witness?  Or are you wanting to proceed also by

11   proffer?

12         MR. GAMBURG:  With the permission of the government,

13   I would ask to proceed by proffer, Your Honor.

14         MS. SILINSKI:  Yes, Your Honor.

15         THE COURT:  Go ahead.

16         MR. GAMBURG:  Thank you, Judge.  If I may, Your

17   Honor, I'm 99 percent sure that the Court has read my written

18   submission, so I'm not going to belabor some of the issues.

19         Your Honor, in this particular case we had the

20   fortune of having a preliminary hearing prior to the case

21   being adopted by the federal authorities.  And at that

22   preliminary hearing, Your Honor -- and this goes to the weight

23   of the evidence against Mr. Suggs specifically, Your Honor.

24         At that preliminary hearing it was indicated that

25   there was no information about Mr. Suggs.  There was no

1    telephone contact with Mr. Suggs.  There was no confidential

2    informant did not speak of Mr. Suggs.

3           The number that was called was not related to

4    Mr. Suggs.  And they testified, quite frankly, that they did

5    not expect another person to arrive.  When Mr. Suggs was at

6    the scene, he had nothing in his possession.  And, again, to

7    the best of my knowledge, information and belief, what they

8    said was that he had exited the car, entered another car; and

9    that's when he was arrested.  What was found in that car that

10   he allegedly got out of was certainly a substantial amount of

11   narcotics; however, that was in a hidden compartment in the

12   car.

13          There's no indication that Mr. Suggs knew that it was

14   there.  There's no indication that he had anything to do with

15   it.  I'm unaware of any DNA or fingerprints that was tested

16   for for these narcotics that were secreted in a hidden

17   compartment.

18          Judge, I understand this is a presumption case, but

19   it's a rebuttable presumption.  As this Court knows, the

20   guidelines indicate it should be the least restrictive means

21   available to the Court pretrial to insure the safety of the

22   community, as well as the risk of flight.

23          He is a lifetime citizen of Pennsylvania.  Granted,

24   it's in the Philadelphia section of Pennsylvania.  That was

25   verified by Pretrial Services.  He has his family in

1    Pennsylvania.  He has his life in Pennsylvania.

2            I do note, Your Honor, that he does have a prior

3    history.  I do note that one of the charges was for

4    retaliating against a witness.  That was part and parcel of

5    his prior federal case from 2005.  He did get an additional

6    12 months for that in 2007.  I would simply note for the Court

7    that was over 12 years ago.

8            And it also goes back to what I had stated prior,

9    Your Honor, which is that there is absolutely no indication

10   that either Mr. Suggs knows who this CI is or, even more

11   importantly, Your Honor, that the CI even knows who Mr. Suggs

12   is.

13           So I don't think that that is as great of a concern.

14   And I would note that there was no firearms recovered.

15   There's no allegations of firearms.  There's no firearms

16   possessed by Mr. Suggs at any time, which was verified.  He

17   certainly does have a United States passport, Your Honor.  He

18   has certainly traveled overseas.  That concern could be easily

19   alleviated by surrendering the passport to Pretrial Services.

20           In addition, Your Honor, when the case was still in

21   the Court of Common Pleas of Allegheny County, his family made

22   arrangements to secure an apartment in Allegheny County so

23   that he could be monitored for electronic monitoring with a

24   bracelet.  That apartment is still rented.  It's still

25   available for him.  And that would alleviate any concerns

1    about the risk of flight.

2           I understand that whenever you're talking about a

3    large quantity of narcotics and these type of allegations,

4    that certainly there is some implied danger to the community.

5    However, with Pretrial Services monitoring the Defendant with

6    an electronic monitor on his ankle, with the surrender of a

7    passport and whatever conditions the Court deems appropriate

8    under these circumstances, certainly, in my opinion,

9    conditions or a combination of conditions would insure both

10   the Defendant appearing as required, as well as a risk of

11   flight.

12          I would also note, Your Honor, that in the criminal

13   history there is no indication that Mr. Suggs has ever not

14   appeared as required for any of these court cases.  And I

15   would also respectfully suggest, Your Honor, that with all his

16   family in the Commonwealth of Pennsylvania, with all of his

17   extended family, his work history, all taking place in the

18   Commonwealth of Pennsylvania, that there is certainly a

19   combination of conditions that will insure the requirements of

20   the Bail Reform Act.

21          I would respectfully suggest to this Court that we

22   have overcome the presumption, especially in light of the

23   relative strength and weaknesses of the government's case

24   vis-a-vis Mr. Suggs.  Based on that, Your Honor, in accordance

25   with the bail guidelines, we would ask that you release him on

1    conditions.

2              THE COURT:  Okay.  I think before we go to Mr. Clark,

3    I'll hear the government's response as to Mr. Suggs.

4              MS. SILINSKI:  Sure.  Your Honor, may I be seated for

5    this?

6              THE COURT:  You may.

7              MS. SILINSKI:  Thank you, Your Honor.  Your Honor,

8    with regards to the weight of the evidence, as the Court is

9    well aware, the federal system operates under two means for

10   which these charges can be brought either by a complaint or by

11   an indictment.  Here, Your Honor, we have an indictment that

12   was returned by a Federal Grand Jury of Mr. Suggs' peers.  In

13   that, the Federal Grand Jury returned that three-count

14   indictment, two counts against the Defendant.

15             Certainly, the defense counsel will have its

16   opportunity to make any argument as to the sufficiency of the

17   evidence post this detention hearing.  With regards to the

18   concern for the safety of the community, it's firmly

19   established with respect to an offense such as this that just

20   the character, life-style or community ties is insufficient to

21   overcome this burden.

22             Even if the Defendant is able to rebut the

23   presumption, the statutory language is clear that Congress

24   intended to equate drug trafficking and drugs with the danger

25   to a community.  Congress provided this guidance specifically

stating that the committee also emphasizes that the risk that
a Defendant will continue to engage in drug trafficking
constitutes danger to the safety of any person or the
community.

