1

COMMONWEALTH OF PENNSYLVANIA  )

                            )

             vs.          )    OTN:  G831415-4

                            )           G831417-6

JERMAINE CLARK, TERRY SUGGS,  )

                            )

        Defendants.    )


H E A R I N G


held at Turtle Creek, PA, before Magisterial

District Judge Thomas Miller, on March 5, 2019 before

Phyllis M. Machel, a Professional Court Reporter, in and for

the said County of Allegheny.

A P P E A R A N C E S

FOR THE COMMONWEALTH:          Ilan Zur, Esq.

                               Assistant District Attorney

                               303 Courthouse

                               Pittsburgh, PA 15219


FOR THE DEFENDANTS:            Kenneth Haber, Esq.

                               Mitchell Building

                               Ross Street

                               Pittsburgh, PA  15219


                               Robert Gamburg, Esq.

                               1500 John F. Kennedy Blvd.

                               Suite 1203

                               Philadelphia, PA  19102

3

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DETECTIVE BONACCI | 4 | 13 | 36 | |

4

```
 1              THE COURT:  This is the Commonwealth vs.
 2         Jermaine Clark and the Commonwealth vs. Terry
 3         Suggs.
 4              Mr. Suggs and Mr. Clark are present and are
 5         represented by counsels.
 6              Waive the reading?
 7              MR. GAMBURG:  Yes, Your Honor.
 8              MR. HABER:  On behalf of Mr. Clark, waive
 9         the reading and plead not guilty.
10              Ready to proceed.
11  (Whereupon, the witnesses were first duly sworn.)
12                   DIRECT EXAMINATION
13  BY MR. ZUR:
14  Q    Sir, please state your full name and spell your last
15       name.
16  A    Ray Bonacci.  B-o-n-a-c-c-i.
17              MR. HABER:  Excuse me, Ilan.
18              Judge, I would move for sequestration.
19              MR. GAMBURG:  I would join.
20              MR. ZUR:  I have no problem, I'd just ask
21         that the affiant be allowed to remain.
22              THE COURT:  And that would be detective Kucic.
23              MR. ZUR:  Kucic, correct.
24  (Whereupon, the witnesses were sequestered.)
25  BY MR. ZUR:
```

5

```
1    Q    Did we get to spelling your last name?

2    A    Yes.

3    Q    Sir, how are you employed?

4    A    I'm a detective supervisor with the Allegheny County

5         District Attorney's Office.

6    Q    What are your responsibilities?

7    A    I supervise the Drug Task Force.

8    Q    How long have you been a police officer?

9    A    Twenty-five years.

10   Q    What is the type of work that you mainly focus on as a

11        police officer?

12   A    The last 25 years, for 20 of the years I've been

13        exclusively drug law enforcement.

14   Q    I'd like to now draw your attention to February 25, 2019,

15        did you meet with a confidential informant?

16   A    I did.

17   Q    What was the purpose of meeting with the confidential

18        informant?

19   A    We were to place a call to the defendant to place an

20        order to receive a delivery of cocaine.

21   Q    Was there a specific number, amount of cocaine that you

22        were attempting to receive delivery for?

23   A    Yes.

24   Q    How much?

25   A    Five kilograms.
```

6

```
 1    Q    Who was the individual that the CI was contacting for

 2         this delivery of cocaine?

 3    A    Jermaine Clark.

 4    Q    And do you see Mr. Clark in court here today?

 5    A    I do.

 6    Q    Could you please identify him and describe --

 7    A    Sitting behind Mr. Haber.

 8              THE COURT:  The record will reflect that he's

 9         identified the defendant.

10              MR. ZUR:  Thank you.

11  BY MR. ZUR:

12    Q    What was the means of communication with the defendant

13         Clark?

14    A    It was cell phone.

15    Q    Can you please place that number on the record?

16    A    I don't think that I have the record.

17    Q    Do you have the complaint?

18    A    Yes.  It's area code 267-752-0440.

19    Q    Did the CI on this date place a call to that phone

20         number?

21    A    Correct.

22    Q    Were you present for that?

23    A    I was.

24    Q    Was this a recorded phone call?

25    A    Yes, it was.
```

```
 1   Q   Did you hear both ends of the phone call?

 2   A   Yes, I did.

 3   Q   Approximately what time, if you recall, was this call

 4       placed?

 5   A   Noon time, 11:30, 12 o'clock.

 6   Q   What was discussed over this phone call?

 7   A   Where the meet was to occur, when the meet was to occur.

 8   Q   Where was the meet to occur?

 9   A   On Grant Street in the Borough of North Braddock.

10   Q   And approximately what time was this supposed to happen?

11   A   Three, 4 o'clockish.

12   Q   In the afternoon?

13   A   Yes.

14   Q   After this call was placed, what occurred next, as far

15       as this investigation?

16   A   Surveillance officers were detailed to that area and

17       then we received another incoming call from Mr. Clark

18       stating that he was 20 minutes away.

19   Q   What time was that, approximately?

20   A   Approximately 3:30, 3 o'clock.

21   Q   What happened next?

22   A   Surveillance officers, arrest team was assembled and

23       placed in the area at Grant Street in North Braddock.

24       Surveillance officers indicated that the defendant was

25       driving a Traverse, a Chevy Traverse.  We confirmed
```

