IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 19-134 |
| | ) | |
| TERRY SUGGS, JR. | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PRETRIAL RELEASE IN REBUTTABLE
PRESUMPTION CASE**

AND NOW, comes the United States of America, by and through Scott W. Brady, United

States Attorney for the Western District of Pennsylvania, and Rebecca L. Silinski, Assistant United

States Attorney for said District, and respectfully files the following Response in Opposition to

Defendant's Motion for Pretrial Release Rebuttable Presumption Case and Supplement thereto

(Doc. Nos. 146, 149) (collectively referred to as the "Motion").   As explained below, Mr. Suggs'

attempt to secure release, on review, is unconvincing, and the Court should deny his Motion.

I.      FACTUAL AND PROCEDURAL BACKGROUND

    A.      The Present Case

On April 19, 2019, a criminal complaint was filed, charging the defendant, Terry Suggs,

Jr., and his co-defendant, Jermaine Clark, with conspiracy to possess with intent to distribute

cocaine.   *See* Doc. No. 3.   On May 9, 2019, a federal grand jury returned a three-count

Indictment, charging Mr. Suggs and his co-defendant, Jermaine Clark, with conspiracy to

distribute and possess with intent to distribute a mixture and substance containing five (5)

kilograms or more of cocaine and 500 grams or more of methamphetamine (Count One) as well

with possession with intent to distribute the same at Counts Two (Clark) and Three (Suggs).   *See*

Doc. No. 19.   Each of these charges carries a mandatory minimum of ten (10) years'

imprisonment to a maximum of life; however, for a defendant with a prior conviction for a serious

drug felony or a serious violent felony, that is final, each of these charges carries a mandatory minimum of fifteen (15) years' imprisonment to a maximum of life.   *See* Doc. No. 20 (citing 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), and 841(b)(1)(A)(viii)).

On May 24, 2019, a detention hearing was held before the Honorable Cynthia Reed Eddy, Chief United States Magistrate Judge.   *See* Doc. No. 69 (Detention Hearing Transcript).   The United States Probation Office, Pretrial Services, prepared a full bond report and recommended detention.   Thereafter, Judge Eddy ordered Mr. Suggs detained pending trial.   *See* Doc. No. 52 (Order of Detention).   Consequently, Mr. Suggs has remained detained in the Allegheny County Jail ("ACJ"), on federal charges, since May 24, 2019.   He was initially arrested by local authorities, for the same conduct and has been detained at ACJ since February 25, 2019.   *See* Doc. 102, ¶ 1.   Approximately 578 days after he was ordered detained by Judge Eddy, and after having filed a motion for release due to COVID-19, which was denied, Mr. Suggs now seeks review of that Order.

In ordering Mr. Suggs' detention, Judge Eddy found that a rebuttable presumption existed, under 18 U.S.C. § 3142(e)(3), and that Mr. Suggs did not introduce sufficient evidence to rebut the presumption.   *See* Doc. No. 69, p. 20:12-15.   Pursuant to 18 U.S.C. § 3142(e)(1), the Court further held that the Government had shown by clear and convincing evidence that no condition or combination of conditions of release would reasonably assure the safety of any other person and the community.   *Id.*   Judge Eddy, in so ruling, considered the arguments made by counsel, the recommendation of the Probation Office, and factors to be considered, pursuant to 18 U.S.C. § 3142(g).

As to the nature and circumstances of the offense, this case involves a large quantity of narcotics – 23 kilograms of cocaine – which the Court considered "is a serious offense that poses

[a] threat to persons of the community if the Defendant were to be released." *Id.* at p. 21:3-7. The Court also "considered the weight of the evidence and the defense counsel's argument as to the weight of the evidence in light of the preliminary hearing in Allegheny County and the bond that had been set there." *Id*. at p. 21:8-11.   Specifically, the Court clarified: "I will note that a Federal Grand Jury has returned a true bill on the indictment, thus finding probable cause.   And I also note that the statutory characteristics that I must consider are different than those considerations that are imposed upon the judiciary of Pennsylvania." *Id.* at p. 21:11-16.[1]

As to Mr. Suggs' history and characteristics, the Court focused on his lack of any ties to the Western District of Pennsylvania, an extensive criminal history, including incurring new charges while on a form of supervision, lack of employment, and drug use.

As the Court noted, Mr. Suggs is a long-time resident of Pennsylvania, but, with ties to Philadelphia, and no ties to the Western District of Pennsylvania.   *See Id.* at p. 21:17-21.   Defense counsel noted, at the hearing, that Mr. Suggs' family ***could*** get an apartment for him in Allegheny County if the Court would have permitted him to remain on bond with conditions.   *See Id.* at. p. 11:20-25.   The Court did not find such arrangement suitable.