Beyond that, Your Honor, the Defendant's criminal
history, lack of clear employment and the notion that there
are ties to the community isn't sufficient, Your Honor.
Moreover, to the extent any opportunity for the Defendant to
be released has not been presented to Pretrial.  It's not
contained in the report.  Your Honor, we would argue that the
safety of the community is of utmost concern, especially in
this case with regards to Mr. Suggs.

As to the risk of flight, Your Honor, to the extent
the Court would like to hear additional evidence as to
Mr. Suggs' travel in and out of the country, I'm happy to put
on two exhibits that have been obtained by the United States
Customs and Border Patrol.

THE COURT:  Has the Defendant been --

MS. SILINSKI:  Yes, Your Honor.

THE COURT:  -- given copies of the exhibits?

MS. SILINSKI:  Yes, Your Honor.  They are Government
Exhibit No. 1 and Government Exhibit No. 2.  To the extent the
Court would like, I can go ahead and have Agent Cruz take the
stand to give a brief synopsis of these.

THE COURT:  Okay.  You may come forward and be sworn.

1          MR. GAMBURG:  Again, I know the Court has a copy of

2  the exhibits.

3          THE COURT:  I do.

4          MR. GAMBURG:  I can stipulate to them.  But if the

5  government wishes to call him, either way.

6          THE COURT:  I would like to hear from the agent.

7          MS. SILINSKI:  Sure.  No problem.

8                    -----

9                 DARCOS CRUZ

10  a witness herein, was duly sworn and testified as follows:

11                    -----

12              DIRECT EXAMINATION

13  BY MS. SILINSKI:

14  Q.  Go ahead and introduce yourself to the Court.

15  A.  Special Agent Darcos Cruz with the FBI.

16  Q.  Agent Cruz, how long have you been an agent with the FBI?

17  A.  Three years.

18  Q.  And what did you do prior to that?

19  A.  I was a detective, police officer in Florida.

20  Q.  And what part of Florida?

21  A.  In the Miami area.

22  Q.  Agent Cruz, are you familiar with the US Department of

23  Homeland Security Customs and Border Protection reports that

24  summarize travel history for individuals?

25  A.  Yes.

1    Q.  **Specifically prior to today's hearing, did you have an**

2    **opportunity to review as to the Defendant, Mr. Terry Suggs?**

3    A.  **Yes.**

4    Q.  **Would you be able to briefly summarize for the Court the**

5    **findings as found on Government Exhibit No. 1?**

6    A.  **Yes.  As regards to Mr. Suggs, there are several travels**

7    **starting in 2014.  The one that gets my attention from all the**

8    **years and experience as an investigator in narcotics,**

9    **especially international, in 2018, within a three-month**

10   **period, he traveled to three major hubs for cocaine**

11   **trafficking being Montego Bay, Jamaica; Mexico; and Cartagena,**

12   **Columbia.**

13          **Cartagena being a major hub for a source of cocaine,**

14   **and Montego Bay and Mexico being the routes to bring that into**

15   **the United States.  Within that three-month period, he**

16   **traveled to all three countries just for a couple days.**

17   Q.  **Agent Cruz, can you specifically identify the dates of**

18   **that travel?**

19   A.  **Yes.  Montego Bay, Jamaica, was February 16th through the**

20   **19th.  Los Cabos, Mexico, was April 14th through the 17th,**

21   **2018.  And Cartagena, Columbia, was May 2nd through May 8th of**

22   **2018.**

23          **MS. SILINSKI:  I have no additional questions, Your**

24   **Honor.**

25          **THE COURT:  Cross-examination.**

1          MR. GAMBURG:  Thank you.

2                    -----

3              CROSS-EXAMINATION

4    BY MR. GAMBURG:

5    Q.  Good afternoon, Agent Cruz.  How are you?

6    A.  Good.   Thanks.

7    Q.  So when you fly to Cartagena out of the United States, you

8    need a passport; correct?

9    A.  Yes.

10   Q.  And when you fly back from Cartagena to the United States,

11   you need a passport; correct?

12   A.  Yes.

13   Q.  Same thing with Mexico?

14   A.  Yes.

15   Q.  Same thing with Montego Bay?

16   A.  Yes.

17   Q.  If he didn't have a passport, he couldn't leave the United

18   States; correct?

19   A.  Legally.

20   Q.  And he couldn't re-enter the United States legally either;

21   correct?

22   A.  Yes.

23   Q.  So if he surrendered his passport, would that be

24   alleviated?

25   A.  Legally, yes.  But it's done illegally many times.

1    Q.  **You sort of indicated to the Court that these are major**

2    **drug distribution hubs; correct?**

3    A.  **Yes.**

4    Q.  **But you were able to find his information, because he left**

5    **legally and re-entered legally; correct?**

6    A.  **Yes.**

7    Q.  **Are you aware that he went with girlfriends or family or**

8    **friends?**

9    A.  **No.**

10   Q.  **If he exited the country illegally, there's a strong**

11   **likelihood that he can never get back in here, based on our**

12   **border protection; correct?**

13   A.  **Well, I wouldn't say that.  There's thousands of people**

14   **coming in illegally and not being detected.**

15            MR. GAMBURG:  **That's all I have, Your Honor.**

16            THE COURT:  **Any redirect?**

17            MS. SILINSKI:  **Briefly, Your Honor.  With regards,**

18   **Agent Cruz, to the travel in and out, is it your understanding**

19   **-- can you explain your understanding as to the nature of**

20   **whether individuals will -- if you know, whether individuals**

21   **who travel to these countries possibly engaging in illegal**

22   **behavior could ultimately travel with family or friends or**

23   **other business associates?**

24            THE WITNESS:  **Yes.  Based, again, on training and**

25   **experience and prior cases involving international nexus, it's**

typical for United States citizens or it is common in the drug

trafficking world to travel to those countries.  For example,

Columbia, to just talk, set up the deals with the sources of

supply and then travel to the other countries to set up the

routes, speak with whoever is going to bring it to the United

States.  Not necessarily him, but just coordinating all the

logistics of it.