8

```
 1          the plate that he has been driving and another person

 2          entered the passenger side of the vehicle with him.

 3    Q     This other person that entered the passenger side of

 4          the vehicle with Mr. Clark, where did he come from?

 5    A     He came from another vehicle and then we later learned

 6          that it was a Subaru.

 7    Q     The individual that exited the Subaru and entered the

 8          Traverse, do you see him in court today?

 9    A     I do.

10    Q     Can you please identify him?

11    A     Sitting at the end of the table beside his counsel.

12    Q     Who is that?

13    A     Terry Suggs.

14              MR. ZUR:  May the record reflect

15          identification.

16              THE COURT:  The record reflects he's

17          identified the defendant, Suggs.

18   BY MR. ZUR:

19    Q     Just so that I have a better understanding of what is

20          going on, where are these vehicles on the street in

21          relation to, is it near a residence, or where is this?

22    A     It's a neighborhood, it's a residential neighborhood.

23    Q     The individual that you identified as Mr. Suggs, he

24          exited what part of the car, passenger, driver?

25    A     Driver's side.
```

9

| | | |
|---|---|---|
| 1 | Q | Then entered the Traverse that was driven by Mr. Clark? |
| 2 | A | Correct. |
| 3 | Q | And where did Mr. Suggs go in the Traverse? |
| 4 | A | Passenger side. |
| 5 | Q | Both of these vehicles, did you ultimately run the |
| 6 | | registration? |
| 7 | A | Yes. |
| 8 | Q | Where are they registered? |
| 9 | A | The city of Philadelphia. |
| 10 | Q | Where are Mr. Suggs and Mr. Clark, where are they from? |
| 11 | A | The City of Philadelphia. |
| 12 | Q | Were you aware of, based on the dealings with the CI |
| 13 | | that these individuals were coming from Philadelphia? |
| 14 | A | Yes. |
| 15 | Q | After this was observed, Mr. Suggs entering the Traverse |
| 16 | | with Mr. Clark, what happened? |
| 17 | A | Surveillance officers indicated that they were present in |
| 18 | | the vehicle.  Once the arrest team was in place, we moved |
| 19 | | in, boxed the car in, boxed the vehicle in and took both |
| 20 | | of them into custody. |
| 21 | Q | Were any cell phones recovered from Mr. Clark and |
| 22 | | Mr. Suggs? |
| 23 | A | Yes. |
| 24 | Q | How many cell phones each? |
| 25 | A | Four from Mr. Clark and I don't know how many from |

```
 1           Suggs.

 2    Q     After Mr. Clark and Mr. Suggs were taken into custody

 3          and you got the cell phones, what was done with the

 4          vehicles that were involved, the Subaru and the

 5          Traverse?

 6    A     They were impounded and taken back to the Swissvale

 7          Police Department.  Once secured at the Swissvale Police

 8          Department, search warrants were obtained.

 9    Q     Was a search done of the Traverse?

10    A     Yes.

11    Q     Was anything found in the Traverse?

12    A     Yes.

13    Q     What was found in the Traverse?

14    A     Five kilograms of cocaine.

15    Q     Where was that found?

16    A     In a hydraulic trap in the rear.

17    Q     How is it that you knew -- did you do any testing on

18          the substance to confirm that it was in fact cocaine?

19    A     Right.

20    Q     What testing did you do?

21    A     I had a NarcoPouch, 904 is a field test.

22    Q     What do you actually do?

23    A     We put a small amount of the substance into a pouch,

24          bust two tubes to see if there's a presence of cocaine.

25    Q     So, one of these packages was opened then?
```

11

```
1    A    No.  We poked it.

2    Q    Poked it.

3              And you got some of the substance out of it?

4    A    Yes.

5    Q    And it tested positive for cocaine?

6    A    Correct.

7    Q    Is there anything else, based on your experience that

8         led you to believe that this substance was in fact

9         cocaine?

10   A    The odor.

11   Q    The odor.

12   A    Strong odor.

13   Q    So, you've smelled that odor before in cocaine?

14   A    Yes.

15   Q    As part of our 25 years as a police officer you have

16        handled and seized cocaine before?

17   A    Yes.

18   Q    You said five kilograms, and that's 5000 grams is taken

19        out of the Traverse from a trap in the back?

20   A    Right.

21   Q    What about the Subaru, was that also searched, the car

22        that Mr. Suggs exited?

23   A    Yes.

24   Q    What was found in the Subaru?

25   A    Eighteen (18) kilograms.
```

```
 1   Q   Where were the 18 kilograms in the Subaru?

 2   A   They were also in a hydraulic trap in the rear of the

 3       vehicle.  This was after a dog sniff also.

 4   Q   And the dog sniff alerted to the presence of narcotics?

 5   A   Right.

 6   Q   The dog sniff, is it specific to the type of substance,

 7       or would it alert it to any sort of narcotic?

 8   A   I don't know.

 9   Q   At some point did you, or did somebody place a phone

10       call to 267-752-0440, the number that the CI used to

11       contact Mr. Clark?

12   A   Yes.

13   Q   Did a phone ring?

14   A   Yes.

15   Q   The phone that rang, where did that phone come from?

16   A   It was one of Mr. Clark's phones.

17   Q   Do you know what the purchase price was that the CI was

18       supposed to pay for the kilograms per kilo?

19   A   Thirty-two thousand (32,000) per kilogram.

20   Q   Based on your experience as a narcotics detective, what

21       is the street value of 23 kilograms that were seized of

22       cocaine?

23   A   Before it's cut it's worth at a $100 a gram 2.3 million

24       dollars.

25                   MR. ZUR:  Offer for Cross.
```

1                    THE COURT:  Cross.

2                        CROSS EXAMINATION

3    BY MR. HABER:

4    Q    Detective Bonacci, you were asked on Direct about

5         meeting with a confidential informant.  What time did

6         you first meet with the informant on this date?