The Court also considered Mr. Suggs' criminal history.   *See Id.* at pp. 22-23.   Notably, this is not Mr. Suggs' first drug offense.   On August 31, 2006, Mr. Suggs was sentenced, in the Western District of Virginia, to thirty-seven (37) months' imprisonment and twenty-four (24) months' supervised release after entering into a plea agreement with the government on a drug conspiracy charge.   *United States v. Terrance Suggs,* Crim. No. DVAW304CR000047-003, Doc.

---

1.     Mr. Suggs again tries to argue that this Court should be guided by the decision made in Allegheny County; however, as Judge Eddy made clear, what occurred during and the considerations taken by the attorneys and judges during the proceedings in any of the state court proceedings have no bearing on this *federal* court's decision.

No. 1171 (W.D. Va. September 5, 2006).   Judge Eddy further noted that Mr. Suggs committed this offense "while Defendant was on bond."   Doc. No. 69, p. 22:16-18.   On May 23, 2007, Mr. Suggs was convicted on a guilty plea and sentenced to twelve (12) months' imprisonment and twenty-four (24) months' supervised released for making a threatening communication to a witness, which appears to be related to the previous case, and also was committed while Mr. Suggs was on bond for the previous offense.   *See* Doc. No. 69, p. 22:12-23:2.   Additionally, on September 9, 2015, Mr. Suggs was convicted for various DUIs, which resulted in a county prison sentence of two (2) days to six (6) months.

The Court also considered Mr. Suggs' employment history, "which is partially verified from the extent Defendant's sister said that he had employment with a transportation company." Doc. No. 69, p. 21:21-24.   Mr. Suggs does not have any verified employment history – indeed, a check of the PA Department of Labor and Industry Employment revealed no employment records on file.   During the detention hearing, the government presented evidence pertaining to Mr. Suggs' international travel.   Specifically, Special Agent Darcos Cruz, FBI, testified that in 2018, within a three-month period Mr. Suggs traveled to three (3) major hubs for cocaine trafficking: Montego Bay, Jamaica (February 16-19, 2018), and Los Cabos, Mexico (April 14-17, 2018), which are routes used to bring cocaine into the United States, as well as Cartagena, Colombia (May 2-8, 2018), which is a major hub for a source of cocaine.   *See* Doc. No. 69, p. 16:4-12.   As the Court noted, it considered Mr. Suggs international travel "with the caveat that we don't know for sure what the international travel was for."   *Id.* at p. 23:22-25.   Even so, the question remains, how was Mr. Suggs able to fund this international travel without a job?

On April 6, 2020, Mr. Suggs filed his Motion to be released from the ACJ to home detention based upon the *possibility* of him contracting COVID-19 and that he has "the very type

of underlying health issues that make him especially susceptible to this virus, i.e. asthma and diabetes." Doc. No. 102 at ¶ 12. The government responded to Mr. Suggs' Motion, opposing the requested relief. *See* Doc. No. 110. Consistent with this Court's Order (Doc. No. 46), undersigned counsel consulted with the U.S. Probation Office, to obtain its position as to Mr. Suggs's Motion. The Probation Office stands by its original recommendation of detention, finding no condition or combination of conditions could reasonably assure the presence of the defendant and the safety of the community. Specifically, the Probation Office provided the following statement to the parties, by email:

> Pretrial Services prepared a full bond report on Mr. Suggs on May 23, 2019, recommending detention. On May 24, 2019, after a full hearing before Chief U.S. Magistrate Judge Cynthia Reed Eddy, the defendant was ordered detained. Pretrial Services has not received any information that would substantially change information contained in the Pretrial Services report originally prepared. Consequently, Pretrial Services maintains our recommendation of detention. It is noted that Pretrial Services officers are not uniquely qualified to make clinical assessments, evaluate an "at risk" population based on health concerns, or make recommendations to the Court on health assessments.

The Court denied Mr. Suggs' Motion. *See* Doc. Nos. 110, 111.

Since then, additional briefing has been submitted to the Court relating to motions to suppress and a status conference is scheduled for January 28, 2021, regarding said motions.

### B.   COVID-19 and the Community

The ACJ issued a COVID-19 alert on its webpage, which, as of the filing of the present response, reads as follows:

> **Our Response**
>
> The Bureau of Corrections is charged with providing for the care, custody and control of persons committed to the Allegheny County Jail. Confined areas present challenges when it comes to mitigation and elimination of the spread of illness or disease, and COVID-19 is no exception.