So that's typically what they do.  Because,

obviously, they know it's difficult for them to do it

themselves if they're flying.  So everything looks normal as

far as the flying looks legal, but it's not that they're

bringing anything themselves.  It's just to set up all the

logistics and the deals for other people to take that risk.

MS. SILINSKI:  I have no further questions, Your

Honor.

MR. GAMBURG:  Just one based on that, Your Honor.

You're not suggesting to the Court that there are not

legitimate reasons to go to these places for vacation, are

you?

THE WITNESS:  No.

MR. GAMBURG:  Thank you.

MS. SILINSKI:  Nothing further, Your Honor.

THE COURT:  Thank you.  You may step down.  So are we

moving for Exhibit 1 to be admitted?

MS. SILINSKI:  Yes, Your Honor.  Please.

1          THE COURT:  Any other evidence that you want --

2          MS. SILINSKI:  No other evidence, Your Honor.  Just

3     simply one last argument would be while there certainly are

4     innocent reasons to travel international, Your Honor, in light

5     of the criminal history of the Defendant, the repeated pattern

6     of engaging in drug offenses, it remains the government's

7     position that the presumption has not been rebutted by the

8     Defendant and detention is appropriate in this case.

9          THE COURT:  Okay.  And I sense you have something

10    else you would like to say, sir?

11         MR. GAMBURG:  Nothing further, Your Honor.

12         THE COURT:  Okay.  I'm going to go ahead and make my

13    ruling as to Mr. Suggs.  The government has indicated that

14    this is a presumption case, and I find that it is a

15    presumption case.

16         First, the Defendant has been charged with violations

17    of Title 21, USC Section 841, and 21 USC 841(a)(1) and 21 USC

18    841(b)(1)(a)(2), 21 USC 841(b)(1)(a)(8) and all in one

19    Count 3.  Pursuant to the Bail Reform Act, I find there is a

20    rebuttable presumption.  No conditions or combination of

21    conditions will reasonably assure the safety of the community.

22         I've considered the request of the United States

23    Attorney and the evidence presented by the government as it

24    pertains to the factors in 18 USC Section 3142(e)(1), as well

25    as the filing by defense counsel, as to the preliminary

1    hearing in Allegheny County, as well as arguments by the

2    defense here.

3           I've considered the nature and circumstance of the

4    offense.   The offense charged is an offense involving

5    narcotics, and the offense charged is a serious offense that

6    poses threat to persons of the community if the Defendant were

7    to be released.

8           I've considered the weight of the evidence and

9    defense counsel's argument as to the weight of the evidence in

10   light of the preliminary hearing in Allegheny County and the

11   bond that had been set there.   And I will note that a Federal

12   Grand Jury has returned a true bill on the indictment, thus

13   finding probable cause.   And I also note that the statutory

14   characteristics that I must consider are different than those

15   considerations that are imposed upon the judiciary of

16   Pennsylvania.

17          I've considered the history and characteristics of

18   the Defendant.   I understand that he has been a long-time

19   resident of Pennsylvania, particularly in Philadelphia, and

20   that he has some family ties there.   No family ties to the

21   Western District of Pennsylvania.   I have considered his

22   employment history, which is partially verified from the

23   extent Defendant's sister said that he had employment with a

24   transportation company.   I've also considered his physical

25   health and mental health as reported to Pretrial Services.

I've considered the prior criminal history of the Defendant as summarized in the Pretrial Services report. And I note that the Defendant had several juvenile offenses, none of which being felonies. And I did not consider the juvenile offenses in making my decision, nor do I consider any dismissed offenses.

I note that in 2002 in Fairfax County, Virginia, he plead guilty to petty larceny and was sentenced to 12 months confinement, 8 months supervised release. And I note that he has a misdemeanor conviction coming out of -- that was withdrawn, so strike that.

And then ATF charges from 2005, a federal offense for selling and distributing narcotics, as well as RICO, racketeering, both felonies to which he was sentenced to 37 months of confinement followed by 2 years supervised release. And the Pretrial Services officer noted that this offense was committed while Defendant was on bond for the offense captioned at the previously mentioned offense. I noted that then in 2007 he was charged with retaliation against a witness victim, a felony. He plead guilty, and he served time for that offense.

I note in 2012 that there was a misdemeanor, obstructing an officer, going back to the retaliation against a witness victim at the top of that page 7 of the Pretrial Services report, that that offense appears to have been

1    committed while the Defendant was on bond for the previously

2    mentioned offense at the 2005 criminal number.

3            Then in 2014, DUIs.  We had an offense, also from

4    2015, default in appearance.  The disposition of that was not

5    reported, so I will not consider that.  Then we have the

6    current offenses at the state level, which appear to be those

7    offenses which were adopted for the federal offense.  Pretrial

8    Services notes that the Defendant's been charged with

9    distribution of cocaine and methamphetamine, that he has daily

10   use of marijuana, that he has prior criminal activity while

11   under supervision.  And it appears that he committed two new

12   offenses while under some form of supervision and that he has

13   two prior federal convictions.

14           I've also reviewed the Pretrial Services officer

15   recommendation, which was that there's no condition or

16   combination to reasonably insure the safety of the community.

17   And based on the evidence, I find by clear and convincing

18   evidence that no condition would reasonably assure the safety

19   of the community and that the Defendant has not overcome the

20   presumption in this case.  So I will order that Mr. Suggs be

21   detained until the time of his trial.

22           Let's take a moment to transition to Mr. Clark.  I

23   did also consider the Defendant's international travel with

24   the caveat that we don't know for sure what the international

25   travel was for.

1          Okay.  As to Mr. Clark, does the government want to

2   present evidence at this time?  Or do you want to reserve for

3   rebuttal?

4          MS. SILINSKI:  Your Honor, I will reserve for

5   rebuttal; however, noting the numerous offenses that the

6   Defendant has committed, the lengthy criminal history.  In

7   addition -- I'll wait until the defense counsel has proceeded.