7    A    My first actual meeting was about 11:30.

8    Q    So, when you were asked about a call being placed and

9         you said that it was around 11:30 a.m. or 12 noon, that's

10        when you first met with the CI?

11   A    Right.

12   Q    Is this the first time that you met with the CI ever?

13                   MR. ZUR:  Objection, relevance.

14                   THE COURT:  Sustained.  That doesn't have

15          anything to do with today.

16   BY MR. HABER:

17   Q    Did you contact the CI to come meet with you, or did

18        the CI contact you on the date that we're talking about?

19   A    There was constant communication between me and the

20        confidential informant throughout the morning, so who

21        placed the first phone call, I don't know.

22   Q    You testified that you had a cell phone number to call

23        and that there was a recorded call, is that correct?

24   A    Right.

25   Q    When did you acquire or come into possession of this

1          cell phone number?

2                      MR. ZUR:  Again, I'll object to relevance as

3                  far as predating the 25th, which is the date of the

4                  seizure.

5                      MR. HABER:  I'll just ask it a different way.

6      BY MR. HABER:

7      Q    Let me ask you this.  Did you provide the phone number

8           to call to the informant?

9      A    No.

10     Q    The informant provided it to you?

11     A    Correct.

12     Q    When you say the person that the informant was calling

13          was Jermaine Clark, you testified to that, correct?

14     A    I did.

15     Q    Had you ever heard Mr. Clark's voice before so that you

16          can make that statement here today that it was Mr. Clark

17          on the phone?

18     A    I have.

19     Q    You've heard his voice before?

20     A    Yes.

21     Q    Before the date of February 25th?

22     A    Yes.

23     Q    And you were asked about did you hear both ends of the

24          call, do you remember being asked that?

25     A    I do.

1   Q   I assume that you heard the person speaking from the

2       other phone?

3   A   Correct.

4   Q   And you're saying that's a voice that you've heard

5       before?

6   A   I did, yes.

7   Q   Did the person on the other end of the phone identify

8       themselves by name?

9   A   No.

10  Q   How about a nickname?  Or, did the informant -- I should

11      ask you it this way.  Did the informant identify during

12      the phone conversation, did he refer to that person by

13      name?

14  A   I don't think so.  Not on that date.

15  Q   How long was that phone call?

16  A   Short.  Maybe a minute.

17  Q   Maybe a minute?

18  A   Yes.

19  Q   During that phone call, let me start, I probably know

20      the answer to this, but let me start with the word

21      cocaine, was that word used?

22  A   No.

23  Q   Was any word used in reference to cocaine that in your

24      experience as a 20 year veteran narcotics detective was

25      a synonym or a way of referring to cocaine?

1   A   No.

2   Q   Was there any word used to describe that there was a

3       meeting for a drug transaction?

4   A   Yes.

5   Q   What was that phrase?

6   A   So, it's common for drug traffickers not to say these

7       words, because they always assume that there's wire

8       taping in place, so they intentionally avoid using the

9       words cocaine and obvious words, so, they'll just say,

10      do you have that for me, do you have them five for me,

11      things like that, where they have some kind of

12      plausible denial, that it could be five hamburgers.

13  Q   I understand that, and I understand that can be common,

14      but in this specific one minute or so call was any

15      phraseology used that you can recall that would indicate

16      that it was about drugs?

17  A   Yes.

18  Q   Do you remember what it was?

19  A   It was just that, it was, will you have that?  Or, will

20      they be ready?  I'm not sure exactly what the terms

21      were.

22  Q   Was there, and I'm not asking you about prior

23      transactions or anything like that, but was there any

24      prior call that you heard, or were aware of, or that

25      the CI related to you in reference to the drug deal that

1         you say was going to take place on the 25th of February?

2    A    Yes.

3    Q    How many days back, if it was days or hours, how many

4         days back does it go?

5             Again, only in reference to the 5 kilogram deal

6         that we're talking about?

7    A    Five, six days.

8    Q    You're saying you believe, quote, unquote, in the works

9         for five or six days?

10   A    Yes.

11   Q    Would it be from those five or six days that you can say

12        that you knew the voice of Mr. Clark?

13   A    Correct.

14   Q    Not prior to that?

15   A    I think -- I don't remember.

16   Q    You testified about a meeting place being on Grant Street

17        in North Braddock, do you remember that?

18   A    Yes.

19   Q    You knew that from what, from the informant telling you

20        this, or from listening to the phone call?

21   A    Both.

22   Q    Did the informant tell you that would be the meeting

23        place prior to the phone call?

24   A    No.

25   Q    Did the informant only tell you that, or you heard that

18

1          only because of the one minute phone call?

2     A    Practice.

3     Q    Who picked the meeting place?

4     A    I don't remember.

5     Q    Did the person on the end of the phone talking to the

6          informant indicate where they were coming from?

7     A    Can you be a little bit more specific?

8     Q    Did they indicate where they were coming from, where

9          they were at, at that moment, and where, therefore, they

10         were going to come from to Braddock?

11    A    Yes.  So, Mr. Clark indicated that he was in the City,

12         and assuming at the hotel he was staying that.

13    Q    The City, you believe that --

14    A    Pittsburgh.

15    Q    -- that was reference to the City of Pittsburgh?

16    A    Right.  Yes.

17    Q    You talked about surveillance officers, do you remember

18         testifying about that?

19    A    Yes.

20    Q    My question to you is, when you say surveillance

21         officers were watching, and there was no objection

22         because obviously you didn't see this, you're getting

23         this from them, correct?