At the jail, we continue to follow the guidance of our health officials. People are wearing masks, washing their hands and remaining physically distanced. We're testing when appropriate. Positive cases are isolated. We perform contact tracing and quarantine those individuals. We have consistent cleaning of the environment. Ongoing screenings include temperature checks and queries about symptoms of all employees and contractors. Visitation restrictions, while difficult for everyone, are limiting the number of people who interaction with the inmates and reducing the chance of spread. Our healthcare staff and key personnel working directly with those who are isolated or quarantined due to COVID were among the very first employees in the county to be vaccinated. We continue to enforce and reinforce all recommendations and these measures have been upheld by our hardworking, essential employees and dedicated staff. They work continuously to ensure the safe management of this facility and all those who are in it.

The Allegheny County Jail is not alone in seeing an increase in cases. Across Pennsylvania, correctional institutions have been hit particularly hard by COVID-19, with the number of positives inmates jumping since Thanksgiving. Likewise, this region has seen increased cases beginning in November through today.

Healthcare and other personnel at the Allegheny County Jail were among the first employees in the county to begin receiving the COVID-19 vaccine. To date, the facility has held three vaccine clinics and a total of 224 employees have been vaccinated, including healthcare, correctional staff, and other direct care essential employees on all three shifts.

The health, safety and welfare of the inmates and our staff remains our biggest priority. We are deeply indebted to, and salute, our healthcare and corrections staff who are working tirelessly to care for those in our custody. We recognize the commitment, dedication and sacrifices that represents, and remain grateful for everything that they do.

https://www.alleghenycounty.us/jail/index.aspx (last visited January 26, 2021).    Also reported on the ACJ website, regarding the number of cases at the ACJ, is the following information pertaining to the number of positive COVID-19 cases"

| COVID-19 Testing at ACJ (As of 1/24/2021) Totals are Cumulative | | | | | | |
|---|---|---|---|---|---|---|
| | Tested* | Positive | Negative | Pending | Number of COVID-19 Positive Inmates in Facility | Released/ Recovered | Number of COVID-19 Related Hospitalizations |
| Inmates | 1339 | 123 | 1190 | 18 | 0 | 123 | 0 |

**

| COVID-19 Staff Testing at ACJ (As of 1/24/2021) Totals are Cumulative | | | | | |
|---|---|---|---|---|---|
| | Tested | Positive | Negative | Pending | Recovered |
| Staff | 289 | 102 | 187 | 1 | 96 |

*Id.* The government recognizes that in early December 2020, there was an outbreak of COVID-19 at the ACJ. *See* https://www.wpxi.com/news/top-stories/covid-19-outbreaks-reported-allegheny-county-jail-westmoreland-prison/Q2UWCXCVPRF2JKLUUBA3GK2TWI/ (last accessed January 26, 2021).

As of January 25, 2021, there are 807,867 total cases of COVID-19 in Pennsylvania, 53,630 of which are confirmed positive cases in Allegheny County and 98,625 of which are confirmed positive cases in Philadelphia County. *See* https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx; https://www.health.pa.gov/topics/Documents/Diseases%20and%20Conditions/COVID-19%20County%20Data/County%20Case%20Counts_1-25-2021.pdf (last visited January 26, 2021).

## II.    LEGAL STANDARD

Title 18, United States Code, Section 3142 provides that upon the appearance of a defendant before a judicial officer, the judicial officer shall issue an order directing either pretrial release of a defendant (with conditions (§ 3142(c)) or without (§ 3142(b))), or detention if the judge determines that no condition or combination of conditions will reasonably assure the appearance of the person as required or the safety of any other person or the community. 18 U.S.C. § 3142(a)-(f).

Where, as here, a defendant is charged with an offense for which there is a maximum term of imprisonment of ten years or more per the Controlled Substances Act, "[s]ubject to rebuttal by the [defendant], it *shall be presumed* that that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."   18 U.S.C. § 3142(e)(3)(A) (emphasis added).

Title 18, United States Code, Section 3142(g) sets forth a list of factors to be considered in determining whether there are conditions of release that will reasonably assure the appearance of the defendant as required and the safety of any other individual and the community: (1) the nature and circumstances of the offense charged and whether the offense is a crime involving a controlled substance; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, and criminal history; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's pretrial release.

The Government bears the burden of persuasion to show risk of flight by a preponderance of the evidence (*United States v. Kulkowski*, Criminal Action Nos. 15-19, 15-22, 2015 WL

1445042, at *2 (W.D. Pa. Mar. 30, 2015) (*citing United States v. Himler*, 797 F.2d 156, 161 (3d

Cir. 1986)), and/or dangerousness by clear and convincing evidence (18 U.S.C. § 3142(f)(2)(B)).