8          THE COURT:  There's also a rebuttal presumption as to

9   Mr. Clark?

10         MS. SILINSKI:  Yes, Your Honor.  That is correct.

11  Same as the Defendant Mr. Suggs.  There is a rebuttable

12  presumption because he has been -- a Federal Grand Jury has

13  returned an indictment as to a controlled substance offense

14  with a maximum term of imprisonment of ten years or more.

15         THE COURT:  Okay.  All right.  Mr. Haber.

16         MR. HABER:  Thank you, Your Honor.  If I could, I

17  would like to start, as I indicated before, by proffer; and I

18  may have some questions of Pretrial Services.

19         THE COURT:  Any objection?

20         MS. SILINSKI:  No, Your Honor.

21         MR. HABER:  Thank you.  Your Honor, Mr. Clark is also

22  a lifelong resident of the Commonwealth of Pennsylvania, also

23  from the Philadelphia area.  He has extensive ties to that

24  community, which is within this Commonwealth.  His mother, who

25  he helps care for and is in extremely failing health -- and I

would also note that some of these points were raised in the
filing before the detention hearing.  He does care for his
mother and also his daughter, who he has literally daily
contact with.  She is ten years old.  And he also has a
fiancee that he resides with in Philadelphia.

Your Honor, counsel for the government in the prior
detention hearing made reference to employment history.  And I
would note that Mr. Clark does have a consistent history of
recent employment that was verified on page 2 of the Pretrial
Services report.  He is a member of the Local Union 542.  It's
an Operating Engineers Union where he works as a heavy machine
operator and worked on the Pennsylvania pipeline.

He worked throughout 2018 and for part of 2017 and
part of 2019.  In 2017, the last year in which he was able to
file a tax return.  He was incarcerated on these charges prior
to being able to do so for 2018, but he did file a tax return
and earned approximately $30,000, earned more than, is my
understanding, last year and was also earning money here in
2019 doing the same work.  So he did have, again, I emphasize,
verifiable employment throughout that time period.

Your Honor, to the extent there's been an allegation
of flight risk and Pretrial Services makes a note of that, I
would also note there's no history of nonappearance that I can
see.  There's no history of skipping bail.  The factors that
are cited really are duplicative and I respectfully would

represent to the Court are not factors of risk of flight,

specifically criminal history, criminal activity, which the

report cites as an indication he's a flight risk or risk of

nonappearance.

I will address those in a moment under the assessment

of danger and whether the Defendant poses a risk of danger to

the community, but I would note at this point that that

clearly does not indicate he's a risk of nonappearance.  To

the contrary, all indications are that he is not a flight

risk.

Both because he's a lifelong resident of this

Commonwealth and because he has employment.  He has a

ten-year-old daughter.  And as the government is probably

going to note, he also traveled, but he did so with a

passport, always being there's no surreptitious travel on his

part.

Your Honor, the government's obviously going to

raise and the Court is going to look at whether the Defendant

is a risk of danger to the community.  And I would note a

couple of things in that regard.  One, most of his convictions

are old, as I indicated in our pre-detention hearing filing.

But, specifically, I think this is a drug offense.  There's no

violence alleged in this.  No weapons.  This is a drug

offense.

And I think of particular note is Mr. Clark is

1    41 years of age and has no prior drug convictions or drug

2    offenses.  I think that's significant when you're looking at

3    this particular case, because it's a drug allegation.  It's a

4    possession of cocaine with the intent to distribute.  He has

5    no prior record with respect to that.

6              THE COURT:  Excuse me.  What about the 2007

7    conviction out of Philadelphia for possession with intent to

8    deliver a controlled substance felony, possession controlled

9    substance misdemeanor, possession of drug paraphernalia

10   misdemeanor and resisting arrest?  That's a prior drug felony,

11   is it not?

12             MR. HABER:  It would be if he was convicted, and he

13   was not.  That's why I wanted Pretrial Services to --

14             THE COURT:  He plead guilty.

15             MR. HABER:  He did not plead guilty, Your Honor.

16             THE COURT:  So you're questioning the veracity of

17   this report?

18             MR. HABER:  On that respect, I am.  I would also

19   question the veracity --

20             THE COURT:  Do you have any evidence that there was

21   no conviction?

22             MR. HABER:  I believe I do.  I have -- first of all,

23   I spoke to my client about it.  I'm not asking the Court that

24   that is conclusive evidence.  But before counsel would ever

25   make a representation to Your Honor, it's something I feel I

have an obligation to talk to my client about.  As a starting

point, I offer that.  As a secondary source, I have a printout

from the first judicial --

THE COURT:  Well, if you offer your client, then he

would be subject to cross-examination, if you're going to

offer the proffer.  So I don't believe you're suggesting that,

correct, Mr. Haber?

MR. HABER:  No.  It was more as a way of in case the

Court was wondering if I didn't have a good faith basis to

make that recommendation.

THE COURT:  You're an attorney of good reputation.

MR. HABER:  Well, thank you.  I just wanted to

reference that.  But, as a follow-up, the arrest date of

11-29-07 -- I didn't cross-reference this.  Let me see.

THE COURT:  11-30-07, offense date being 11-29-07.

MR. HABER:  Right.  The records out of the First

Judicial District of Pennsylvania indicate that Mr. Clark was

found guilty of a misdemeanor resisting arrest and was found

not guilty of the other three remaining charges he was charged

with, including possession with intent to distribute,

possession and possession of drug paraphernalia.

So perhaps I should have called the witness before I

did my proffer.  I wasn't trying to create any doubt or alarm,

but it is my belief that that part of the Pretrial Services is

incorrect.  And before we get to that point -- because there's

another indication in the record that perhaps is the most

important record before this Court, which is the indictment

that the government is relying on that for their presumption.

Because there was a finding of probable cause.

The Grand Jury found under a notice of special

findings that Jermaine Kyle Clark, my client, was previously

convicted in April of 2006 in Federal Court within the

District of Virginia of conspiracy to distribute 50 pounds of

marijuana.  That, also, is incorrect.

THE COURT:  Well --

MR. HABER:  I'll represent that to the Court.

THE COURT:  I understand.  But I'm not here to make a

finding on that.