24    A    Correct.

25    Q    The surveillance officers, where were they?  Were they

19

```
 1         surveying Mr. Clark when he was quote, unquote, in the
 2         City?
 3    A    What day of the week are you speaking about?
 4    Q    This day?
 5    A    On that day there was surveillance at the hotel in the
 6         morning, there was surveillance in Westmoreland County,
 7         there was surveillance all over the place.
 8    Q    Now, in terms of you personally, where were you, were
 9         you with the informant?
10    A    At a certain point.
11    Q    Were you doing any surveillance?
12    A    Yes.
13    Q    Did you see Mr. Clark any time that day?
14    A    I did not personally see him, no.
15    Q    The time period from 11:30 a.m. or noon when the call
16         was place and recorded until the time that Mr. Clark is
17         taken into custody, okay --
18    A    Yes.
19    Q    -- do you know where the informant was?
20              MR. ZUR:  Objection, relevance.
21              THE COURT:  Sustained.
22    BY MR. HABER:
23    Q    Well, let me ask you about this Subaru.  The informant
24         had access to the Subaru during this time, didn't that
25         person have access to the Subaru?
```

```
 1   A   Did the informant have access to the Subaru?

 2   Q   Yes.  The Subaru that is mentioned that you testified

 3       about that had 18 kilos and that the complaint says had

 4       money in it, correct?

 5   A   Correct.

 6   Q   Was there money in the Subaru?

 7   A   Yes.

 8   Q   Where was that located?

 9   A   I think it was behind the driver's side seat, that's

10       where it was located.

11   Q   How much, do you know?

12   A   Eight, nine thousand.

13   Q   Do you know where that Subaru was between noon and

14       roughly 4 p.m. when the arrest went down?

15   A   No.

16   Q   Did any of your surveillance indicate to you that they

17       ever saw this Subaru prior to it being on the scene

18       where people were arrested?

19   A   On that day?

20   Q   Yes.

21   A   No.

22   Q   You testified surveillance officers saw a second person

23       gets out of the Subaru and enter the Traverse, correct?

24   A   I testified that surveillance officers saw a person get

25       out of a vehicle that was later identified as a Subaru
```

```
 1       after they were in custody.

 2   Q   No surveillance officers ever saw the Subaru pull up to

 3       the scene, correct?

 4   A   I don't think so, no.

 5   Q   You agree with me?  To the best of your knowledge --

 6   A   Not necessarily.

 7   Q   To the best of your knowledge?

 8   A   To the best of my knowledge, I don't know.

 9   Q   Would it also be accurate that surveillance officers did

10       not see the Traverse pull up?

11   A   No, surveillance officers did see the Traverse pull up.

12   Q   They did see the Traverse pull up?

13   A   I believe that they said it was a Traverse.  I could be

14       wrong, the surveillance officers might have said, a

15       Traverse is here already.

16   Q   So, they might have said that, hey, we just arrived and

17       the Traverse is already here?

18   A   Correct.  That's what happened, yes.

19   Q   Did the surveillance officers see anybody that was in

20       the Traverse meet up with anybody?

21   A   Just whoever got in the passenger side.

22   Q   But not the informant?

23   A   No.

24   Q   Obviously I'm not asking for the identity of anybody,

25       but was the informant present at the scene?
```

```
 1                    MR. ZUR:  Objection, relevance.

 2                    THE COURT:  Sustained.

 3   BY MR. HABER:

 4   Q    When the informant told you that the meet place was

 5        Grant Street in North Braddock -- let me ask you this

 6        question, not being that familiar with the area, is

 7        Grant Street the main drag?

 8   A    No.

 9   Q    How long is Grant Street?  How many blocks long is that?

10   A    I'm guessing ten.

11   Q    At what point on that 10 block area was it your

12        understanding the meeting place would be, or did you not

13        know?

14   A    I didn't know.

15   Q    Did anybody know?

16   A    We were told Grant Street.

17   Q    So, did you have all 10 blocks covered?

18   A    No, it's a narrow street, it was towards the end of it.

19   Q    Did you know that it was going to be towards the end

20        of it?

21   A    I didn't know that, no.

22   Q    Did anybody know it, as far as you know?

23   A    As far as I know, no.

24   Q    I know that you have all kinds of surveillance going

25        on, did you have a photograph of somebody that you were
```

1         looking for?

2    A    Yes.

3    Q    Specifically my client, Mr. Clark?

4    A    Yes.

5    Q    Did the informant tell you that a particular vehicle

6         that he or she expected to be part of this?

7    A    Yes.

8    Q    Which vehicle?

9    A    A Traverse.

10    Q    Is that the only vehicle that they mentioned?

11    A    I'm not sure that I understand your question.

12    Q    Is the Traverse the only vehicle that the informant

13         mentioned that would be involved in this meeting?

14    A    That was our understanding, yes, that we were just

15         looking for the Traverse.

16    Q    When the incoming call came indicating the caller would

17         be about 20 minutes away, was that call to the

18         informant's phone?

19    A    I believe so, yes.

20    Q    Was that recorded?

21    A    It was.

22    Q    Were there any other calls that you know of that were

23         between who you believe to be Mr. Clark and the

24         informant on the date in question here, the 25th of

25         February, other then the two calls that you testified

1        about?

2    A    Were there any other calls?

3    Q    Between who you believe to be Mr. Clark and the

4        informant?

5    A    No.  Just those ones.

6    Q    Just those two?

7    A    That's all that I'm aware of.

8    Q    if you know, do you know how long it was that the driver

9        of the Traverse was present before the other person gets

10       into the Traverse?

11   A    I don't know.

12   Q    Were you present when the quote, unquote, takedown

13       occurred?