A defendant may rebut the presumption by presenting "some credible evidence" that he

will not pose a threat to the community upon his release. *United States v. Carbone*, 793 F.2d 559,

560 (3d Cir. 1986).  It can however, be a "tall order" to rebut the presumption when there are

allegations of a serious drug crime.  *United States v. Burnett*, 2019 WL 109333, at *6 (W.D. Pa.

Jan. 4, 2019).

If a magistrate judge issues an order of detention, the defendant may request review of the

order of detention by the court having original jurisdiction over the offense, that is, the district

court.  18 U.S.C. § 3145(b).  In conducting its review of the motion, the district court applies a

*de novo* standard of review.  *See United States v. Delker*, 757 F.2d 1390, 1394-95 (3d Cir. 1985);

*United States v. Oliver*, No. 16-40, 2016 WL 1746853, at *4 (W.D. Pa. May 3, 2016).

## III.   ARGUMENT

The factors in 18 U.S.C. § 3142(g), which Chief Magistrate Judge Eddy considered in

rendering her decision, still counsel in favor of Mr. Suggs' pre-trial detention.

### A.   The Nature and Circumstance of the Present Offense

Mr. Suggs argues that he should be released pending trial because the present offense does

not involve a crime of violence, sex trafficking, terrorism, or the use of firearms.  *See* Doc. No.

146, ¶ 14(a).  The Court determined that the offense for which the defendant has been charged is

one of the specified crimes of the Bail Reform Act and, thus, gives rise to the presumption of

detention.  *See* 18 U.S.C. § 3142(e) ("it shall be presumed that no condition or combination of

conditions will reasonably assure…the safety of the community").  Specifically, Chief Magistrate

Judge Eddy further held that "[t]he offense charges is a serious offense that poses threat to persons of the community if the Defendant were to be released."   TR p. 22: 3-7.

As this Court is well-aware, drug trafficking continues to present a substantial risk of danger to the community, even when considered apart from the corresponding risk of violence it generates.   "The statutory language, as well as the legislative history [of the Bail Reform Act], unequivocally establishes that Congress intended to equate traffic in drugs with a danger to the community."   *United States v. Strong*, 775 F.2d 504, 506 (3d Cir. 1985); *see also United States v. Atkins,* 2015 WL 4920831, at *7 (W.D. Pa. 2015) (explaining, in addressing a bond motion, that "[d]rug trafficking certainly poses a substantial risk of harm to the community"); *United States v. Oliver*, Criminal No. 16-40, 2016 WL 1746853, at *8 (W.D. Pa. May 3, 2016) ("Drug trafficking certainly poses a substantial risk of harm to the community, particularly the trafficking of significant quantities of very dangerous and addictive drugs like heroin and cocaine.") (citations and quotations omitted).

Additionally, many federal drug trafficking defendants present a substantial risk of recidivism if released on bond because many are not first-time offenders.   "It is well known that drug trafficking is carried on to an unusual degree by persons engaged in continuing patterns of criminal activity.   Persons charged with major drug felonies are often in the business of importing or distributing dangerous drugs, and, thus, because of the nature of the criminal activity with which they are charged, they pose a significant risk of pretrial recidivism." *Strong*, 775 F.2d at 507 (quoting S.Rep. No.225, 98th Cong., 2d Sess. 20); *see also United States Cymbalak*, Case No. 2:19-cr-00273-WSS, Doc. 33, p. 8 (W.D. Pa. Nov. 14, 2019) (finding, relative to a drug trafficking defendant, "little reason to accept Defendant's contention that his behavior going forward would be different" if released on bond).   Here, as will be discussed more fully below, Mr. Suggs is not

a first-time offender, nor is he a first-time federal drug offender.

In addition to facing a 10-year mandatory minimum sentence, Mr. Suggs' prior criminal conviction is likely to make him eligible for the filing of an information under 21 U.S.C. § 851, increasing the mandatory minimum sentence to 15 years.

This factor weighs in support of detention.

### B.    The Weight of the Evidence Against the Defendant

Mr. Suggs argues that he should be released on pre-trial bond because "the evidence presented thus far . . . has been meager, attenuated and highly circumstantial."   Doc. No. 146, ¶ 13(a).   Mr. Suggs' argument, however, continues to ignore the fact that a grand jury indicted him, and thus there is probable cause to believe that he has committed the offense.   It is not the purpose of a detention hearing for the government to try the case before the magistrate judge. *United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986) ("Our holding that the indictment is sufficient to support a finding of probable cause triggering the rebuttable presumption of dangerousness under § 3142(e) is in accord with the unanimous position of the other circuits that have reached the issue.").   The government did, however, present additional evidence at the detention hearing relevant to the issue of detention.