MR. HABER:  Well, you are here to make a finding as

to whether you can rely on that indictment, as the

government's asking you to establish probable cause of these

offenses.  The Grand Jury -- we're not going to be able to

debate the facts of the case as to Counts 1, 2 and 3, because

this is not a trial.  I'm sure that Mr. Gamburg, on behalf of

Mr. Suggs --

THE COURT:  So the other findings would be as to the

penalties and whether it would be a presumption case or not?

Is that your point?

MS. SILINSKI:  No, Your Honor.

THE COURT:  I'll hear from you in a moment.  Go

1    ahead.

2            MR. HABER:   Actually, a couple points.   One point is

3    we're here to decide whether Mr. Clark loses his freedom for

4    who knows how long.

5            THE COURT:   That's not my question.   I understand

6    that.   My question is, your questioning of the Grand Jury

7    citation of an April 2006 conviction out of West Virginia --

8            MR. HABER:   Western District of Virginia.

9            THE COURT:   Oh, Western District of Virginia.

10   -- doesn't go to probable cause on Counts 1, 2 and 3?

11           MR. HABER:   It certainly could.

12           THE COURT:   Hear me out.   So you're saying if they

13   got that wrong, they got everything wrong?   Or are you saying

14   that that affects -- my pointed question is, does that affect

15   the status of your client's detention procedure?   Is this

16   being classified as a presumption case?   That's my question to

17   you on this.

18           MR. HABER:   To answer the last part first, it does

19   not affect it being a presumption case, Your Honor.

20           THE COURT:   And that's really all I was asking at

21   that point.

22           MR. HABER:   But Your Honor did, I think, ask a

23   question.   If you did not, I apologize.   But I thought you

24   also asked am I stating there's -- does it place into question

25   the entire indictment as to Counts 1, 2 and 3?

1            THE COURT:  Is that your argument?

2            MR. HABER:  I think it's one of my arguments, and I

3    think it does.  I think if a Grand Jury is going to make such

4    an egregious error -- here's how we know it's an egregious

5    error.  We look at the Pretrial Services report.  We see

6    nothing about that.

7            THE COURT:  All right.  If we can move on.  Do you

8    have evidence that you want to present to the Court, absent

9    oral proffer or argument?

10           MR. HABER:  I do not have any witnesses that I intend

11   to present.

12           THE COURT:  Okay.  Did you intend to present a

13   document?

14           MR. HABER:  Not at this time, Your Honor.

15           THE COURT:  Okay.  This would be the time to do so,

16   if you're going to.

17           MR. HABER:  I guess I would present --

18           THE COURT:  Then if you want to call the government's

19   agent to question him about that, go ahead and move that into

20   evidence.

21           MS. SILINSKI:  Your Honor, this agent's knowledge of

22   the criminal history would not be pertinent at this point.

23           MR. HABER:  I guess I would have to call Pretrial

24   Services, then.

25           THE COURT:  Well --

32

1          MR. HABER:  If there is an objection to me

2    introducing the document I was referring to earlier that

3    shows --

4          THE COURT:  Well, it's not a certified document.

5    It's not a court certified document.  And to the extent I

6    think that you want to call the Pretrial Services agent --

7    sorry, officer, just to question that, everything else is in

8    the Pretrial -- not to go over the whole report.  But if you

9    want to ask as to that conviction being on -- this is your

10   time to put on evidence.  So you want to call the Pretrial

11   Services officer?

12         MR. HABER:  Yes.  I call the Pretrial Services

13   officer.

14         MR. LOCKWOOD:  Your Honor, may I bring documents?

15         THE COURT:  Yes.  If it would be helpful to you

16   addressing this situation, certainly.

17                         -----

18                    DANIEL LOCKWOOD

19   a witness herein, was duly sworn and testified as follows:

20                         -----

21                    DIRECT EXAMINATION

22   BY MR. HABER:

23   Q.  Good afternoon.  Could you state your name.

24   A.  Daniel Lockwood.

25   Q.  And how are you employed?

1   A.   I'm a US Probation and Pretrial Services officer here.

2   Q.   And, Mr. Lockwood, I'm going to draw your attention to the

3   information that you gathered in preparation for today's

4   hearing with respect to Jermaine Clark and specifically ask

5   you about two areas, so to speak.  Do you have it in front of

6   you?

7   A.   I do.

8   Q.   Unless there's an objection, feel free to refer to it at

9   any time during my questions.  With respect to the 2007 -- I'm

10  sorry -- yeah, 2007 reference to an arrest of Mr. Clark by the

11  Philadelphia Police Department, which indicates September 30,

12  2007, do you see that?

13  A.   I do.

14  Q.   I think it's on page 5.  There's a listing of four

15  charges; one being a felony drug offense, two misdemeanor drug

16  offenses and a misdemeanor resisting arrest; is that correct?

17  A.   Yes, that is.

18  Q.   Now, there's a history of what happened in the case that

19  starts in 2007 and goes up to 2009.  Where did you go -- I

20  notice that it says "9-18-09."  It says "Guilty"; correct?

21  A.   Yes.  That's correct.

22  Q.   And do you know which charge or charges he was adjudged

23  guilty of?

24  A.   In reviewing the docket sheet, which I also have attached

25  here, I do find that was an error on our part, that he was

 1   found guilty of resisting arrest and that the three charges

 2   above that were dismissed.

 3   Q.   Okay.  So he was not found guilty of any drug-related

 4   offense; is that correct?

 5   A.   That's correct.

 6   Q.   Secondly, sir -- thank you.  And, secondly, in reviewing

 7   his criminal history, did you find any federal conviction for

 8   any drug offense?  Specifically, did you find any reference or

 9   conviction or even a charge that came out of the Western

10   District of Virginia, United States District Court?

11   A.   No, I did not.

12   Q.   Thank you, sir.  That's all I have.

13          MS. SILINSKI:  No further questions.

14          THE COURT:  Okay.  Thank you, Officer.  Okay.  So I

15   will disregard the first three charges listed under 2007.

16          MR. HABER:  Your Honor, with that, I have nothing

17   further.