14   A    Yes.

15   Q    You were?

16   A    Yes.

17   Q    At what point did you arrive on-scene?

18   A    First.

19   Q    You were first?

20   A    Yes.

21   Q    First meaning you were a surveillance officer?

22   A    No.  I was part of the arrest team, I was first.

23   Q    You were first on the arrest team?

24   A    Yes.

25   Q    So, you were part of the take down team?

1    A    Yes.

2    Q    Describe exactly what you did when you got on-scene?

3    A    Pulled my vehicle to the rear of the Traverse, went up

4         to the driver's side window, ordered Mr. Clark out of

5         the vehicle, we set his phones on the street, we placed

6         him in handcuffs.

7    Q    What was Mr. Clark doing when you got there?

8    A    Sitting on the street.

9    Q    In his car?

10   A    In the vehicle.

11   Q    Was he talking on the phone?

12   A    I'm not sure.

13   Q    Were you similar as to how you're dressed today?

14   A    Yes.

15   Q    So plain clothes?

16   A    Yes.

17   Q    I assume you identified yourself as a police officer?

18   A    Yes.  And I had a badge around my neck.

19   Q    To make it clear who you were?

20   A    Sure.

21   Q    In other words, law enforcement, right?

22   A    Yes.

23   Q    Obviously, there were several others along with you

24        that were doing this?

25   A    Yes.

1   Q   Was there any marked car?

2   A   Yes.

3   Q   How many officers total were part of the takedown team?

4   A   Ten, roughly.

5   Q   You described your role as you approached from the rear

6       of the Traverse, correct?

7   A   Correct.

8   Q   I assume some officers approached from the front?

9   A   Yes.

10  Q   And is it fair to say that given the nature of the

11      investigation that everyone had their firearms drawn?

12  A   Correct.

13  Q   And drawn in the direction of Mr. Clark, correct?

14  A   Mine was, I don't know where everybody else's was.

15  Q   What did you say?

16  A   Initially?

17  Q   Yes.

18  A   I just wanted to make sure that I could see his hands,

19      to put his hands up.

20  Q   Then what did you say?

21  A   I directed it to the passenger the same thing.

22  Q   You already said, you ordered them out of the vehicle?

23  A   I did.

24  Q   Did they come out with hands up?

25  A   Yes.

27

| 1 | Q | Did you tell them then to put their hands behind their |
| 2 | | back to be handcuffed? |
| 3 | A | I did, yes. |
| 4 | Q | And they complied? |
| 5 | A | Yes. |
| 6 | Q | They were then taken into custody? |
| 7 | A | Correct. |
| 8 | Q | Where were they taken at that point? |
| 9 | A | From there? |
| 10 | Q | Yes. |
| 11 | A | They were taken to the Swissvale Police Department. |
| 12 | Q | Now the vehicle that Mr. Clark was sitting in the |
| 13 | | driver's seat, the Traverse, when he was taken to |
| 14 | | Swissvale, did the Traverse remain on Grant Street in |
| 15 | | North Braddock? |
| 16 | A | Do you mean after we left? |
| 17 | Q | Yes. |
| 18 | A | For a short time until the tow truck arrived? |
| 19 | A | You called for a tow? |
| 20 | A | Somebody did. |
| 21 | Q | Had you already discovered what was inside of the |
| 22 | | Traverse? |
| 23 | A | No. |
| 24 | Q | You didn't see any drugs inside of the Traverse on Grant |
| 25 | | Street in North Braddock? |

28

1    A    I did not, no.

2    Q    Let me just ask you this, did you search the car at that

3         point?

4    A    No.

5    Q    So, first hand knowledge, you had no idea if anything was

6         in the Traverse, correct?

7    A    No, not for sure.

8    Q    When I say anything, let me be more clear.

9             You obviously didn't see any -- I think you already

10        said, you saw no drugs, correct?

11   A    Right.

12   Q    What about anything else?  Any weapons, any money that

13        was out in the open that you could see inside of the

14        Traverse?

15   A    No, sir.

16   Q    Any packaging material?

17   A    No, sir.

18   Q    With respect to Mr. Clark, you never personally saw

19        him inside of the Subaru, correct?

20   A    No.

21   Q    Same question with respect to surveillance officers

22        who apparently you did speak with, nobody from the

23        surveillance team ever saw Mr. Clark inside of that

24        Subaru, correct?

25   A    Correct.

1    Q    The interaction that you had with Mr. Clark on Grant

2         Street, were you or do you know if anyone else was

3         wearing any recording device such that the incident was

4         recorded either video or audio?

5    A    No, there were no recordings that I know of.

6    Q    I know that the State Police were involved in this,

7         correct?

8    A    They were.

9    Q    You said that there was a uniform car that did pull up,

10        at least one?

11   A    I didn't say that, but there was one there.

12   Q    I thought that you said that, but I stand corrected if

13        you didn't.

14             Was there a dash cam or a body cam either connected

15        to any car or worn by any officer?

16   A    I don't know.  I don't know what the State Police wear,

17        I don't know what Swissvale Police wear, I'm not sure.

18   Q    When you testified that both cars were from Philadelphia

19        and both defendants were from Philadelphia, both people

20        that were arrested there were from Philadelphia,

21        obviously the cars, I assume that you ran the plates?