This factor weighs in support of detention.

### C.    The History and Characteristics of the Defendant

Chief Magistrate Judge Eddy considered a number of factors related to Mr. Suggs' history and characteristics as referenced in Section 3142(g)(3), which continue to counsel in favor of Mr. Suggs' pre-trial detention and are detailed more fully in the Factual Background of this Motion and incorporated herein by reference.   In short, Mr. Suggs' prior criminal history, lack of verified employment, lack of a high school diploma or GED, lack of ties to the Western District of

Pennsylvania and lack of substantial ties to the Eastern District of Pennsylvania, and prior drug use all counsel in favor of detention.  In his Motion, Mr. Suggs focuses on his prior criminal history, physical health and COVID-19, as well as his ties to the community as a basis for this Court to revoke the Order of Detention.

### 1.      Prior Criminal History

Mr. Suggs, age 36, has had several encounters with the law – his first adult arrest occurred at the age of 18 and his criminal history has spanned across four (4) separate jurisdictions, including both the state and federal judicial systems.  Further, Mr. Suggs' prior offenses do involve violence (kidnapping and witness retaliation) as well as a firearm, as discussed more fully below.

Specifically, Mr. Suggs takes issue with two aspects of the Court's consideration of his prior criminal history in ordering his pre-trial detention: 1) whether the court properly considered certain prior convictions (petty larceny, misdemeanor obstructing an officer, and misdemeanor DUIs) and 2) whether he committed additional criminal activity while on supervision or violated the terms of his probation, parole or supervised release.

As a preliminary matter, for ease of reference, the government has distilled Mr. Suggs' criminal history into the following list, which was referenced by the Court, at the hearing, and identified in the Bond Report:

| Arrest Date | Age at Arrest | Jurisdiction | Offense of Conviction | Sentence Date | Sentence |
| --- | --- | --- | --- | --- | --- |
| August 15, 2002 | 18 | Fairfax County, VA | Petit Larceny (M) | October 8, 2002 | 12 months' confinement, 8 months suspended, unsupervised probation |

| March 30, 2005 | 20 | VA (federal) | Felony Narcotics<br><br>Felony Racketeering | August 31, 2006 | 37 months' confinement, 2 years' supervised release |
| --- | --- | --- | --- | --- | --- |
| March 19, 2007 | 22 | VA (federal) | Felony Retaliating Against Witness, Victim | May 23, 2007 | 12 months' confinement to be served consecutive to any other state or federal sentence and 2 years' supervised release |
| October 20, 2012 | 28 | Daytona Beach, FL | Obstruct Officer without Violence (M) | May 1, 2014 | Fines and costs |
| March 17, 2014 | 29 | Philadelphia Police, PA | DUI (4 counts) | September 8, 2015 | 6 months' confinement with time served |

Chief Magistrate Judge Eddy considered Mr. Suggs' criminal history, taking care to clarify that she would not consider certain offenses, stating "I note that the Defendant had several juvenile offenses, none of which being felonies.   And I did not consider the juvenile offenses in making my decision, nor do I consider any dismissed offenses."   Doc. No. 69 (Det. Hearing Transcript), p 22:3-6.

Mr. Suggs argues, however, that the government "inappropriately" relies upon prior convictions for petty larceny, misdemeanor obstruction, and a misdemeanor DUI, "in asserting a basis for this factor."   *Doc.* 146, ¶ 13 (b).   As a preliminary matter, the citation to the detention hearing transcript – pg. 22-23 – is a citation to the Court's decision, not the government's argument.   Even so, the government avers that there is nothing "inappropriate" about the Court

considering the defendant's 2002 petty larceny conviction, his 2014 obstructing an officer conviction, or his convictions for four (4) misdemeanor DUIs in 2015, which are listed above.

In support of his position, Mr. Suggs cites to the decision in *United States v. Himler*, 797 F. 2d 156, 160 (3d Cir. 1986). It appears, however, that the defendant misapprehends that decision and its application. In *Himler,* the defendant was charged by criminal complaint with "the production of a false identification document, namely, an international driving permit." *Id.* at 158. That is, Himler was *not* charged with one of the enumerated offenses in Section 3142(f). The Third Circuit, on review, determined that Himler was not within the "small but identifiable group of particularly dangerous defendants" for whom Congress authorized pretrial detention. *Id.* at 160. Further, the Third Circuit explained, "[i]n a nutshell, a detention hearing, *i.e.,* for considering detention as opposed to setting conditions of release, may be held upon an appropriate motion in a case involving . . . a federal narcotics offense with a potential sentence of ten years or more". *Id.* at 159.