18          THE COURT:  Okay.

19          MS. SILINSKI:  Your Honor, the government's argument

20   with regards to Mr. Clark's detention rests upon the lengthy

21   criminal history and the timeline, including armed bank

22   robbery charges, aiding and abetting armed bank robbery

23   charges, firearm charges, lengthy terms of imprisonment,

24   coupled with an aggravated assault charge in 2008.  The

25   Defendant was released from custody in May of 2015 and placed

1    on parole and then released on parole on 8-5-18.

2          Six months later the new offense was committed

3    bringing the current charges.  Your Honor, noted in the

4    Defendant's submission to the Court was 20 years ago a 1997

5    charge and a second in 2009.  And since such time, he's had no

6    new criminal charges, convictions and/or allegations.

7          The government would simply note that the Defendant

8    has been in custody during the large portion of that time,

9    thus making custody one opportunity to keep the Defendant from

10   committing additional crimes.

11         Your Honor, there is a rebuttable presumption.  The

12   Defendant may have family in the Philadelphia area; however,

13   that does not weigh in favor of the Defendant not being a

14   flight risk.  And, again, the government rests on the fact

15   that drug trafficking, certainly possessing substantial

16   quantities of controlled substances, is a substantial risk of

17   harm to the community, particularly the trafficking of those

18   significant quantities, including something such as cocaine.

19         With that, Your Honor, the government can also

20   present the Government Exhibits 1 and 2 with regards to the

21   Defendant's travel abroad and Agent Cruz's testimony as well

22   with the caveat that it will be very similar to that he stated

23   for Mr. Suggs, except for the note with Government Exhibit

24   No. 2.

25         So with that in mind, if the Court is willing to hear

1    the testimony of Agent Cruz as to Government Exhibit No. 2, I

2    would ask to do so.

3              THE COURT:  Okay.  He may come forward and be sworn.

4              MS. SILINSKI:  Thank you, Your Honor.

5                             -----

6                          DARCOS CRUZ

7    a witness herein, was duly sworn and testified further as

8    follows:

9                             -----

10                      DIRECT EXAMINATION

11   BY MS. SILINSKI:

12   Q.  Agent Cruz, again, just for the record, you've been an FBI

13   agent for the last three years?

14   A.  Yes.

15   Q.  Specifically, in addition to the report of an

16   investigation, as to the travel history for the Defendant,

17   Mr. Jermaine Clark, directing your attention to Government

18   Exhibit 1, is there anything on this report that you would

19   like to address to the Court?

20   A.  Yes.  Specifically, his travel in January of this year

21   just shy of -- actually, about a month prior to his new

22   charges, he travelled to Cali, Columbia, on January 13th.  He

23   came back on January 21st of this year.  Miami to Bogota and

24   Bogota to Cali, Columbia.  Now, he returned on January 21st,

25   less than three weeks later.

 1            He made a pedestrian crossing on February 9, 2019,

 2    Nogales, Arizona.  Not a common place for traveling to Mexico,

 3    especially pedestrian crossing; however, it is one of the

 4    biggest hubs for drug trafficking.  Then a couple weeks later,

 5    February 25th, as we know, he was charged here for the new

 6    offenses.

 7    Q.  And specifically your reference to the travel on

 8    February 2019, the pedestrian travel, that's a reference to

 9    Government Exhibit No. 2?

10    A.  Yes.

11            MS. SILINSKI:  Your Honor, I would move to admit

12    Government Exhibit No. 2.

13            THE COURT:  Okay.  It's admitted.

14            MS. SILINSKI:  Thank you, Your Honor.  I have no

15    further questions.

16            THE COURT:  Any cross, Mr. Haber?

17            MR. HABER:  Yes, Your Honor.  Briefly.

18                            -----

19                      CROSS-EXAMINATION

20    BY MR. HABER:

21    Q.  Agent Cruz, with respect to -- you were asked earlier

22    about travel for vacation.  And I think your answer was, yes,

23    that's a legitimate reason to go to those places and that

24    people do do that; correct?

25    A.  Yes.

Q.  Did you research at all anything further, other than the
fact that Mr. Clark had traveled outside the United States to
those locations?

A.  No.

Q.  Is it within your understanding that some people, given
the health care issues within the United States, specifically
the cost associated with health care and procedures and
treatment, that people sometimes travel outside of the United
States to receive medical care and medical treatment?

A.  I'm sorry.  Repeat that question.

Q.  Is it within your experience that people sometimes leave
the United States to get sometimes less expensive medical
treatments or medical care that they can't otherwise get here?

A.  I've heard, yes.

Q.  You've heard of that?

A.  Yes.

Q.  Are you aware that Mr. Clark was under treatment by
Dr. Andres Garcia in Columbia?

A.  No.

Q.  And was there any investigation into that?

A.  No.

Q.  I'm not going to ask the same questions Mr. Gamburg asked
about passports; but, obviously, you only had these records
because a passport was used; correct?

A.  Yes.

*D. Cruz - Cross - by Mr. Haber*                    39

1   Q.   And this crossing, this pedestrian crossing, I presume

2   that, also, is noted, because Mr. Clark would have had a

3   passport?

4   A.   Yes.

5   Q.   Although I've never been to one of these crossings, I

6   presume, also, that anybody who's crossing is searched?

7   A.   I don't know for sure about that.

8   Q.   If you have any items, any bags or anything like that,

9   they would be examined before you could re-enter the United

10  States; correct?

11  A.   I would assume, but that would be Customs and Border

12  Protection would better answer that question.

13  Q.   Based on -- do you work with them from time to time?

14  A.   I do.

15  Q.   Based on your familiarity, you would agree they would

16  never allow someone to carry a bag from Mexico and not look to

17  see if it had like, say, cocaine in it?

18  A.   Yes.

19  Q.   They would look at that; right?

20  A.   Right.

21  Q.   Thank you.

22           MS. SILINSKI:   Briefly, Your Honor.

23           THE COURT:   I'm sorry.   Mr. Haber, are you finished?

24           MR. HABER:   I should have said, "Thank you.   No

25  further questions."