22   A    I did.

23   Q    But your knowledge about both persons being from

24        Philly came from where?

25   A    Mr. Clark's driver's license.

```
 1   Q   Is that when you first became aware that he might be

 2       from Philadelphia?

 3   A   You mean when I saw his driver's license?

 4   Q   Yes.

 5   A   No.

 6   Q   You testified on Direct that the informant told you

 7       that he was coming from Philadelphia, was that stated

 8       to you the date of February 25th?

 9   A   No.

10   Q   Some time prior?

11   A   Yes.  These arrangements were made about a week, not

12       quite a week, five, six days before.

13   Q   Was there any surveillance of anybody coming from

14       Philadelphia to Pittsburgh?

15   A   Surveillance, well, we had obtained a Court Order to

16       monitor the whereabouts of the cell phone that we

17       mentioned here, so we knew where the cell phone was

18       that Mr. Clark had.

19   Q   So, almost like a GPS tracking?

20   A   Correct.

21   Q   But in terms of actual physical surveillance, eyes of

22       law enforcement watching somebody drive from Pittsburgh

23       to Philly or fly, that wasn't done, correct?

24   A   No.

25   Q   Is that right?
```

1    A    That's correct.

2    Q    When you took Mr. Clark into custody, and took him to

3         the police station, what was he under arrest for?

4    A    At that point?

5    Q    Yes.

6    A    At that point he was under arrest for we believed that

7         he had cocaine in the car, a significant amount.

8    Q    And that belief was based on things that the informant

9         may have told you?

10   A    Reliability of the informant.

11   Q    But we can agree that you did not know nor had you seen

12        whether cocaine was in the car until you took it back

13        to the police station, correct?

14             MR. ZUR:  I'm going to object to this line of

15             questioning as far as I believe it goes more

16             towards suppression, those pieces to the arrest.

17             I don't think that's relevant for today, Your

18             Honor.

19             THE COURT:  Sustained.

20   BY MR. HABER:

21   Q    I think that you testified that you seized all of the

22        cell phones from the vehicle and/or the persons, the

23        two defendants here, is that right?

24   A    Yes.

25   Q    How many phones were taken from Mr. Clark, directly from

1          his person?

2    A     I think that there were four.

3    Q     All four were on his person?

4    A     No.  When he got out of the vehicle we put them on the

5          street, so there were two or three on the street and

6          maybe another one in the vehicle.

7    Q     You took those phones?

8    A     I did not, no.

9    Q     Somebody did?

10   A     Yes.

11   Q     Some law enforcement?

12   A     Uh-hmm.

13   Q     Is that a yes?

14   A     Yes.

15   Q     You took them, I assume, from the scene on Grant Street

16         in North Braddock?

17   A     Yes.

18   Q     What was done with them at that time?

19   A     They were preserved and search warrants were obtained

20         for their content.

21   Q     We can agree that you did not have a search warrant or

22         any warrant to search or seize either of the vehicles

23         prior to 4 p.m. on February 25th, correct?

24              MR. ZUR:  Objection as to the relevance for

25            today's purposes.

```
 1              MR. HABER:  I think that it's relevant to --

 2              MR. ZUR:  It has nothing to do with the prima

 3         facie case, so, therefore, I would argue that it's

 4         not relevant.

 5              MR. HABER:  There's a lot of things that were

 6         testified to on Direct that may not have to do

 7         with prima facie, but it's just part of what

 8         happened.  He testified that he got a warrant

 9         when he got back to the station, I just wanted

10         to know --

11              THE COURT:  We'll give you a little

12         leeway, Sir.

13              MR. HABER:  Okay.  I understand.  And I'm

14         almost done.

15   BY MR. HABER:

16   Q    So, the first search warrant for either vehicle was

17        obtained after the cars were towed back to Swissvale,

18        is that correct?

19   A    Correct.

20   Q    You testified to smelling the cocaine.  I just want

21        to make sure that I understand that.  That was at the

22        point when you were field testing it, correct?

23   A    Correct, yes.

24   Q    You already opened one of the kilo packages, and you

25        were taking it out to test it, that's when you smelled
```

1        it, correct?

2   A   That is, yes.

3   Q   You didn't smell it prior to that?

4   A   No.

5   Q   Is that a, no?

6   A   That's a, no.

7   Q   Just a few more questions.

8        When you said something about after a canine sniff,

9        do you remember saying that on Direct Examination?

10   A   I did.

11   Q   When did this canine sniff occur?

12   A   I believe it occurred on Grant Street, there were three

13        canines there.

14   Q   So, there were three canines on Grant Street, that you

15        recall?

16   A   I do, yes.

17   Q   Do you recall if that's where the canine sniff occurred

18        or not?

19   A   I don't.

20   Q   You don't recall?

21   A   I don't know if they actually sniffed the vehicles

22        while they were on Grant Street.

23   Q   You're not a handler?

24   A   No.

25   Q   Who was the handler?  And that's the only question that

1        I have and then I'll move on.

2   A   There were three, two Swissvale canines were present

3        and a North Versailles.

4   Q   When Mr. Zur asked you about the purchase price, you

5        said 32,000 per kilo?

6   A   Correct.

7   Q   Is that right?

8   A   Yes.

9   Q   Where did you get that information from?

10  A   The informant.

11  Q   Was that during the phone call that was recorded?

12  A   No.

13  Q   The informant told you this when?

14  A   Prior to that.

15  Q   Did you give the informant marked money?

16  A   No.

17  Q   The Subaru and the Traverse were registered to owners

18       that did not come back to Jermaine Clark, is that

19       correct?

20  A   Correct.

21  Q   Did you make any attempt to interview or contact the

22       registered owner of either vehicle?

23  A   They're temp tags, they're registered to it looks like

24       a Dealership, an auto dealer.