Here, that is precisely the case. Mr. Suggs *is* within the category of "particularly dangerous defendants" for whom it is presumed there is no condition or combination of conditions that will reasonably assure the appearance of the defendant and the safety of the community. *Himler,* 797 F. 2d at 160. The Court clearly articulated that this is a "presumption case[]" and government counsel further explained that it is a presumption case because "pursuant to the Bail Reform Act . . . both defendants have been charged with a violation of the Controlled Substance Act, which carries a maximum penalty of ten years or more." Doc. No. 69, p. 7:19-24; *see also* Doc. No. 29 (Request for Detention). Thus, the scenario in *Himler* is wholly distinct from the instant case. Now, whether those convictions, Mr. Suggs takes issue with, will be considered

"prior convictions" in establishing Mr. Suggs' criminal history category, under the United States Sentencing Commission Guidelines, is another matter.

Additionally, Mr. Suggs argues that he has not committed any criminal activity while on probation, parole or supervision.   *See Id.* at ¶¶ 13 (d), (e).   As reflected in the Bond Report, Mr. Suggs was arrested on March 15, 2005, for possession of a controlled substance.   Mr. Suggs posted bail on March 16, 2005.   Then, on March 30, 2005, while on bail, Mr. Suggs was arrested for federal drug trafficking-related charges out of the Western District of Virginia.

In reviewing the docket and related documents on the Western District of Virginia's PACER site, undersigned counsel notes for the Court that the timeframe charged in the Superseding Indictment in the WD Va. Case, alleges "[f]rom in or about sometime in 1995, up through and including the return of the date of this Superseding Indictment", which is February 16, 2005. *United States v. Terry Suggs, Jr., aka, Terry Kenny Moore, aka, T.Y.,* Crim. No. 3:04-cr-47, Doc. No. 213-1 (W.D. Va. Feb. 16, 2005).   Thus, the offense conduct forming the basis for that federal charge, did not occur while the defendant was on bail for the March 15, 2005 arrest. He did, of course, incur these new charges while he was on bail.

In reviewing his prior federal offense, undersigned counsel also noted that on April 6, 2006, a change of plea hearing was held related to the federal drug charges.   Mr. Suggs entered into a plea agreement with the government, which states in part:

> I will enter a plea of guilty to Count One of the First Superseding Indictment, charging me with a narcotics conspiracy.  Specifically, I am pleading guilty to the lesser included charge that relates to my conduct in this criminal enterprise, which is a conspiracy to distribute, and possess with the intent to distribute fifty pounds of marijuana.  I also agree that an enhancement is applicable to my sentencing guideline range because a firearm was possessed and discharged during my participation in the conspiracy.  In addition to the penalties set forth above, I understand that fees may be imposed to pay for incarceration or supervised release and that there will be a $100 special assessment per felony count of conviction.

Crim. No. 3:04-cr-47, Doc. No. 926, p. 2.   Noting the use of a firearm, undersigned counsel also located, on the public docket, the factual basis for the offense, which was presented by the government in that case.   In it, the government described Mr. Suggs and his co-defendants' efforts to engage in a "firestorm of violence", including use of a firearm by one of his close co-defendants, "kidnaping", as well as "left a series of threatening messages . . . on the cellular telephone voicemail":

> On March 9, 2004, Johns sent 50 pounds of marijuana to Charlottesville with defendant, who drove it down in a rental car.  When defendant arrived in Charlottesville, he gave the marijuana to Banks.  Banks then brought 15 or 20 pounds of the marijuana to a hotel where Louis Bryant and defendant were waiting.  Defendant packaged some of that marijuana, and Banks took the rest to his residence in Charlottesville.  Banks showed the marijuana to several friends, including Robert Pryor, aka "Face."  Banks left the marijuana in the trunk of his car for a period of time. Pryor broke into Banks' trunk and stole the remaining marijuana, approximately 35 pounds.
>
> Pryor's theft of the marijuana generated a firestorm of violence that are documented in several racketeering acts in the Superseding Indictment that has been returned in this case.  Banks quickly reported the theft to defendant and Bryant as soon as he discovered it.  Bryant obtained a firearm and immediately went to Banks' apartment to confront those who had seen the marijuana.  Bryant who was with defendant, threatened Banks, Leon Wilson, Brandon Scott, and Curtis Johnson, with the firearm inside Banks' apartment.  Bryant and defendant then directed Banks, Wilson, and Johnson, to accompany them as they searched for Robert Pryor and the missing marijuana.  Bryant directed Wilson to drive to various locations in Charlottesville, searching for Pryor.  Bryant was armed with the gun the entire time, and he used it to threaten and intimidate the men in the car.  He fired one shot out the car window, declaring that the next one would be fired into one of the passengers if he didn't find the missing marijuana.
>
> Bryant and defendant eventually took Banks, Wilson, and Johnson, back to the hotel room they had rented through Bryant's sister.  Bryant prevented Banks, Wilson, and Johnson, from leaving, as he still had not located Pryor or the missing marijuana.  Bryant and defendant eventually learned that Pryor had left town, solidifying their suspicion that he stole the marijuana.  They let Banks, Wilson and Johnson, go sometime on the afternoon of March 11.