1          THE COURT:  Okay.  Go ahead.

2          MS. SILINSKI:  Briefly, Agent Cruz, with regards to

3    pedestrian travel, as it relates to your training and

4    experience in conducting drug investigations, is there

5    anything unique or that you would consider with regards to a

6    pedestrian travel?

7          THE WITNESS:  Typically with a pedestrian crossing,

8    so it only shows inbound, because the United States doesn't

9    monitor outbound, meaning we only care about what comes in.

10   So it doesn't document what goes out.  So he could have either

11   walked across or driven a vehicle.

12          Typically in regards to drug trafficking, it's very

13   common for somebody involved in drug trafficking, specifically

14   in Nogales, to drive a vehicle into Mexico and then cross on

15   foot.  That vehicle will be noted and will be crossed through

16   the border by somebody else, and the vehicle would have traps.

17   So it's common and specifically in that area.

18          MS. SILINSKI:  Again, Agent Cruz, you have not

19   conducted additional investigation and you're not alleging

20   that this is exactly what Mr. Clark would have done; however,

21   it's your understanding that in narcotics trafficking this can

22   occur; correct?

23          THE WITNESS:  Yes.

24          MS. SILINSKI:  I have no further questions, Your

25   Honor.

1              THE COURT:  Okay.  Any redirect, I guess, or any

2    follow-up on her cross?

3              MR. HABER:  I guess just that that part of Arizona

4    that connects to, that borders Mexico; correct?

5              THE WITNESS:  Yes.

6              MR. HABER:  Are you aware there are numerous medical

7    and dental providers right near that border?

8              THE WITNESS:  I'm not aware.

9              MR. HABER:  Thank you.

10             MS. SILINSKI:  No further questions.

11             MR. HABER:  No further questions.

12             THE COURT:  You may step down.  Mr. Haber, any

13   further evidence you wish to present?

14             MR. HABER:  Your Honor, no further evidence.  I think

15   the government sort of gave its argument.

16             THE COURT:  Let me see if she has any rebuttal

17   evidence, then I'll hear argument or supplemental argument

18   from both.

19             MS. SILINSKI:  With regards to Agent Cruz's

20   testimony, no, Your Honor.

21             THE COURT:  No further evidence?

22             MS. SILINSKI:  No, Your Honor.

23             THE COURT:  Okay.  Now, Mr. Haber, I'll hear your

24   argument.

25             MR. HABER:  Your Honor, I'm going to be brief,

because it's going to mostly rehash things that were brought
out during the testimony and/or proffer.  As stated
previously, Mr. Clark is a lifelong resident of this
Commonwealth, has strong family ties, including mother,
daughter and fiancee.  And of particular note, also, he was
employed for the two -- approximately two years leading up to
his arrest in this matter.

Your Honor, I believe that shows, A, that he is
clearly not a flight risk, that he's not a risk of
nonappearance; and, B, I think it also goes and rebuts the
presumption that he's a danger to the community.  But, also, I
suggest, Your Honor, what should rebut that and does rebut
that is that he has no prior history of any drug trafficking,
no drug offenses.  I don't believe he has one conviction at
all, even a petty small possession offense, in his 41 years of
life.  I think that's significant.

Also, that he's not a danger to the community and
will re-offend relative to the type of offense he's now
accused of.

Lastly, I do think, Judge -- and the Court can give
it whatever weight it feels is appropriate, but I do think
that the Grand Jury's decisionmaking here has been placed into
serious question and the fact that they have found probable
cause for something that there was zero evidence of.  And if
they're going to find probable cause for something that there

was no evidence of, then I think that places into great

question why they indicted either Mr. Suggs or Mr. Clark in

this case.

I'm not asking the Court to dismiss the indictment

right now.  I don't think it's the appropriate forum to do so.

But given that their freedom -- his freedom and his liberty is

at issue, I think it bears on, ultimately, the issue of should

we incarcerate somebody just because a Grand Jury found

probable cause?  And I think the answer, generally, as I stand

here and say, the answer is no to that.

But in this particular case, knowing they made some

errors, I think the answer should be and has to be no.

There's a combination of conditions that can assure

Mr. Clark's appearance and the safety of the community, and

that would be electronic monitoring.  We would ask the Court

to impose that condition.  Thank you.

THE COURT:  Any supplemental argument on behalf of

the government?

MS. SILINSKI:  Your Honor, with regards to the

charges against the Defendant in this situation, not only do

we have local charges that were brought, a preliminary hearing

transcript, which counsel for the Defendant has -- both

counsel for Defendant have relied upon in making their

arguments.  But notwithstanding the fact whether the

government's position is that, here we have a situation where

1    a Federal Grand Jury did return an indictment and as was

2    presented at the preliminary hearing.

3            This is a detention hearing.  And the question before

4    the Court is whether or not there is sufficient evidence to

5    suggest that the Defendant does not pose a flight risk and is

6    not a danger to the community.

7            Again, Your Honor, with regards to the charges in

8    this case, the Defendant is charged with possession of more

9    than five kilograms of cocaine.  Based upon the submission to

10   the Court, the preliminary hearing transcript, I would proffer

11   that the Defendant from Philadelphia was in Pittsburgh, that

12   there was a controlled purchase that was set up, that five

13   kilograms of cocaine were found in the car that Mr. Clark was

14   driving.

15           And, as alleged and presented, we have found that to

16   the extent the Court would like additional confirmation as to

17   the drugs that were seized in this, I can present to the Court

18   for purposes of the kilograms the Allegheny County Office of

19   the Medical Examiner report that contains the laboratory

20   findings.  These are provided to both counsel in the Rule 16

21   material.  I'm happy to give them an opportunity to look at

22   this.  Again, Your Honor, though, this is a detention hearing.

23           An indictment is sufficient for finding the facts

24   that have been alleged.  However, to the extent the Court

25   would like for the government to admit that into evidence, I

1    would ask to do so, notwithstanding prior representation that

2    we had closed our evidence.