25  Q   Was the auto dealer contacted?

1    A    No.

2    Q    The last question along those lines.  The Dealer is

3         located --

4    A    In Philadelphia.

5              MR. HABER:  If I may have just one second,

6         Your Honor, I think that I'm done.

7              THE COURT:  No problem.

8              MR. HABER:  Judge, thank you very much for

9         the Court's patience.

10             I have no further questions at this time.

11             THE COURT:  Do you have any questions?

12             MR. ZUR:  No.

13             THE COURT:  Cross.

14                     CROSS EXAMINATION

15   BY MR. GAMBURG:

16   Q    Good morning, detective, how are you?

17   A    Good.  How are you?

18   Q    Good.  Thanks.

19             You're not the affiant on the complaint, correct?

20   A    Correct.

21   Q    Did you review that prior to testifying today?

22   A    No, I didn't.

23   Q    You have a CI and you have a telephone number, correct?

24   A    Correct.

25   Q    That telephone number already testified to, 267-752-0440,

1           correct?

2     A     I believe that's it.

3     Q     You have a Court Order for the GPS tracking of that

4           phone, correct?

5     A     Correct.

6     Q     You have a phone call made to that phone on February 25th

7           at about you said between 11:30 and 12, correct?

8     A     Correct.

9     Q     There is a conversation that you hear, correct?

10    A     Yes.

11    Q     With one individual, correct?

12    A     Yes.

13    Q     You identified that individual at this hearing as

14          Mr. Clark, correct?

15    A     Correct.

16    Q     Based on that conversation there is a meet that is

17          arranged between 3 and 4 p.m., correct?

18    A     Correct.

19    Q     The meeting location, 1400 block of Grant Street in

20          North Braddock was decided during that 11:30, 12 o'clock

21          phone call?

22    A     I don't know about the 1400 block, I know Grant Street

23          was.

24    Q     That was decided between 11:30 and 12, correct?

25    A     Yes.

1   Q   This is a 5 kilogram transaction that is supposed to

2       occur, a big transaction, correct?

3   A   Correct.

4   Q   You have at least yourself, four other detectives and a

5       state trooper, correct, that are part of your detail,

6       would you agree with that?

7   A   At least.

8   Q   At least?

9   A   Yes.

10  Q   What time do you set up surveillance for this meet that

11      is supposed to occur between 3 and 4 p.m. on Grant Street

12      in North Braddock?

13  A   Surveillance officers were up there prior to me, so I'm

14      not exactly sure what time they arrived there.

15  Q   Certainly sometime in advance of the proposed meet?

16  A   Correct.

17  Q   At some point in time you're in constant radio contact

18      with the rest of your team?

19  A   I'm not in constant, no, I wasn't, at that time.

20  Q   Fair.

21  A   At that time, not until I was involved.

22  Q   You're supposed to be part of the takedown team, correct?

23  A   That's correct.

24  Q   So, you have to be in radio contact with them in order

25      to figure out when you're going to come and take them

```
 1          down, right?

 2   A      At that point I was.

 3   Q      Okay.  And they're in, I take it, various locations

 4          around Grant Street?

 5   A      Correct.

 6   Q      When the first vehicle arrives, the Chevy Traverse, that

 7          gentleman never gets out of the car, correct?

 8   A      As far as I know, correct.

 9   Q      The other gentleman you testified got out of the Subaru

10          and gets into the front passenger seat of the Traverse,

11          correct?

12   A      Correct.

13   Q      At that point in time based on the information you're

14          receiving from your other law enforcement, there is

15          nothing in that individual's hand, correct?

16   A      Correct.

17   Q      No bag, no backpack?

18   A      There was no indication to me that he was carrying

19          anything.

20   Q      And that would be significant during your investigation,

21          correct?

22   A      No, I don't think so.

23   Q      So, you plan to meet based on the CI's conversation with

24          one individual that is not Mr. Suggs, right?

25   A      That's correct, yes.
```

1    Q    And you say it wouldn't be important whether or not this

2         other individual who you identified as Mr. Suggs had

3         anything in his hand when he got into the Traverse?

4    A    That wouldn't have been important to me.  I mean it

5         would have been nice to know, but it wasn't that

6         important.

7    Q    At this point in time during the course of however long

8         this investigation has been going on, you had information

9         about another individual being a participant, correct?

10   A    As far as I know, Mr. Clark was supposed to be alone.

11   Q    You would agree with me that no one tells you when the

12        Subaru arrives at this location?

13   A    Correct.

14   Q    You would also agree that no one exits the Traverse in

15        an attempt to go meet with the confidential informant?

16   A    Correct.

17   Q    When the two individuals, one of them you've identified

18        as Mr. Suggs is taken out of the Traverse, he's secured,

19        correct?

20   A    Correct.

21   Q    At that point in time there is still nothing on him in

22        the way of any money or drugs, correct?

23   A    Correct.

24   Q    Mr. Clark is also secured, correct?

25   A    Correct.

| | | |
|---|---|---|
| 1 | Q | There is nothing observed, and I know that it was |
| 2 | | covered by Counsel, Judge, I won't belabor the issue, |
| 3 | | there was nothing observed inside of the Traverse, |
| 4 | | correct? |
| 5 | A | Inside of the Traverse, correct. |
| 6 | Q | There was nothing observed inside of the Subaru, correct? |
| 7 | A | There was a large amount of money that was seized from |
| 8 | | there at some point.  I don't know when it was observed. |
| 9 | Q | That's not my question. |
| 10 | | You were there, right? |
| 11 | A | Oh, yes, I was there. |
| 12 | Q | You didn't observe anything in the Subaru? |
| 13 | A | I did not. |
| 14 | Q | Did any of your fellow detectives or other law |
| 15 | | enforcement indicate to you at the scene that there was |
| 16 | | something located inside of the Subaru? |
| 17 | A | I don't think that it was at the scene.  I don't know. |
| 18 | Q | Again, do you recall if anything was said at the scene? |
| 19 | A | No, I don't recall. |
| 20 | Q | Nevertheless, despite Mr. Suggs not having any involvement |
| 21 | | in any of these conversations with the confidential |
| 22 | | informant, a decision was made to take him into custody? |
| 23 | A | There was. |
| 24 | Q | After he is taken into custody, a decision was then made |
| 25 | | to take the Subaru also, correct? |