1

The termination of the kidnaping did not end Bryant and defendant's pursuit of Robert Pryor. Often accompanied by Jonathan Banks, Bryant and defendant confronted family members and friends of Robert Pryor. Richard Johns, a co-defendant in this matter, came to Charlottesville to assist in the effort to locate Pryor and retrieve the missing marijuana. He brought several other men from Philadelphia. Bryant, defendant, Johns and the others searched for Pryor without success for weeks after the marijuana theft.

Robert Pryor lived on Orangedale Avenue in Charlottesville. On one occasion, shots were fired at Pryor's family's house. Bryant, Johns, and defendant, also left a series of threatening messages on Pryor's cellular telephone voicemail.

*See Id.* at Doc. No. 925.   Mr. Suggs was sentenced on September 5, 2006, to 37 months followed by 2 years of supervised release.   *See Id.* at Doc. No. 1171.

Now, separate and apart from the retaliation above, the government also reviewed the docket and related documents regarding Mr. Suggs' 2007 charge and subsequent conviction for federal felony retaliating against a witness.   In that case, a federal grand jury returned a one-count Indictment against Mr. Suggs on February 7, 2007, charging:

```
         That on or between November, 2006, and continuing up until
    the return of this Indictment, in the Western Judicial District
    of Virginia, the defendant, TERRY KENNY SUGGS, JR., also known as
    "TERRY KENNY MOORE" and "T.Y.", knowingly threatened to engage in
    conduct to cause bodily injury to Yah Yah Veney and or the family
    of Yah Yah Veney, with the intent to retaliate against Veney for
    information Veney provided to law enforcement officers regarding
    violations of federal offenses.
```

*United States v. Terry Suggs, Jr., aka, Terry Kenny Moore, aka, T.Y.,* Crim. No. 3:07-cr-06, Doc. No. 1. (W.D. Va. Feb. 7, 2007).   In a pleading to the Court, requesting joinder of Mr. Suggs' case with another defendant charged with the same offense, which the Court granted, the United States represented that Mr. Suggs and another individual were "both involved with the same gang and

threatened Yah Yah Veney on several occasions between December, 2006 and February, 2007 after learning of his cooperation with federal authorities while all three men were housed in the Central Virginia Regional Jail at Orange, Virginia."   *Id.* at Doc. No. 17.   Thereafter, on May 23, 2007, Mr. Suggs entered into a plea agreement with the government, and pled guilty to this offense. *See Id.* at Doc. No. 32 (Plea Agreement).   Mr. Suggs was sentenced on the same date.   *See Id.* at Doc. No. 34 (Judgment).   The government does not dispute that Mr. Suggs was physically in custody when this offense occurred; and, thus, he was not on parole, probation, or supervised release.

Mr. Suggs was, however, being "supervised" – he was serving a term of imprisonment under the direct supervision of the Central Virginia Regional Jail.   This was not, as Mr. Suggs would have the Court believe, "the result of tension between two incarcerated individuals."   Doc. No. 146, ¶ 13(d).   Mr. Suggs' actions were directed against an individual who cooperated with federal authorities in their prosecution.   Here, as the Court is aware, there also is a witness who is cooperating with federal authorities.   Even if the parties were aware at the time of detention hearing that Mr. Suggs was in custody when he committed this offense and not out on bond, the government would still argue that this conviction supports a finding that Mr. Suggs poses a danger to the community period – including if he were released pending trial.   After all, he had the audacity to commit this crime while serving a term of imprisonment, under the nose of law enforcement.