3              THE COURT:  Anyone else want to say anything else?

4              MR. HABER:  No.

5              THE COURT:  Give me just a moment.

6              MS. SILINSKI:  Sure.

7              THE COURT:  Are you finished?

8              MS. SILINSKI:  Yes, Your Honor.

9              THE COURT:  As I stated, the government filed a

10   request for detention in this case indicating that there was a

11   rebuttable presumption that no condition or combination of

12   conditions will reasonably assure the appearance of the

13   Defendant is required for the safety of the community.

14              I've considered the following factors in making my

15   decision.  First, I've considered that the Defendant was

16   charged with violations of 21 USC Section 846, conspiracy to

17   distribute and possess with intent to distribute five

18   kilograms or more of a mixture of cocaine and Count 2,

19   21 USC 841(a)(1), 21 USC 841 B(1)(a)(2) and 21 USC 8418.

20              I find that these are serious narcotics offenses

21   which do pose a threat to persons of the community.  I've

22   considered the weight of evidence in this case.  As to the

23   counts with which the Defendant was charged, the Grand Jury

24   found probable cause that he committed these offenses.

25              As to the citation of an offense which related to the

1    Western District of Virginia, which defense counsel argues is

2    incorrect, that wasn't a part of the counts that he's here to

3    face.  I don't know if that was in connection with possible

4    penalties.

5         MS. SILINSKI:  Your Honor, if I may, with regards to

6    the first step back, it is now the government's position that

7    it will file special findings and that no bearing as to the

8    evidence presented with regards to the substantive counts.  So

9    as to Counts 1, 2 and 3, it is simply a note to put the

10   Defendant on notice that the government could file an 851

11   information.

12        As the Court is well aware, though, an 851

13   information is a separate document that is subject to the

14   government producing those exhibits and a heightened standard

15   regards to that as well.  It is only to put the Defendant on

16   notice that he may be subject to heightened penalties, as

17   those heightened penalties were listed.  However, with regards

18   to the charge, it still is a presumption case as to the weight

19   of the substance that has been charged.

20        THE COURT:  That was my understanding of what would

21   have been in an indictment.  So as of now, the Defendant has

22   not yet been charged with that enhanced penalty, based upon

23   this particular charge?

24        MS. SILINSKI:  No, Your Honor.

25        THE COURT:  So I find that isn't relevant to the

probable cause finding as to the counts.  And, also, you have
the state court preliminary hearing in the matter.  I've
considered the history and characteristics of the Defendant.
I do understand he's been -- it appears he's been a lifelong
resident of Philadelphia and that he is from Pennsylvania and
that he has a daughter and he has other family members.
That's not a connection to this community, although it is a
connection to Philadelphia.

        I also note that defense counsel is relying on his
employment of the last two years.  However, he was born in
1977; and this is the only employment I see listed in his
life.  So while that's commendable, that's not a long record
of legitimate employment.  I note to his other personal
characteristics.  He reports he's in overall good health with
some back issues.

        Now, as to his criminal history, I note for the
record that I did not consider nolle prossed or dismissed
counts.  So the first arrests from 1997 I see were nolle
prossed.  So I will not consider that.  In 1998, at age 20, he
was convicted of armed robbery and aiding and abetting and two
counts of using a firearm during a crime.

        I note that his supervised release was revoked after
serving his prison sentence.  And the charge as to false
identification to law enforcement was dismissed, so I will not
consider that.

As to that 2007 case, the Pretrial Services officer verbally amended the report to reflect he was not convicted of the felony and two misdemeanors there, but he was convicted of a misdemeanor resisting arrest and that this conviction occurred while the Defendant was on bond for a prior case and while on a term of supervised release from his armed bank robbery.

In 2008 he was by guilty plea convicted of aggravated assault and criminal conspiracy for aggravated assault.  I will not consider those nolle prossed charges.  And it appears that the Defendant committed this offense while on bond with the previous conviction and still while on that term of supervised release from the armed bank robbery conviction from 1997.

Then I see the charges from North Versailles and that those charges are the current federal charges.  I've reviewed the recommendation by Pretrial Services finding that the Defendant poses a risk to the community, based both on the current charges as well as previous violation action on previous terms of supervised release, violent behavior history, criminal association, prior history of crimes involving violence, the prior felony of using a firearm during a crime and the criminal history.

While I understand defense attorney's argument that he has a mother, a daughter and fiancee, I don't find that

1     those relationships are strong enough to overcome the

2     presumption, nor do I find that the misreporting of three

3     reported counts he plead guilty to -- I'm not considering

4     those.  So I don't find that area of the Pretrial Services

5     report is sufficient to overcome the presumption, nor do I

6     find the reference to the Western District of Virginia

7     possible 851 notice to be sufficient.

8            So I find by clear and convincing evidence that

9     release of the Defendant would pose a danger to the community

10    and that the Defendant has not overcome the presumption.

11    Therefore, I order the Defendant to be detained pending trial

12    of these charges.  Anything further on behalf of the

13    government?

14             MS. SILINSKI:  No, Your Honor.  Thank you.

15             THE COURT:  On behalf of either of the Defendants?

16             MR. GAMBURG:  No, Your Honor.  Thank you for your

17    courtesy.

18             THE COURT:  Okay.  Thank you.  We're dismissed

19                   -----

20            (Whereupon, the above-captioned matter was

21    concluded.)

22                   -----

23

24

25

1                        **I N D E X**

2   <u>WITNESSES</u>:                                    <u>PAGE</u>:

3   DARCOS CRUZ
      Direct by Ms. Silinski              15, 36
4     Cross by Mr. Gamburg                    17
      Cross by Mr. Haber                      37
5
    DANIEL LOCKWOOD
6     Direct by Mr. Haber                     32

7                        -----

8              **C E R T I F I C A T E**

9          I, NOREEN A. RE, RMR, CRR, certify that the
    foregoing is a correct transcript from the record of
10  proceedings in the above-entitled case.

11

12
    s\ Noreen A. Re_____          _____August 6, 2019___
13  NOREEN A. RE, RMR, CRR              Date of Certification
    Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25