42

```
 1    A    Correct.

 2    Q    And, again, just so we're clear, you didn't receive any

 3         information from anyone else on surveillance when that

 4         Subaru arrived on the scene, is that fair?

 5    A    That's fair.

 6    Q    Mr. Suggs didn't make any statements to you while in

 7         custody, did he?

 8    A    He said that the Subaru was not his.

 9    Q    And that was the only statement that he had made?

10    A    Yes, he didn't know whose it was.

11    Q    And, again, whatever was found in this hydraulic lift in

12         the Subaru was not visible to the naked eye, correct?

13    A    Right.

14              MR. GAMBURG:  That's all that I have, Judge.

15              THE COURT:  Redirect?

16              MR. ZUR:  Nothing, Your Honor.

17              No more witnesses.

18              THE COURT:  The Commonwealth rests?

19              MR. ZUR:  Yes, Your Honor.

20              THE COURT:  Argument?

21              MR. HABER:  Your Honor, my argument relates to

22         the 903, criminal conspiracy.  Mr. Clark is charged

23         with conspiracy with Mr. Suggs, I submit there is

24         no evidence, particularly in light of what we just

25         heard a few moments ago from the detective, that
```

1         there is no evidence of a conspiracy.

2              A conspiracy is a crime that there has to be

3         proof not only of an agreement but then some overt

4         act in furtherance thereof.  I submit that there's

5         no evidence of a conspiracy here.

6              Their theory seems to be, and I think that

7         there will be arguments that I can and will make

8         after today relative to Mr. Clark and the fact that

9         he was not involved in the A16 or A30 counts as

10        well, but I'll reserve argument on that for today,

11        but on the conspiracy, I would move to dismiss,

12        there's no evidence.

13             THE COURT:  Thank you.

14             MR. GAMBURG:  Your Honor, I'm going to move

15        for a discharge.  There's absolutely no evidence

16        whatsoever that Mr. Suggs was involved in any

17        conspiracy.  There's absolutely no evidence that

18        he had dominion and control over what was found in

19        that Subaru.

20             I, respectfully, Your Honor, I know that all

21        inferences are in favor of the Commonwealth at a

22        preliminary hearing, and I understand that we're

23        only at a prima facie case, but there is absolutely

24        no evidence on this record that the defendant knew

25        or should have known what was secured or secreted

1          in the tract of the car where the only statement

2          given at the scene was that, it is not my car.

3              Furthermore, Your Honor, the entire

4          investigation, however long it lasted including

5          the GPS, including the cell phone, including the

6          CI, including the detective at what he testified

7          to, everything indicated that this was a transaction

8          involving only one individual.

9              For whatever reason Mr. Suggs arrived up on

10         that scene, for whatever reason he got in the car,

11         that's the only inferences that we have favorable

12         for the Commonwealth at this level.

13             There are as many innocent explanations for

14         that as there are some nebulous conspiracy involving

15         Mr. Clark and Mr. Suggs.

16             So, based on the record that you have before

17         you, Your Honor, understanding that it's a very low

18         threshold, I would move for a discharge.

19             THE COURT:  Commonwealth.

20             MR. ZUR:  Yes, Your Honor.

21             My argument is only going to relate to the

22         threshold of a prima facie case, and what we have

23         here is evidence that Mr. Suggs and Mr. Clark are

24         both from Philadelphia, they're both in vehicles

25         with Philadelphia registration.

1             We know that Mr. Clark has a meeting set up

2       with the CI to meet on a particular day at a

3       particular location at a particular time.  We know

4       that Mr. Clark has 5 kilos of cocaine, which was

5       the agreed upon amount for the transaction in his

6       vehicle that he's driving.  We know that Mr. Suggs

7       exits a vehicle, the Subaru, which has 23 kilos of

8       cocaine in a similar tract in the car.  They're

9       both at the scene at the same time for the meet

10      with the CI, and based on the circumstantial

11      evidence we have here that they're together both

12      from outside of Pittsburgh, both in cars that both

13      have large amounts of cocaine hidden in the car, I

14      submit that for today's purposes, there certainly

15      is a prima facie case and they're both in a

16      conspiracy to deliver cocaine.

17            THE COURT:  Looking at the light most

18      favorable to the Commonwealth, we find that the

19      Commonwealth has established a prima facie case on

20      both defendants.

21  (Whereupon, the hearing concluded and the charges were held

22  for court.)

23

24

25

```
 1
 2                    C E R T I F I C A T E
 3
 4         I, Phyllis M. Machel, a Notary Public - Court
 5    Reporter for the Commonwealth of Pennsylvania, do
 6    hereby certify that the said hearing was taken at the
 7    time and place stated herein; and that the said
 8    hearing was recorded stenographically by me and then
 9    reduced to transcript form under my direction, and
10    constitutes a true record to the best of my ability
11    and belief of the testimony given at the time of the
12    hearing.
13
14                              _____
15                              Phyllis M. Machel
16
17
18
19
20
21
22
23
24
25
```