### 2.    Physical Health and COVID-19

Mr. Suggs also argues that his physical health, including Type II Diabetes and high blood pressure, in conjunction with COVID-19, should be considered by the Court as a factor favoring release.   He attaches a two-page letter from Ms. Marie Pierre, who has been "great friends for 15

years" with Mr. Suggs, who largely discusses her experiences with COVID-19 as a nurse practioner. *See* Doc. No. 146-3 (Exhibit C). Understandably, she expresses her concerns for Mr. Suggs' health and well-being. Ms. Pierre notes that she "is confident that the prison system is taking all possible measures to keep Mr. Suggs safe and healthy" but still has concerns that nursing homes and prisons can make it difficult to contain the virus. *Id.* The government recognizes that there was an outbreak at ACJ. Mr. Suggs does not allege that he was exposed to the virus or that he contracted the virus. Further, Mr. Suggs has not alleged that he is unable to engage in self-care, obtain medications or otherwise have access to health-care while he is in custody. Thus, for the reasons set forth herein and articulated in the government's response (Doc. No. 110), Mr. Suggs physical health does not present a compelling reason for release.

COVID-19 is, as the defendant acknowledges, spreading in the United States far more rampantly than it was in April of 2020, in all communities. Even if the Mr. Suggs is at an increased risk of contracting the disease (because of his health concerns), that does not outweigh the original reasons for detention. *See,, e.g.*, *Crute*, 19-cr-299, Doc. No. 37, at 3 ("Crute's current arguments for release do not outweigh the factors considered by Magistrate Judge Kelly in ordering his detention."); *Jones*, 19-cr-249, Doc. No. 50, at 6 ("given the Court's finding that no condition or combination of conditions will reasonably assure the safety of the community if Defendant were released, the Motion to Reconsider Detention Order will be denied"); *Jackson*, 18-cr-216, Doc. No. 237, at 4 ("although Defendant's health conditions rightfully are of concern, and the COVID-19 pandemic is, as the Government describes, extraordinary, these factors do not outweigh the factors discussed above and considered initially by Magistrate Judge Mitchell in ordering that Defendant continue to be detained"); *Harris*, 18-cr-152, Doc. No. 986, at 5 ("while Defendant's health conditions are of concern, and the pandemic of COVID-19 is, as the

Government appropriately describes, extraordinary, these factors do not outweigh the factors discussed and addressed by both Magistrate Judge Kelly and this Court findings that detention was, and remains, warranted").   While the government is aware of the risks with COVID-19 and certainly sensitive to Mr. Suggs' concerns, Mr. Suggs track record suggests that releasing him into the community is particularly dangerous because by his actions he has demonstrated that he is not someone who is going to readily follow the rules.

This factor does not weigh in favor of release.

### 3.    Community Ties

Mr. Suggs' argues that he should be released on bond because he has been a life-long resident of Pennsylvania, specifically, Philadelphia.   *See* Doc. No. 146, ¶ 14(b).   Mr. Suggs has provided the Court with a letter from one of his friends.   The government appreciates Ms. Pierre's letter to the Court but this *one* letter, written to the Court nearly two years' after the offense and his initial arrest occurred, is hardly the type of evidence sufficient to rebut the presumption. Further, Mr. Suggs had a high volume of international travel to locations that a veteran narcotics investigator classified as three (3) major hubs for cocaine trafficking.   In sum, ties to the community are an important factor but just one of the many factors for the Court to consider. Here, Mr. Suggs' alleged ties to the community, to-date, have not stopped him from engaging in criminal activity across four (4) jurisdictions, including in Philadelphia.

In sum, when considering Mr. Suggs' history and characteristics, this factor weighs in support of detention.

### D.    The nature and seriousness of the danger to any person or the community that would be posed by the defendant's pretrial release

The government will not belabor the arguments already set forth herein, which are incorporated by reference, pertaining to the danger Mr. Suggs presents to the community if he

were released on pretrial release.  Mr. Suggs did not present at the detention hearing over a year and a half ago any evidence, let alone "some credible evidence", to rebut the presumption that he is a danger to the community nor has he done so now.

This factor weighs in support of detention.

**IV.    CONCLUSION**

For pretrial detention, the lack of reasonable assurance of either the Defendant's appearance or the safety of the community is sufficient; both are not required.  *See* 18 U.S.C. § 3142(b).  Nonetheless, the United States avers that it has met the burden of proof for both. The United States has demonstrated, by clear and convincing evidence, that the Defendant poses a danger to the community and, by a preponderance of evidence, that the Defendant poses a risk of flight.  Thus, for the reasons set forth herein, the government respectfully requests that this Honorable Court deny the Defendant's Motion and affirm Chief Magistrate Judge Eddy's order of detention.

Respectfully submitted,

SCOTT W. BRADY
United States Attorney

*/s/ Rebecca L. Silinski*
REBECCA L. SILINSKI
Assistant United States Attorney
PA ID No. 320774