IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,

      Plaintiff,

         vs.

TERRY SUGGS, JR.,

      Defendant.

Criminal Action

No. 19-134-2

_____


    Transcript of SUPPRESSION HEARING proceedings recorded on Wednesday, May 5, 2021, in the United States District Court, 700 Grant Street, Pittsburgh, Pennsylvania, before The Hon. Joy Flowers Conti, United States District Judge


APPEARANCES:

For the Government:         Rebecca L. Silinski, Esq.
                          United States Attorney's Office
                          700 Grant Street, Ste. 4000
                          Pittsburgh, PA  15219


For the Defendant:         G. William Bills, Jr., Esq.
                          1601 Frick Building
                          Pittsburgh, PA  15219

                          Samir Sarna, Esq.
                          Worgul, Sarna & Ness, Criminal
                            Defense Attorneys, LLC
                          429 Fourth Avenue, Ste. 1700
                          Pittsburgh, PA  15219


Court Reporter:             Deborah Rowe, RMR, CRR
                          700 Grant Street, Ste. 5300
                          Pittsburgh, PA  15219
                          (412) 471-2510


Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription

1                     P R O C E E D I N G S

2                            - - -

3              (11:10 a.m.; in open court, Defendant present with

4     counsel:)

5              THE COURT:  It's nice to be back in person and to

6     see everybody.  So at this time we are here for the purpose

7     of a suppression hearing in the United States versus Terry

8     Suggs, Jr., Criminal No. 19-134.  Will counsel for the

9     Government please enter your appearance?

10             MS. SILINSKI:  Yes, Your Honor.  Assistant United

11    States Attorney Rebecca Silinski, appearing on behalf of the

12    Government.

13             THE COURT:  Will counsel for the Defendant please

14    enter your appearance?

15             MR. BILLS:  George Bills for Terry Suggs, and

16    co-counsel will introduce himself.

17             MR. SARNA:  Good morning, Your Honor.  May it

18    please the Court, Samir Sarna also on behalf of Mr. Suggs

19    today.

20             THE COURT:  Okay.

21             MR. BILLS:  Because we have two counsel here and

22    there are two actually separate motions, one is a

23    suppression, the second is the Franks v. Delaware, I will be

24    doing the lead cross on the Detective.  And I will handle all

25    of the questioning --

1          THE COURT:  On the suppression -- I mean on the --

2          MR. BILLS:  -- on the arrest, and Mr. Sarna will

3     then handle however he wishes on the Franks v. Delaware with

4     the Court's permission.

5          THE COURT:  That's fine.

6          MR. BILLS:  Thank you.

7          THE COURT:  Is there any objection?

8          MS. SILINSKI:  No, Your Honor.  I think initially

9     though Mr. Sarna will need to establish that there is an

10    actual basis for us to go into --

11         THE COURT:  Yes.  He'll have to do that.

12         MS. SILINSKI:  Sure.  Correct.

13         THE COURT:  He'll make those arguments.

14         MS. SILINSKI:  With that, Your Honor, no.

15         THE COURT:  I just want to be clear for the record

16    that the court is now open.  The public is able to come in

17    here.  You know, they do have to wear a mask and be checked

18    for their temperature and that type of thing.  But we are

19    open.  This is an open hearing.

20         And at this time then I just wanted to review with

21    the parties the general law that the Court will be applying

22    in this case and note the arguments that have been raised by

23    the Defendant.

24         The way the Court handles these kinds of

25    proceedings when we have an evidentiary hearing, and one is

1    required here because of the nature of the suppression

2    claims, the issues will be dealt with by having a transcript

3    ordered at the joint cost of the parties.  And then the

4    parties will simultaneously file proposed findings of fact

5    and conclusions of law, and we'll just have to determine

6    what's the appropriate time for that, how much time does

7    counsel need after they receive the transcript to do that.

8            So I don't know that we'll need any concluding

9    arguments on the matter.  If there's some preliminary

10   argument that the parties wish to make, you may do so, but

11   I'm going to just first review the general legal issues that

12   are involved.

13           At suppression hearing the Court may rely on

14   hearsay and other evidence even though the evidence would not

15   be admissible in trial.  United States versus Raddatz, 447

16   U.S. 667, 1980.

17           The issues raised here with respect to the

18   suppression involve warrantless searches.  Typically the

19   burden on the suppression hearing would initially be on a

20   Defendant who's seeking to suppress the evidence.  United

21   States versus Johnson, 63 F.3d 242, Third Circuit 1995.

22           Here, the defense has raised the issue of

23   warrantless searches, both of a car, a vehicle, and the

24   arrest of the Defendant.  So there's two warrantless -- one

25   was a search and one was the arrest.  So I think the

1   Government doesn't dispute that.

2           MS. SILINSKI:  Your Honor, I would just note that

3   there was a warrant for the vehicles to be searched.  The

4   vehicle --

5           THE COURT:  Now, the question is of the seizure of

6   the vehicle --

7           MS. SILINSKI:  Yes, ma'am.

8           THE COURT:  -- and whether there was a warrant for

9   that.

10          MS. SILINSKI:  Yes, ma'am.  That's correct.

11          THE COURT:  And there was an actual search.  There

12  was a warrant, and that's some of the issues for the Franks

13  hearing.

14          MS. SILINSKI:  Yes, ma'am.

15          THE COURT:  So what we're concerned about is the

16  initial seizure of the vehicle, the towing of the vehicle.

17  So that was without a warrant.

18          MS. SILINSKI:  Correct.  Yes, Your Honor.

19          THE COURT:  And his arrest, the Defendant's arrest,

20  was without a warrant.

21          MR. SILINSKI:  Correct, Your Honor.

22          THE COURT:  So at least as to those two aspects,

23  the burden shifts to the Government.  And the Government's

24  burden at this time when you're dealing with a warrantless

25  search arises under the Fourth Amendment.

1           The Supreme Court in Horton versus California, 496

2    U.S. 128, 1990, found that warrantless searches are

3    presumptively unreasonable, subject to certain specifically

4    established and well-delineated exceptions.  In the context

5    of a motion to suppress evidence obtained in connection with

6    a warrantless search, the Government bears the burden to

7    prove by a preponderance of the evidence that the disputed

8    search falls within one of the recognized exceptions to the

9    warrant requirement; United States versus Johnson, 65 F.3d

10   242, Third Circuit, 1995.

11          Any evidence obtained in connection with an illegal

12   search must be suppressed as fruit of the poisonous tree,

13   United States versus Brown, 448 F.3d 239, Third Circuit,

14   2006.

15          Here, when you have the arrest of an individual,

16   the issues are going to be whether there was probable cause

17   for the arrest.  With respect to the exceptions, the Court

18   understands there might be at least two, maybe more -- the

19   Government will have to articulate that -- exceptions, and

20   one would be a search incident to arrest exception and the

21   automobile exception.  I don't know if there's any others

22   that the Government is articulating at this time.

23          But there's really -- as I said, on the motion to

24   suppress evidence, the issues raised by the Defendant are,

25   first, that his arrest on February 25, 2019, on Grant Street

1  in North Braddock, Pennsylvania, was without probable cause.

2  The second issue is that law enforcement did not have

3  probable cause to seize the Subaru from Grant Street

4  following his arrest.  So those are the two issues raised in

5  the suppression.

6  With respect to a Franks hearing, the defense is

7  arguing that law enforcement recklessly omitted material

8  information from the affidavit of probable cause upon which

9  it relied to obtain a search warrant for the Subaru.

10  Under Franks versus Delaware, 438 U.S. 154, 1978,

11  the Supreme Court held that when a warrant is obtained based

12  upon a false statement made in a supporting affidavit, the

13  fruits of the search warrant must be excluded if the

14  remaining material following the excision of falsity is

15  independently insufficient to support a finding of probable

16  cause.

17  In United States versus Frost, 999 F.2d 737, Third

18  Circuit, 1993, the Court of Appeals held that if the falsity

19  is based upon an omission, which is the allegation in this

20  case, rather than a misstatement of facts, the Court must

21  remove the falsehood by supplying the omitted information to

22  the original affidavit and determine if the affidavit with

23  the added information contains probable cause; Sherwood

24  versus Mulvihill, 113, F.3d 396, Third Circuit 1997.

25  The Defendant to obtain a Franks hearing must first

1    make a substantial preliminary showing that the affidavit

2    contained a false statement which was made knowingly or with

3    reckless disregard to the truth and that the false statement

4    is material to the finding of probable cause.

5            And those two things would be equally applicable to

6    an omission; and today the task of the Court is to determine

7    if it is an omission and it would be a factually accurate

8    statement that is asserted, to put that into the affidavit

9    and determine if, with the added information, there is

10   probable cause.

11           Okay.  So those are the standards that the Court

12   will be looking at.  We're going to handle the issues

13   surrounding the suppression relating to the lack of

14   probable -- the asserted lack of probable cause for the

15   seizure of the Subaru and the arrest of the Defendant.

16           Ms. Silinski, you'll go first.

17           MS. SILINSKI:  Yes, Your Honor.  The Government is

18   going to call Detective Mark Hetherington as the Government's

19   witness.

20           THE COURT:  The witness will please come forward

21   into the witness box.

22           (The witness, DETECTIVE MARK HETHERINGTON, was duly

23   sworn.)

24           MS. SLINSKI:  And Your Honor, does the Court have a

25   preference whether I stand or sit at counsel table for --

M. HETHERINGTON – DIRECT

1          THE COURT:  You know, in these days with the --

2          MS. SLINSKI:  I have a feeling the microphone --

3          THE COURT:  You're probably better off there.

4          MS. SILINSKI:  Okay.  Yes, ma'am.

5          THE COURT:  Just make sure you pull the mike maybe

6   a little closer to you.  That way we can get a clear hearing.

7          MS. SILINSKI:  Sure.  Can you hear me okay?

8          THE COURT:  Yes.

9                    DIRECT EXAMINATION

10  BY MS. SILINSKI:

11  Q.   Okay.  Could you please state and spell your name for

12  the record?

13  A.   Mark Hetherington, H-e-t-h-e-r-i-n-g-t-o-n.

14  Q.   And Mr. Hetherington, by whom are you employed?

15  A.   North Versailles Township Police Department.

16  Q.   How long have you worked for the North Versailles

17  Township Police Department?

18  A.   Twenty-two years.

19          MR. BILLS:  I'm sorry.  Could we ask the witness to

20  speak up?

21          THE COURT:  Yes.  Lean close to the mike.  If you

22  speak directly into the bulb, they'll hear you.

23  A.   Twenty-two years.

24  Q.   And prior to working with the North Versailles

25  Township Police Department, what did you do?

M. HETHERINGTON - DIRECT

1    A.   I was a police officer in the Borough of North
2   Braddock and Rankin.
3    Q.   And how long in total have you worked in law
4   enforcement?
5    A.   About 25 years.
6    Q.   Are you a member of any Task Forces?
7    A.   I am.
8    Q.   And which is that?
9    A.   The District Attorney's Narcotics Enforcement Team.
10   Q.   And do you have experience investigating narcotics
11  trafficking?
12   A.   I do.
13   Q.   Were you involved in the arrest of the Defendant,
14  Mr. Terry Suggs, and his co-Defendant, Mr. Jermaine Clark, on
15  February 25, 2019?
16   A.   I was.
17   Q.   When did you become involved in the investigation
18  related to Mr. Suggs and Mr. Clark?
19   A.   October of 2018.
20   Q.   Okay.  And what happened in October of 2018?
21   A.   We were -- we had a CI that had informed us that he
22  could make purchases of a large amount of cocaine from a
23  gentleman from the Philadelphia area.
24   Q.   And when you say CI, can you identify for the Court
25  and the record what a CI is?

M. HETHERINGTON – DIRECT

1   A.   Confidential informant.

2   Q.   As it relates to the confidential informant, did the

3   CI provide a name for the source of supply in Philadelphia?

4   A.   He did.

5   Q.   And what was that name?

6   A.   Fats.

7   Q.   And did you understand that Fats was a street name or

8   a nickname used by that individual?

9   A.   Yes.

10         THE COURT:  I'm sorry.  Are you saying Fats?

11         MS. SILINSKI:  Fats.  F-a-t-s is the phonetics.  I

12   think there are a couple of different spellings of that

13   potentially.

14         THE COURT:  Okay.

15   BY MS. SILINSKI:

16   Q.   Is that correct, as far as the phonetic?

17   A.   Yes.

18   Q.   Okay.  Now, did the CI provide any additional

19   information related to Fats at the time?

20   A.   As far as -- he told us that he has bought large

21   quantities of cocaine from him, and that Fats travels from

22   Philadelphia to Pittsburgh and sees multiple customers and

23   distributes cocaine to them.

24   Q.   Okay.  And if we can break that down a little bit

25   more, did the CI provide -- when you say large quantities,

M. HETHERINGTON – DIRECT

1  did they indicate -- did the CI indicate what those large

2  quantities were?

3     A.   Kilos of cocaine.

4     Q.   And as far as the timeframe that the CI had purchased

5  cocaine from the individual named Fats, approximately how

6  long had the CI purchased cocaine from Fats?  A year?  Two

7  years?

8     A.   I believe it was a little over a year.

9     Q.   Did the CI also have access to the telephone number

10 used by Fats?

11    A.   Yes.

12    Q.   Do you recall approximately how much the CI paid for a

13 kilogram of cocaine?

14    A.   Between $30,000 and $33,000, I believe.

15    Q.   Now, did the CI also provide any information related

16 to where the drug transactions occurred?  You mentioned that

17 Fats would come from Philadelphia to Pittsburgh.  Was there a

18 specific location?

19    A.   Yes.

20    Q.   Okay.  And what was that?

21    A.   It was Grant Street in North Braddock.

22    Q.   Did you have an understanding as to whether or not

23 there was a residence on Grant Street in North Braddock, or

24 was it just on the street?  Where specifically?

25    A.   A residence.

M. HETHERINGTON - DIRECT

1    Q.    Did you also -- did the CI identify a vehicle that was
2    operated by Fats?
3    A.    Yes.
4    Q.    And what vehicle was that?
5    A.    A Chevy Traverse.
6    Q.    Now, did law enforcement identify what Fats' legal
7    name or given name was?
8    A.    We did.
9    Q.    Okay.  And how did law enforcement do that?
10   A.    I believe it was through the McLaughlin system.
11   Q.    And what is that?
12   A.    It's a system that utilizes for phone numbers to do
13   reverse lookups, I believe.  Detective Keenan is the one who
14   actually discovered the identity of Fats.
15   Q.    Okay.  And can you identify, are you aware based upon
16   your involvement in this investigation who Fats is?
17   A.    Yes.
18   Q.    And who is that?
19   A.    Jermaine Clark.
20   Q.    Did law enforcement have an opportunity to show the
21   confidential informant a driver's license photograph of
22   Mr. Clark?
23   A.    They did.
24   Q.    And based upon that photograph, did the confidential
25   source indicate who that individual was in the photograph?

M. HETHERINGTON – DIRECT

1    A.    Yes.

2    Q.    And who was that?

3    A.    Jermaine Clark.

4    Q.    Known to you –– the CI, as Fats, though; correct?

5    A.    Correct.

6    Q.    Now, we were talking about October of 2018 when you

7    and other law enforcement officers learned from the CI that a

8    source of supply from Philadelphia could possibly be the

9    subject of an investigation; correct?

10   A.    Yes.

11   Q.    Now, is it your understanding based upon your training

12   and experience, is Philadelphia commonly known to law

13   enforcement as a source city for cocaine?

14   A.    Yes.

15   Q.    Okay.  And is Pittsburgh a source city as well?

16   A.    No.

17   Q.    Okay.  What is Pittsburgh considered?

18   A.    Distribution.

19   Q.    Now, in February of 2019, did law enforcement involved

20   in this investigation engage in a telephone call where the

21   the CI essentially called Mr. Clark to arrange for a purchase

22   of cocaine?

23   A.    Yes.

24   Q.    Do you recall what quantity of cocaine he was

25   intending to obtain?

M. HETHERINGTON – DIRECT

1    A.    Five kilos.

2    Q.    Did the CI at the time provide law enforcement with a

3    telephone number for Mr. Clark?

4    A.    Yes.

5    Q.    Okay.  After the initial call was made, did Mr. Clark

6    confirm that he could come to Pittsburgh to conduct a drug

7    transaction?

8    A.    Yes.

9    Q.    Okay.  Approximately how soon after did law

10   enforcement then engage in subsequent phone calls with

11   Mr. Clark via the CI?

12            (No verbal response.)

13   Q.    I guess –– let me rephrase my question.  Was the call

14   that was initially made regarding the five kilogram

15   transaction, did that occur a month before?  A year before?

16   Six months before?  Or within a few days?

17   A.    Within a few days.

18   Q.    Okay.  Did you learn based upon your involvement in

19   this investigation that Mr. Clark was intending to come to

20   the Pittsburgh area to effectuate the drug deal on or about

21   either Monday or Tuesday, which would be February 25 or 26 of

22   2019?

23   A.    Yes.

24   Q.    And what happened next as it relates to the

25   investigation?

M. HETHERINGTON - DIRECT

1   A.    The CI had contacted Detective Bonacci and informed

2   him that Fats was currently in Pittsburgh and staying at the

3   Westin Hotel.

4   Q.    Do you recall what day the CI contacted Detective

5   Bonacci?

6   A.    I believe it was the 24th, the day prior to.

7   Q.    As it relates to the communication between the CI and

8   Detective Bonacci, how did the CI know that Mr. Clark was in

9   Pittsburgh?

10  A.    The CI informed us that he had met Mr. Clark on the

11  evening of the 24th.

12  Q.    And when you indicate he met Mr. Clark, did the CI

13  provide a location as to where the meeting occurred?

14  A.    He said that he met him at a restaurant, and that he

15  was with his cousin.

16  Q.    Now, did Mr. -- I'm sorry -- did the CI provide any

17  information related to -- strike that.

18        Earlier you mentioned that Mr. Clark -- the CI had

19  informed you that Mr. Clark drove a Chevy Traverse; is that

20  correct?

21  A.    Yes.

22  Q.    Did law enforcement try to locate the Chevy Traverse

23  in advance of the drug transaction?

24  A.    Yes.

25  Q.    Did law enforcement locate the Chevy Traverse?

M. HETHERINGTON – DIRECT

1    A.   We did not.

2    Q.   Okay.  Having not located the Traverse, what did law

3    enforcement do?

4    A.   Detective Bonacci then contacted the CI again and

5    asked if Clark was in his normal vehicle, which would be the

6    Chevy Traverse.  And the CI informed Bonacci that on Sunday

7    when he had met with him, they were in his cousin's Subaru.

8    Q.   Did the CI provide a color or what he thought was the

9    color of the Subaru?

10   A.   I believe he stated it was a silver Subaru.

11   Q.   Now, as far as the timing -- so you mentioned that on

12   February 24, that evening, the CI indicated that he had met

13   with Mr. Clark and who was identified at that time to him as

14   Mr. Clack's cousin; correct?

15   A.   Correct.

16   Q.   And the following day, just to make sure I understand

17   and the record is clear, was it the following day that you

18   tried to locate the vehicle?

19   A.   Yes.

20   Q.   Okay.  So that is the morning of the 25th?

21   A.   Yes.

22   Q.   And on the morning of the 25th, law enforcement was

23   advised that the night before at least, Mr. Clark and his

24   cousin were using his cousin's gray Subaru; correct?

25   A.   Yes.

M. HETHERINGTON – DIRECT

1   Q.   All right.  Were you able to locate the gray Subaru in

2   the Westin parking deck?

3   A.   No.

4   Q.   All right.  After law enforcement attempted to locate

5   the vehicles and were unsuccessful, what did law enforcement

6   do at that time?

7   A.   We met at a secure location and made some recorded

8   phone calls to Mr. Clark.

9   Q.   And were you present for at least some of the recorded

10  phone calls?

11  A.   I was.

12  Q.   Okay.  What generally speaking was the nature of those

13  recorded calls?

14  A.   I believe it was time and location on where to meet to

15  do the transaction.

16  Q.   Okay.  And as it relates to the location, where did

17  you understand that Mr. Clark and the CI would be meeting?

18  A.   The 1400 block of Grant Street in North Braddock.

19  Q.   And are you familiar with the North Braddock area of

20  Pittsburgh?

21  A.   I am.

22  Q.   And based on your training and experience, are you

23  aware of drug trafficking activity that occurs within the

24  North Braddock area of Pittsburgh?

25  A.   Yes.

M. HETHERINGTON – DIRECT

1   Q.   Now, after the telephone calls were placed, just to be
2   clear, at that time the telephone call specifically though
3   was not with Mr. Suggs; correct?
4   A.   Correct.
5   Q.   Okay.  After the call was placed -- after those calls
6   occurred where the deal was set up, the time and the location
7   was determined, what did you do?
8   A.   I then went to the area of the 1400 block of Grant
9   Street to set up surveillance.
10   Q.   And did you set up surveillance?
11   A.   I did.
12   Q.   Did you have a view of the area where the drug
13   transaction was to occur?
14   A.   Yes.
15   Q.   After you set up surveillance, can you describe for
16   the Court what happened thereafter?
17   A.   The Chevy Traverse and the Subaru then arrived in the
18   1400 block of Grant Street.
19   Q.   Okay.  And did you make any observations?  Did the
20   Traverse and Subaru pass you?  Did they park?  What happened?
21   A.   They had parked.
22   Q.   Okay.  And in what proximity to where the deal was to
23   occur?
24   A.   Across the street, I believe.
25   Q.   Now, as it relates to the Chevy Traverse and Subaru,

M. HETHERINGTON – DIRECT

1    did you observe whether there were occupants of those

2    vehicles?

3      A.    I did.

4      Q.    Okay.  After the vehicle pulled over across the street

5    or thereabouts from where the deal was to occur, what did you

6    observe?

7      A.    I observed a large black male exit the vehicle –– exit

8    the Subaru, I'm sorry –– and enter into the Chevy Traverse.

9      Q.    Did you make any observations with regards to the gray

10   Subaru after the individual that you observed exited the

11   vehicle?

12     A.    I noticed that the vehicle was still running, that it

13   was never shut off.

14     Q.    Okay.  All right.  After you observed the individual

15   exit the Subaru, did you observe any other passengers in the

16   Subaru?

17     A.    I did not.

18     Q.    Did you observe any other passengers inside the Chevy

19   Traverse?

20     A.    I did not.

21     Q.    Based upon your knowledge as it relates to the

22   investigation, did you identify the Chevy Traverse as the

23   vehicle that the CI had previously identified as a vehicle

24   used and operated by Mr. Clark?

25     A.    Yes, we did.

M. HETHERINGTON - DIRECT

1    Q.    Okay.  And based upon your knowledge as it relates to

2    the events that occurred surrounding February 25, 2019, did

3    you believe that the gray Subaru that you observed, silver

4    Subaru that you observed, was the Subaru referenced by the CI

5    as belonging to Mr. Clark's cousin?

6    A.    Yes.

7    Q.    Now, based upon your 25 years as a law enforcement

8    officer and investigating drug trafficking, are you aware of

9    the terms load car and trail car, t-r-a-i-l?

10   A.    Yes.

11   Q.    And what do those terms mean as it relates to drug

12   trafficking?

13   A.    Typically when drug traffickers are transporting large

14   amounts of narcotics and/or cash, they'll use two different

15   vehicles, and a lot of times they'll keep narcotics in one

16   vehicle, cash in the other vehicle.  It's kind of just to

17   watch one another's back as they're conducting business.

18   Q.    Okay.  Now, after you made these observations with

19   regards to the Chevy Traverse and Subaru and saw the driver

20   of the Subaru enter the Chevy Traverse, what happened?

21   A.    It was at that time that Detective Bonacci made the

22   decision to move in and detain the two suspects that were

23   inside the Chevy Traverse.

24   Q.    And can you describe -- at that point were Mr. -- were

25   the two individuals asked to exit the vehicle?

M. HETHERINGTON − DIRECT

1    A.    They were.

2    Q.    Did they comply?

3    A.    They did.

4    Q.    Okay.  At that time did law enforcement conduct a

5    pat−down and search of their person?

6    A.    We did.

7    Q.    Okay.  And the purpose of that was?

8    A.    To identify the actors and make sure they had no

9    weapons on them.  So it was for officer safety purposes and

10   to identify them.

11   Q.    Okay.  Did you ask them for identification?

12   A.    I believe we did, yes.

13   Q.    Did they produce identification?

14   A.    No.

15   Q.    Okay.  All right.  Did you locate on Mr. Clark any

16   identification?

17   A.    We did.

18   Q.    Okay.  And did the identification confirm that it was

19   Mr. Jermaine Clark?

20   A.    Yes.

21   Q.    And you prior to that had indicated he was from

22   Philadelphia.  Did that match on the driver's license?

23   A.    It did.

24   Q.    The second individual that you described exiting the

25   gray Subaru, is it fair to say that at that point you only

M. HETHERINGTON – DIRECT

1   knew him as Mr. Clark's cousin?

2      A.   Correct.

3      Q.   And did that individual have identification on him?

4      A.   He did.

5      Q.   Were you able to review -- you or other officers

6   review the driver's license?

7      A.   Yes.

8      Q.   And at that point did you make an identification?

9      A.   Yes.

10     Q.   And did the identification indicate the individual was

11  Mr. Suggs?

12     A.   Yes.

13     Q.   Did you locate on the identification where Mr. Suggs

14  was from?

15     A.   Yes.

16     Q.   And where is that?

17     A.   Philadelphia.

18     Q.   Were there any other items that were on Mr. Suggs'

19  person?

20     A.   I believe he had two cell phones on him.

21     Q.   And Mr. Clark?

22     A.   Two cell phones also.

23     Q.   Now, at the time you mentioned that the vehicle, the

24  gray Subaru, was left running; is that correct?

25     A.   Yes, ma'am.

M. HETHERINGTON – DIRECT

1   Q.   Did you or any other law enforcement officers ask
2   Mr. Suggs or Mr. Clark if the vehicle was associated with
3   them?
4   A.   We did.
5   Q.   And what was their response?
6   A.   They had no knowledge of the vehicle.
7   Q.   Okay.  You described though that you observed
8   Mr. Suggs exiting that vehicle; correct?
9   A.   Correct.
10   Q.   At that point in time did you observe any other
11   individuals from the residences around or anyone -- did
12   anyone come to the vehicle indicating that they owned the
13   vehicle?
14   A.   No.
15   Q.   At that point in time did law enforcement locate and
16   identify that there were keys left in the ignition?
17   A.   Yes, ma'am.
18   Q.   Okay.  Did law enforcement make a decision with regard
19   to the vehicle that was left on the street and still running
20   as to what you would do with it?
21   A.   Yes.
22   Q.   And what was that decision?
23   A.   To tow it.
24   Q.   And at that point did law enforcement tow both the
25   Subaru and the Traverse?

M. HETHERINGTON - DIRECT

1    A.    We did.

2    Q.    And where were those vehicles towed to?

3    A.    To the Swissvale Police Department.

4    Q.    Okay.  After -- at that time also were Mr. Suggs and

5    Mr. Clark placed under arrest?

6    A.    They were.

7    Q.    And were they transported back to the Swissvale Police

8    Department?

9    A.    Yes.

10   Q.    Now, previously you had mentioned that law enforcement

11   were able to confirm Fats' identity based upon a driver's

12   license photograph.  Is it your understanding that one of

13   your fellow law enforcement officers sent a photograph of

14   Mr. Suggs to the confidential source?

15   A.    Yes.

16   Q.    And based upon that, is it your understanding if

17   Mr. Suggs was identified by the CI?

18   A.    He was.

19   Q.    After the vehicles were towed back to the Swissvale

20   Police Department, what happened?

21   A.    A K9 sniff was conducted on both vehicles.  The K9

22   indicated hits on both of the vehicles in the same area,

23   which would have been near the gas tank where you would fill

24   the gas tank up at, where you put the gas in the car.

25   Q.    Okay.  And is it fair to say that's towards the rear

M. HETHERINGTON – DIRECT

1  of the vehicle?

2  A.  Yes, ma'am.

3  Q.  Now, prior to the dog sniff, had law enforcement been

4  informed by the confidential source whether or not Mr. Clark

5  operated vehicles with a trap location or a concealed area to

6  store drugs and money?

7  A.  Yes.

8  Q.  And was it your understanding that the Traverse

9  contained such a compartment?

10  A.  Yes.

11  Q.  Now, once the -- so the dog alerted to the presence of

12  narcotics on the Traverse; correct?

13  A.  Yes.

14  Q.  And also alerted to the presence of narcotics in the

15  Subaru?

16  A.  Yes.

17  Q.  What happened next?

18  A.  Detective Keenan applied for the search warrants for

19  the vehicles.

20  Q.  Have you had an opportunity to review the search

21  warrant to the vehicle?

22  A.  I did.

23  Q.  Okay.  As it relates to the search warrants, did law

24  enforcement obtain authorization to search the vehicles?

25  A.  Yes.

M. HETHERINGTON - DIRECT

1    Q.   Now, did law enforcement search the vehicles?

2    A.   We did.

3    Q.   Were you involved in the search of the vehicles?

4    A.   I was.

5    Q.   All right.  Can you describe for us what law

6    enforcement identified in the Chevy Traverse, if anything?

7    A.   Yes.  In the rear of the vehicle, the cargo area or

8    third row seating, if you will, underneath the seat was a

9    trap that we discovered.

10   Q.   And when you say trap, is that -- can you describe

11   kind of in laymen's terms what is that --

12   A.   It's a hidden compartment in which -- it's concealed

13   within the vehicle so that dealers will utilize it to

14   transport narcotics and cash so that -- to make it more

15   difficult to locate for law enforcement.

16   Q.   And based upon your training and experience, is it

17   common for large scale drug traffickers to utilize a

18   compartment like you've described in their vehicles for

19   transporting United States currency and controlled

20   substances?

21   A.   Yes.

22   Q.   Okay.  Now, one question I wanted to go back to, at

23   the time going back to the Subaru when it was parked on the

24   street with the keys still running, did a law enforcement

25   officer have to enter the vehicle to turn the vehicle off?

M. HETHERINGTON – DIRECT

1    A.    Yes, ma'am.

2    Q.    Okay.  Did law enforcement try to identify who owned

3    the vehicle since neither Mr. Clark nor Mr. Suggs claimed

4    that the vehicle was theirs?

5    A.    Yes.

6    Q.    And were you able to identify who owned the vehicle?

7    A.    We were not.

8    Q.    Did law enforcement --

9    A.    I'm sorry.  We were able to confirm the owner on the

10   vehicle.

11   Q.    Okay.  And where was the owner of that vehicle

12   located?

13   A.    In Philadelphia.

14   Q.    And was the owner of that vehicle either Mr. Clark or

15   Mr. Suggs?

16   A.    No.

17   Q.    Did law enforcement observe any other items in the

18   vehicle that would have provided identification for who was

19   operating or owning the vehicle so that it could be returned?

20   A.    No.

21   Q.    Did law enforcement locate anything in the vehicle

22   prior to the search that was conducted?

23   A.    Yes.  There was a large sum of money sitting on the

24   passenger rear floor of the vehicle.

25   Q.    Did you observe that currency?

M. HETHERINGTON – DIRECT

1    A.   I did.

2    Q.   Okay.  And can you describe for the Court how that

3    United States currency was packaged, if at all?  Was it

4    loose?  In a bag?  How did you observe it?

5    A.   It was smaller denominations of bills stacked together

6    and tied together or stuck together with rubber bands.

7    Q.   All right.  When law enforcement executed the search

8    of the Subaru, the money was still in the vehicle; correct?

9    A.   Yes, ma'am.

10   Q.   Okay.  Did law enforcement locate anything else within

11   the Subaru?

12   A.   Yes, ma'am.

13   Q.   And what was that?

14   A.   We located another trap in the rear of the Subaru, the

15   cargo area, again, of the vehicle.

16   Q.   Okay.  And how did you identify that area?

17   A.   As we were searching the vehicle, I noticed that the

18   carpet was pulled away from the interior wall of the vehicle.

19   At that time you could tell it wasn't factory produced.  So I

20   pulled the carpet back a little further, at which time that

21   revealed a fresh weld of some type of box underneath the

22   carpet.

23   Q.   And based upon your training and experience and

24   information related to this investigation, was it your belief

25   that that was a trap compartment or concealed compartment?

M. HETHERINGTON - DIRECT

1    A.   Yes, ma'am.

2    Q.   Did law enforcement access that compartment?

3    A.   Yes, ma'am.

4    Q.   And what was located inside the compartment?

5    A.   Eighteen keys of cocaine.

6    Q.   And when you say "keys" --

7    A.   Kilos.

8    Q.   Kilos, okay.  Now, based upon your training and

9    experience, did you have an opportunity to personally observe

10   the controlled substances -- or suspected controlled

11   substances in the Traverse and the Subaru?

12   A.   Yes.

13   Q.   And in those two vehicles, those controlled

14   substances, were they field tested?

15   A.   They were.

16   Q.   As it relates to the five kilograms that were located

17   within the Traverse, did that field test positive for

18   anything?

19   A.   Yes.

20   Q.   And what was that?

21   A.   Cocaine.

22   Q.   Based upon this investigation, was it your

23   understanding -- you testified earlier that Mr. Clark had set

24   up a deal with the confidential source for five kilograms;

25   correct?

M. HETHERINGTON - DIRECT

1   A.   Yes.

2   Q.   Now, the suspected narcotics in the Subaru, were those

3   also field tested?

4   A.   They were.

5   Q.   And I should say did you field test each and every

6   kilogram, or did you field test one of them as it relates to

7   that?

8   A.   One.

9   Q.   Okay.  What, if anything, did they field test positive

10  for?

11  A.   Cocaine.

12  Q.   Did you make any observations as it relates to the

13  manner in which those controlled substances were packaged?

14  A.   Yes.  The five kilos that were in the Traverse and the

15  18 kilos that were in the Subaru were both packaged in the

16  same manner.

17  Q.   Can you describe when you say in the same manner, what

18  that means?

19  A.   I believe they all had vacuum sealed baggies on the

20  exterior.  Underneath that was a layer of black electrical

21  tape.  Underneath the black electrical tape, I believe, was

22  green Seran wrap.  Once you got down to the actual cocaine

23  itself, they were stamped with a K, and I believe it was a

24  backwards Z.  So it was KZ, but the Z was backwards.

25  Q.   And did you make the observation that that same stamp

M. HETHERINGTON – CROSS

1  was located on the cocaine found in the Traverse as the

2  Subaru?

3    A.   Yes.

4    Q.   And based on your training and experience, is it your

5  understanding that the cocaine was packaged for distribution?

6    A.   Yes.

7    Q.   In your training and experience as it relates to drug

8  traffickers, have you made any observations with regards to

9  their use of cellular telephones?

10   A.   Yes.

11   Q.   And is it common for individuals who are involved in

12 drug trafficking to possess multiple cell phones?

13   A.   Yes.

14        MS. SILINSKI:  Your Honor, with that, I'll pass the

15 witness for cross-examination.

16        MR. BILLS:  Thank you.  May I stand?

17        THE COURT:  Yes, you may.

18        MR BILLS:  And use this microphone?

19        THE COURT:  Let's see if the court reporter is

20 comfortable with that distance.

21        THE COURT REPORTER:  I think that's far enough.

22 That's fine.

23                    CROSS-EXAMINATION

24 BY MR BILLS:

25   Q.   Good morning, Detective.

M. HETHERINGTON - CROSS

1    A.   Good morning.

2    Q.   You had indicated that the buy-bust was to go down on

3    2/25/19 and approximately between three and four o'clock; is

4    that correct?

5    A.   Yes, sir.

6    Q.   All right.  However, the investigation started some

7    time before that; is that correct?

8    A.   Yes.

9    Q.   All right.  And as a matter of fact, you put that time

10   as sometime in October of '18; is that correct?

11   A.   Yes.

12   Q.   What happened in October of '18?  Did you come in

13   contact with the confidential informant in October?

14   A.   Yes.

15   Q.   All right.  And how much interaction in October to

16   let's say mid February did you have with this confidential

17   informant?

18   A.   Myself, not much.  Very little.

19   Q.   Was it Officer Bonotti (sic)?

20   A.   Bonacci, yes, sir.

21   Q.   Bonetti, I'm sorry.  He had contact -- it was his CI;

22   was it not?

23   A.   I believe so, yes.

24   Q.   And he would have had -- were there phone calls for a

25   five-kilo deal as far back as February -- or October?

M. HETHERINGTON – CROSS

1    A.   I have no knowledge of that.

2    Q.   I'm sorry?

3    A.   I don't have any knowledge of when he knew.

4    Q.   All right.  Well, you do know that immediately, within

5    four or five days of February 25, the investigation for the

6    buy-bust heated up; did you not?

7    A.   Yes.

8    Q.   Okay.  And that's because the informant called an

9    individual in Philadelphia; am I correct?

10   A.   Again, sir, I'm not certain because I was not

11   involved.

12   Q.   Well, if Officer Bonotti testified to that, you

13   wouldn't dispute that?

14   A.   I wasn't there.

15   Q.   I understand you weren't there.  But you know for a

16   fact that the CI made phone calls to an individual by the

17   name of Clark; correct?

18   A.   Correct.

19   Q.   All right.  And in these phone calls they were

20   monitored and recorded; am I correct?

21   A.   Yes, sir.

22   Q.   And they were done by Officer Bonotti; am I correct?

23   A.   They were done by Detective Bonacci and --

24   Q.   Bonetti?

25   A.   -- and Detective Keenan.

M. HETHERINGTON - CROSS

1   Q.   Okay.  Those two.  And did they tell you -- did either

2   one or both of them tell you that we're having monitored

3   phone calls with the CI and an individual who's going to

4   deliver five kilos?

5   A.   Yes.

6   Q.   Okay.  Now, how many times did they tell you that the

7   calls are going through?

8   A.   They didn't.

9   Q.   Was it more than five?

10       MS. SILINSKI:  Your Honor, the witness has answered

11  he doesn't know.

12       MR. BILLS:  All right.  We're going to be calling

13  other witnesses.

14       THE COURT:  You just need to move on if he doesn't

15  know.

16       MR BILLS:  I will.

17  BY MR. BILLS:

18  Q.   There's no doubt that any of the communications

19  between the CI and Clark were only between the CI and Clark;

20  correct?

21  A.   I don't know.

22  Q.   At no point in time in this investigation was anyone

23  by the name of Suggs mentioned to you; is that correct?

24  A.   Correct.

25  Q.   And at no point in time in this investigation was any

M. HETHERINGTON - CROSS

1  other vehicle outside of the Traverse mentioned to you?  Is

2  that correct?

3      A.    No, sir.

4      Q.    And do you know, when Officer Bonetti told you that

5  the calls were being made, was he overhearing them?

6      A.    I believe so -- or I believe it was on speaker or

7  recorded.  I don't know.  I wasn't there --

8      Q.    Well, if he was overhearing, if he overheard the call,

9  it was either because they put the CI on speaker, or he just

10  listened in; one of the other?  Is that correct?

11      A.    Correct.

12      Q.    All right.  And are you aware of any paper indicating

13  that the CI voluntarily did this and wasn't coerced?

14      A.    I'm not aware of any.

15      Q.    All right.  Did you ever see an authorization from the

16  Attorney General that there can be overhears on a consensual

17  monitoring?

18      A.    No, sir.

19      Q.    I'm going to take you to 2/25/21.  That was the take-

20  down; correct?

21      A.    2/25/21?

22      Q.    2/25/19.  I'm sorry.  2/25/19.  2/25/19, that was the

23  day of the take-down?

24      A.    Yes, sir.

25      Q.    In North Braddock?

M. HETHERINGTON - CROSS

1    A.   Yes, sir.

2    Q.   On Grant Street?

3    A.   Yes, sir.

4    Q.   Is that right?

5    A.   Yes, sir.

6    Q.   And when you went there, you were on surveillance?

7    A.   Yes, sir.

8    Q.   And where were you positioned?

9    A.   In the 1300 block, I believe.

10   Q.   All right.  Did you have a clear view of the Traverse?

11   A.   I did.

12   Q.   And you didn't expect, you had no expectation that

13   there would be anyone other than the Traverse and Clark; am I

14   correct?

15   A.   You're not.

16   Q.   I'm not?

17   A.   You're not.

18   Q.   Did you have any information there was going to be

19   another car?

20   A.   Yes, sir.

21   Q.   What was that?

22   A.   The CI had informed us that when he met with Clark on

23   Sunday, the day prior, that he was with his cousin, and they

24   were driving his cousin's car, which was the Subaru.

25   Q.   All right.  You didn't -- did you expect the Subaru to

M. HETHERINGTON – CROSS

1   show up?

2   A.   No.

3   Q.   No.  Did you expect -- you knew nothing about Mr.

4   Suggs; did you?

5   A.   Nope.

6   Q.   And if I understand it correctly, do you see this

7   Terry Suggs get out of the car and walk to the Traverse?

8   A.   Yes.

9   Q.   Did Mr. Suggs have a backpack?

10  A.   I'm sorry?

11  Q.   A backpack on?

12  A.   Not that I recall.

13  Q.   You didn't seize one; did you?

14  A.   I'm sorry?

15  Q.   You didn't seize one after he was arrested; did you?

16  A.   I don't believe so.

17  Q.   And you didn't see him with anything in his hands?

18  A.   No, sir.

19  Q.   You didn't see a bulge in his waistband; did you?

20  A.   No.

21  Q.   So he was unarmed and not carrying anything; is that

22  correct?

23  A.   Correct.

24  Q.   And when he sat down, how long was he in the Traverse?

25  A.   Not very long.

M. HETHERINGTON – CROSS

1    Q.   Do you want to give me an estimate?  A minute?  Two

2    minutes?

3    A.   Two minutes, three minutes I guess.

4    Q.   So then you had a take-down team; is that correct?

5    A.   Yes.

6    Q.   And how many people were on the take-down team?

7    A.   I don't recall.  I could guess and say ten.

8    Q.   Ten?

9    A.   Eight maybe.  I don't know.

10   Q.   Eight to ten?  Bonetti put it at eight.  Would you

11   disagree with that?

12   A.   No, sir.

13   Q.   And each one of them had guns; is that correct?

14   A.   Yes, sir.

15   Q.   And each one of them had vests; is that correct?

16   A.   Yes, sir.

17   Q.   And Tasers?

18   A.   I don't know.

19   Q.   And badges?

20   A.   Yes.

21   Q.   And when they -- did they have helmets?

22   A.   I don't believe so.

23   Q.   Well, they had Pennsylvania State Police there; didn't

24   they?

25   A.   They did.

M. HETHERINGTON – CROSS

1    Q.   They had the take-down team; is that correct?

2    A.   They did.

3    Q.   How many revolvers and how many AR's?

4    A.   I don't know.

5    Q.   Well, you were watching it; were you not?

6    A.   I was.

7    Q.   Well, did you see anyone with an AR?

8    A.   I don't recall, to be honest with you.

9    Q.   Well, you're not -- you don't recall it, but you're

10   not saying they didn't have it?  Am I correct?

11   A.   Yes.

12   Q.   And did you see the red dot scopes on any of the

13   handguns or the AR?

14   A.   No, sir.

15   Q.   Guns for the police are accessible -- they have the

16   technology for red dots; is that correct?

17   A.   They do.

18   Q.   And did you see any red dots flashing inside this

19   vehicle?

20   A.   None that I recall.

21   Q.   Okay.  Now, did you hear or overhear anyone saying,

22   "Hands, get your fucking hands up," quote?

23   A.   Yes.

24   Q.   All right.  How many -- excuse me.  I'm going to move

25   over here.  How much individuals or how many people said "Get

M. HETHERINGTON – CROSS

1  your fucking hands up," unquote?

2  A.   I have no knowledge.

3  Q.   Well, you had heard it?

4  A.   I heard it.

5  Q.   Did you hear it from one, or did you hear it from

6  more?

7  A.   I would say more.

8  Q.   And that's standard operating procedure for emphasis;

9  is it not?

10  A.   Yeah.

11  Q.   Or they just like to use that word because ――

12  whatever; right?

13  A.   No.  As you stated, there was a ――

14      MS. SLINSKI:  Your Honor, I'm going to object at

15  this point as to the relevance for a suppression hearing with

16  regards to the precise terminology.  This witness has stated

17  that he does not recall specifically how many individuals

18  stated what the terms were used.

19      He's also indicated he works for one police

20  township.  He's not a State Trooper.  He doesn't work for the

21  State Police.  So I think defense counsel has asked this

22  question, and he's received an answer, and he can and should

23  move on to the suppression issues at hand.

24      MR. BILLS:  I don't need the garbage.  I can move

25  on.

M. HETHERINGTON – CROSS

1          THE COURT:  Okay.

2     Q.   Now, at some point in time, the eight individuals,

3  they all had their guns drawn; did they not?

4     A.   I would assume so, but I don't know for certain.  I

5  don't know what each individual officer or detective was

6  doing at that current time.

7     Q.   Did you have a surveillance, an observation of it?

8     A.   I did.

9     Q.   And did you see their guns drawn?

10    A.   I seen weapons and --

11    Q.   What?

12    A.   Weapon, yes.

13    Q.   What weapons?  Out of their holsters?

14    A.   Yes.

15    Q.   And in their hands?

16    A.   Yes.

17    Q.   And trained on the vehicle?

18    A.   Yes.

19    Q.   And would that be unanimous for all eight?

20    A.   I'm sorry?

21    Q.   Would that be unanimously across the board all eight

22  had their firearms out, trained on the vehicle?

23    A.   Again, I can't answer what each individual officer was

24  doing.

25    Q.   Okay.  But there were definitely guns drawn on the

M. HETHERINGTON - CROSS

1   vehicle?

2              MS. SLINSKI:  Your Honor, asked and answered.

3              MR. BILLS:  Okay.  I can move on.

4   Q.   Now, at some point in time Mr. Suggs was taken out of

5   the vehicle; is that correct?

6   A.   Correct.

7   Q.   And at some point in time Mr. Suggs was handcuffed; is

8   that correct?

9   A.   Correct.

10  Q.   And at some point in time immediately thereafter

11  Mr. Suggs was put on the side of the road face down; am I

12  correct?

13  A.   Yes.

14  Q.   All right.  And we can both agree that told to put

15  your hands up, guns drawn, taken out, handcuffed behind his

16  back and put on the side of the road, he wasn't free to

17  leave?

18  A.   No, not at that time.

19  Q.   And was there one of the officers assigned to watch

20  Mr. Suggs?

21  A.   I'm not aware of that.

22  Q.   Did you see an officer standing beside Mr. Suggs while

23  he was on the side of the road?

24  A.   I saw several officers standing next to Mr. Suggs.

25  Q.   And did you hear anyone question Mr. Suggs and he

M. HETHERINGTON - CROSS

1    reply, "It's not my vehicle"?

2    A.   He said nothing.  They asked him, and he said nothing.

3    Q.   Well, if Officer Bonetti said Mr. Suggs said it's not

4    my vehicle, would you dispute that?

5    A.   I would not.

6    Q.   You wouldn't?

7    A.   Nope.

8    Q.   And do you know whether or not that answer from

9    Mr. Suggs came in response to a question by one of the

10   individuals that was surrounding him?

11   A.   I do not.

12   Q.   And did you review the file before you came in to

13   testify today?

14   A.   I'm sorry?  Did I review --

15   Q.   Did you review this file before you came in to testify

16   today?

17   A.   Yes, sir.

18   Q.   And did you review the preliminary hearing transcript

19   where Officer Bonetti testified?

20   A.   I did not.

21   Q.   Why not?

22   A.   I don't know.  I didn't --

23   Q.   Well, he was a lead on this; was he not?

24   A.   Yes.

25   Q.   Okay.  And the lead in this particular case testified

45

M. HETHERINGTON - CROSS

1   under oath at a preliminary hearing; is that correct?

2   A.   Yes.

3   Q.   Didn't you think it was important to review what he

4   said under oath?

5   A.   No.

6   Q.   You didn't find that important?

7   A.   No, sir.

8   Q.   You didn't find that you could fill in the blanks from

9   what Bonetti said to you and to others?

10          (No response.)

11  Q.   Now, in this case there was an individual dog by the

12  name of Atlas; is that correct?

13  A.   Yes, sir.

14  Q.   And you quoted that in the search warrant; correct?

15  A.   I didn't type the search warrant, but I believe

16  Detective Keenan quoted that in the search warrant.

17  Q.   Okay.  Officer Bonetti said that Atlas hit on both

18  cars; am I correct?

19  A.   Yes.

20  Q.   Well, when the dog hits, that's the conclusion of the

21  trip around by the handler; am I correct?

22  A.   I'm not a K9 handler, sir.  I don't know.

23  Q.   I know.  I know.  But I'm still asking the questions.

24          MS. SLINSKI:  Your Honor, the witness has answered

25  the question, and defense counsel's assertion or trying to

M. HETHERINGTON - CROSS

1    force an answer upon this witness is inappropriate.

2          At a suppression hearing, Your Honor, it's the

3    Government's responsibility to present a witness, and defense

4    counsel has had ample opportunity and could have subpoenaed

5    individuals to testify today. Mr. -- Detective Hetherington

6    today has testified as it relates to the probable cause

7    issues --

8          THE COURT:  Well, I'm not going to get into that

9    issue.  The question here is whether or not the further

10   questioning can be had if the witness said he doesn't have

11   any information about that or is not knowledgeable about the

12   K9 activity.

13         MR. BILLS:  Well, it's important for the Court to

14   consider because they quoted what the dog did.  They

15   presented one witness, and I'm trying to ascertain what he

16   saw.

17         THE COURT:  You can ask whether he saw what the dog

18   did.

19         MR. BILLS:  He doesn't have to be the handler if he

20   can see what the handler did.

21         THE COURT:  He can testify to what he saw.

22   BY MR. BILLS:

23   Q.   Did you see the dog go around the car?

24   A.   Yes.

25   Q.   All right.  And is this a young dog?

M. HETHERINGTON - CROSS

1    A.   I have no knowledge.

2    Q.   Do you know what a cue is?

3    A.   I do not know what a cue is.

4    Q.   Do you know what a signal is?

5    A.   I do not.

6    Q.   Well, if I signal you to go down off the stand, that's

7    a signal for you to go --

8         MS. SILINSKI:  Your Honor, the question has been

9    asked.  The witness has said he does not know.  He is not a

10   K9 handler.  The K9 handler could have been called by defense

11   counsel if there was an issue related to suppression.  I

12   would remind defense counsel that that issue was not raised

13   in their suppression motion.

14        MR. BILLS:  It is.

15        MS. SILINSKI:  And defense counsel did not

16   incorporate by reference any of the arguments that were made

17   by Mr. Clark.  Mr. Clark's attorney and Mr. Clark's attorney

18   alone is the individual who raised the issue as to Atlas.

19        So if we need to continue today's hearing so that

20   defense counsel can call any witnesses, so be it.  But I will

21   also say that Mr. Suggs' attorney has had ample

22   opportunity -- we have delayed this multiple times -- to be

23   prepared for today's hearing to call the witnesses that they

24   believe are necessary for the issue of suppression.

25        At this point we're far outside of the scope of

M. HETHERINGTON - CROSS

1  this witness's knowledge as it pertains to the issues at hand
2  raised by Mr. Suggs in the suppression --
3       THE COURT:  If the witness does not know what a
4  signal is in the context of a K9, then you have to move on.
5       MR. BILLS:  Well, it's part of the search warrant.
6  So therefore, the surrounding circumstances of that you're
7  going to be asked to take into consideration as a factor,
8  Your Honor.  And I'm suggesting that I should be able to do
9  as much with this witness as I can.
10      THE COURT:  But if the witness doesn't have any
11  information, it's not helpful to you --
12      MR BILLS:  But he watched it.
13      THE COURT:  He watch it, but you're asking him if
14  he knew what a signal was in the context of a K9 search --
15      MR. BILLS:  I understand.
16      THE COURT:  And he said he did not know what that
17  meant.
18      MR. BILLS:  Okay.  I'll move on.
19  BY MR. BILLS:
20   Q.   Do you know whether or not or have you ever seen
21  whether the handler had a body cam on?
22   A.   No.
23   Q.   You didn't?  Or you didn't see it?
24   A.   I don't believe he had a body camera on.
25   Q.   All right.  Do you know whether or not where the

1    vehicle was parked, whether he had a dash cam on recording

2    his traversing of the car?

3        A.    No.

4        Q.    No, what?

5        A.    He did not have a camera on.  The vehicles were at

6    Swissvale Police Department.

7        Q.    Okay.  And when you first looked inside the Subaru,

8    where was that?  Where was it the first time you looked

9    inside?

10       A.    On Grant Street.

11       Q.    Did you see anything in it?

12       A.    Yes.

13       Q.    What?

14       A.    The money on the rear passenger floor.

15       Q.    Okay.  Now, you know -- or had no information that

16   Mr. Suggs was actually connected to Mr. Clark, no specific

17   articulable facts?

18       A.    Other than what the CI had informed us, that it was

19   Clark's cousin.

20       Q.    Well, but he didn't say that he was going to be there?

21       A.    The CI did not, no.

22             MR. BILLS:  Very good.  May I have a moment?

23             (Brief pause.)

24             MR. BILLS:  Your Honor, I have no further questions

25   on the suppression on the warrantless part.  We'll move on,

M. HETHERINGTON - REDIRECT

1   and Mr. Sarna will deal with the Franks issue.

2          THE COURT:  Okay.  Miss Silinski, do you have any

3   follow-up?

4          MS. SILINSKI:  Yes, Your Honor.  Just a brief

5   follow-up as it relates to the questions.

6                    REDIRECT EXAMINATION

7   BY MS. SILINSKI:

8   Q.   Detective Hetherington, just to make clear, was

9   Detective Bonacci present with you while you were conducting

10  surveillance of the Grant Street location?

11  A.   He was in the area.  He wasn't --

12  Q.   So my question specifically is was he present with you

13  while you were tasked with --

14  A.   No, ma'am.

15  Q.   -- conducting surveillance on the vehicles?

16  A.   No, ma'am.

17  Q.   Okay.  Did Detective Bonacci come to the location

18  after you had advised law enforcement that the vehicles had

19  arrived?

20  A.   Yes, ma'am.

21  Q.   And he was involved in the actual arrest; correct?

22  A.   Yes, ma'am.

23  Q.   But as it relates to the observations that you made,

24  you made those observations based upon what you observed as

25  it relates to the seizure of the vehicle as well as the

M. HETHERINGTON - REDIRECT

1    seizure of the persons of Mr. Suggs and Mr. Clark?

2    A.    Yes, ma'am.

3    Q.    Now, I think there was some confusion as it relates to

4    the telephone calls that were placed.  So just to clarify, is

5    it accurate to say that there was a telephone call that was

6    initially made outside of your presence where Mr. Clark

7    agreed to come to Pittsburgh to conduct a controlled

8    purchase -- to sell the confidential source five kilograms of

9    cocaine?

10   A.    Correct.

11   Q.    And you were not a part of that particular

12   conversation?

13   A.    I was not.

14   Q.    But were you advised by law enforcement at a time

15   before February 25, 2019, that this may occur?

16   A.    Yes.

17   Q.    And by this, the drug transaction that you had been

18   informed in October of 2018, could potentially occur?

19   A.    Correct.

20   Q.    On February 25, 2019, were you a part of, did you

21   overhear one or more of the calls that were conducted between

22   the confidential source and Mr. Clark related to the where

23   and when the drug transaction would occur?

24   A.    Yes.

25   Q.    And based upon that call, did you understand that the

M. HETHERINGTON – RECROSS

1  drug transaction was to occur on Grant Street in the

2  Braddock-North Braddock area?

3  A.   Yes, ma'am.

4  Q.   And after those calls occurred, is that when you then

5  were tasked with setting up on surveillance at the location

6  where the deal was to occur?

7  A.   Yes, ma'am.

8  Q.   Now, based upon your training and experience as it

9  relates to the observations that you made –– actually strike

10  that.  I'm sorry.  You were asked about –– no.  Strike that

11  again.  I'm sorry.

12       MS. SILINSKI:  Your Honor, actually that's the only

13  points of clarification that I have for this witness.

14                       RECROSS-EXAMINATION

15  BY MR. BILLS:

16  Q.   When you say you overheard a phone call from the

17  confidential informant to Clark, how did you overhear it?

18  A.   Speaker phone.

19  Q.   And there was a confidential informant on one side,

20  Clark on the other, and you were in the room, and who else

21  was in the room overhearing this?

22  A.   I believe Bonacci, Kucic, Keenan.  There may have been

23  a couple troopers there that I don't recall their names.

24  Q.   So it was multiple overhears, but one call?

25  A.   Yes, sir.

53

1    Q.   Is that correct?

2    A.   Yes, sir.

3    Q.   And were you present for any of the other calls that

4  were made from the CI to Clark?

5    A.   No.

6    Q.   But you were advised of what the conversations were?

7  Am I correct?

8    A.   Nothing more than where the transaction was to take

9  place, and then that's where I went.

10         MR. BILLS:  Very good.  Thank you.

11         MS. SILINSKI:  Nothing further, Your Honor.

12         MR. BILLS:  I have nothing further on that issue.

13         THE COURT:  Thank you.

14         THE WITNESS:  Thank you, ma'am.

15         THE COURT:  Are the exhibits that were attached to

16  the various motions, are any of those part of this record?

17         MS. SILINSKI:  Your Honor, I was going to move

18  Exhibits A, B and C, which were attached to the Government's

19  motion and I believe referenced both by defense -- prior

20  defense counsel as well into evidence at this time.

21         THE COURT:  Is there any objection to those

22  exhibits?

23         MR. BILLS:  No.

24         THE COURT:  Okay.  They are admitted.  Does the

25  Government have any further evidence that you wish to call?

54

1          MS. SILINSKI:  No, Your Honor.  That concludes the

2     Government's evidence as it relates to the suppression issue.

3          And I have no intention of calling another witness

4     as it relates to the Franks issue on the basis that defense

5     counsel has not yet shown a substantial basis as to the need

6     for a Franks hearing.  The factors the Court's reiterated

7     were stated in conclusory fashion without any additional

8     supporting evidence as to what omissions.  So at this time

9     the burden rests on defense counsel to advise the Court as to

10    why a Franks hearing is warranted in this case.

11         THE COURT:  Mr. Bills, the Government has rested

12    its case.  Did you have any evidence on behalf of the defense

13    that you wish to present?  The Government has finished its

14    case, has rested, and the question is does the defense wish

15    to offer any evidence at this time?

16         MR. BILLS:  No.  We rest on that part.  And

17    Mr. Sarna is going to do the other part, however he wants to

18    handle it.

19         MR. SARNA:  Judge, if the Court is not inclined to

20    grant the Franks in light of the testimony that was heard

21    today as well as the material that went in the motion, I

22    would be able to question Detective Hetherington specific to

23    those issues.

24         THE COURT:  Well, the question really is the

25    information that I believe you wish to add was the omissions.

1    I think there were two omissions you presented?

2              MR. SARNA:  Correct.

3              THE COURT:  And so the question for you to argue

4    is, if those are added, let's just assume the truth of those

5    statements; okay?  So if those are added to the affidavit,

6    does it make a difference for probable cause?  Really that's

7    the question before the Court at this time.

8              MR. SARNA:  Oh, yes, Your Honor.  I do understand

9    that.  What I wasn't sure about is previous -- prior to us

10   starting this morning, you indicated that you did not want to

11   hear conclusory arguments, that we would be briefing those

12   arguments.  So I didn't know if the Court would prefer that

13   that part of --

14             THE COURT:  Well, there's no evidence at this

15   stage, you know, other than if you want to rest on your

16   briefing, that's fine, and I could make a determination.

17   There's nothing further unless you wanted to make some brief

18   argument at this time about what would form the basis for

19   your argument that those omissions were material.

20             MR. SARNA:  No, Your Honor.  They're contained

21   within the briefs.  I think essentially we're just --

22             THE COURT:  Do you want to just rely on the

23   briefing for that?

24             MR. SARNA:  Yes.

25             THE COURT:  Okay.  And would you also like file --

1              MS. SILINSKI:  Yes, Your Honor.  I mean I would be

2    glad to brief in response on that issue.  But if defense

3    counsel is going to rely on the brief that was submitted, I

4    think that's sufficient.

5              THE COURT:  So you want to file a response?

6              MS. SILINSKI:  Yes, Your Honor.  As to the issue of

7    a Franks hearing --

8              THE COURT:  Yes.  That would be the supplemental --

9              MS. SILINSKI:  Correct.  Correct.

10             THE COURT:  I'll permit the supplemental to be

11   filed.  And then when will you have your response?

12             MS. SILINSKI:  Your Honor, as it relates to --

13             THE COURT:  The Franks --

14             MS. SILINSKI:  -- the Franks issue?

15             THE COURT:  -- just the supplemental --

16             MS. SILINSKI:  Within seven days.

17             THE COURT:  Okay.  Very well.  I'll expect your

18   response brief within seven days.  Now, I'll order the

19   transcript.  It's not very long.  So it should be ready in

20   the not too distant future.  How much time after you receive

21   that do you want to file your proposed findings of fact and

22   conclusions of law?

23             MR. BILLS:  Ten days.

24             THE COURT:  Ten days afterwards?

25             MS. SILINSKI:  That's fine, Your Honor.

1          THE COURT:  So what I'm going to do is order the

2     costs of the transcript at the joint cost of the parties.

3     Once the transcript is received, communicate with each other

4     so you both know the dates.  And whoever is the last one to

5     receive it, then that will be the date that we start the

6     timeframe.  And then you'll have ten days from that date to

7     file the proposed findings of fact and conclusions of law.

8     If it lands on a weekend, you'll have until the next business

9     day.

10          MS. SILINSKI:  Yes, Your Honor.  Would the Court

11     like us to go ahead and confirm with your Clerk the date that

12     we anticipate filing it based upon receipt?

13          THE COURT:  Well, it would be ten days -- just file

14     a notice once you receive the transcript.  That way it will

15     be on the docket, and then we'll be able to count the days

16     from then.  You have to meet and confer --

17          MS. SILINSKI:  Yes, exactly.

18          THE COURT:  So everybody is clear, so there's no

19     misunderstanding.

20          MS. SILINSKI:  Correct.

21          THE COURT:  Mr. Bills, do you understand that?

22          MR. SARNA:  Yes, Your Honor.  We understand that.

23          THE COURT:  Okay.  So once you receive it, meet and

24     confer with the other side.  And then file the joint notice

25     of the date it was received, whoever is the last one to

1    receive it, and then it will be ten days from that.  As I

2    said, if it falls on a weekend, you'll have until the next

3    business day --

4                MS. SILINSKI:  At this point, Your Honor, is the

5    Court closing the evidentiary hearing as it relates to the

6    suppression issue?

7                THE COURT:  I believe so.  Mr. Bills is talking to

8    his client, so he didn't hear what you said.

9                MR. SARNA:  Judge, we'd be okay with closing the

10   evidence now if the Court would make part of the record the

11   exhibits that were in our motion, the transcript from the

12   preliminary hearing and the previous --

13               THE COURT:  You want to move those into evidence?

14               MR. SARNA:  Yes, Your Honor.

15               THE COURT:  Okay.  And what are they specifically?

16               MR. SARNA:  The transcript from the preliminary

17   hearing --

18               THE COURT:  Yes.

19               MR. SARNA:  -- and the transcript from the

20   detention hearing in this matter.

21               THE COURT:  And what are those exhibits?  Do you

22   want to say those are --

23               MR. SARNA:  We'll say those are Defense 1 --

24               THE COURT:  Defense 1 and Defense 2?

25               MR. SARNA:  Yes, Your Honor.

59

1          THE COURT:  Any objection?

2          MS. SILINSKI:  No, Your Honor.  Those exhibits are

3  fine.

4          THE COURT:  So they will be admitted.  We have a

5  Document 60-1, which is the transcript of the hearing held on

6  March 5, 2019, before Phyllis M. Machel.  It was filed by a

7  court reporter, and it was for the hearing before Magisterial

8  District Judge Thomas Miller.  But we don't have the

9  detention hearing.

10          MR. BILLS:  I have the detention hearing.

11          MS. SILINSKI:  Your Honor, I would obviously just

12  with the caveat of both of those hearings were held for very

13  different reasons than the reason why we're here today for

14  the suppression --

15          THE COURT:  But if there's some statement in there,

16  they want to --

17          MS. SILINSKI:  Sure.  Sure.

18          THE COURT:  Or if you want to use something --

19          MS. SILINSKI:  Sure.

20          THE COURT:  Evidence can be used by either party.

21          MR. BILLS:  There was nothing at the detention

22  pertaining to the issues --

23          THE COURT:  I'm sorry?

24          MR. BILLS:  There was nothing in the detention

25  hearings that pertained to either of the issues today before

1    the Court.

2              THE COURT:  So the only exhibit would be Defense

3    Exhibit 1?

4              MR. BILLS:  Okay.  Go ahead.

5              MR. SARNA:  Your Honor, I could either file it or

6    provide it to the Court, but I do have the transcript from

7    the detention hearing, and it may be needed.  I don't want to

8    fail to include it today and then find out that we do need it

9    when we're --

10             THE COURT:  Okay.  So if you could just submit it

11   to my clerk as Defense Exhibit 2.

12             MR. SARNA:  Certainly.

13             THE COURT:  Okay.  And do you have a copy, Ms.

14   Silinski?

15             MS. SILINSKI:  Yes, Your Honor.  I do.

16             THE COURT:  So it will be admitted.  And is there

17   anything else that would need to be included?

18             MS. SILINSKI:  Your Honor, I believe we have

19   covered the exhibits that were attached to the Government's,

20   and now defense has indicated on --

21             THE COURT:  You're not objecting to either of those

22   exhibits?

23             MS. SILINSKI:  No, Your Honor.  Obviously we'll

24   make arguments as it relates to both, but it is --

25             THE COURT:  I believe the detention hearings where

1    before this Court in any event.

2           MS. SILINSKI:  Yes, Your Honor.  The detention

3    hearing was before Magistrate Judge Eddy, I believe.

4           THE COURT:  Anything further?

5           MR. BILLS:  No.

6           THE COURT:  Okay.  Then this hearing is concluded.

7    And we'll wait for the transcript to be produced.  And then

8    the Court will receive the proposed findings of fact and

9    conclusions of law.

10          But before we leave, there's just one thing I want

11   to clarify so there's an even playing field here for the

12   simultaneous filings.

13          The Government exception to the warrantless seizure

14   for the car, there were two exceptions that I referenced.

15   Which ones are the Government going to rely on?

16          MS. SILINSKI:  The Government I believe stated in

17   its -- let me look in my -- that would be the same as stated,

18   Your Honor, in the Government's response.

19          THE COURT:  You had the community caretaking issue?

20          MS. SILINSKI:  Yes, Your Honor.  That along with --

21   we would also include then the automobile exception and the

22   search incident to -- as well as the inventory search

23   initially of the vehicle.

24          THE COURT:  Uh-huh.  So it's the automobile

25   exception, the inventory that would be done upon the towing,

62

1  and then the third one would be the community caretaking.

2              MS. SILINSKI:  Yes, Your Honor.

3              THE COURT:  So there's three issues.  Mr. Bills,

4  did you understand that?

5              MR. SARNA:  Judge, I thought I heard that there was

6  also the search incident to arrest.

7              THE COURT:  That's what I said at the beginning.

8  Is that one --

9              MS. SILINSKI:  Yes, Your Honor.

10             THE COURT:  So there's four, just so everybody is

11  clear what the Government was going to be looking at in terms

12  of exceptions.

13             MR. SARNA:  Yes, Your Honor.

14             THE COURT:  Okay.  Anything further?

15             MS. SILINSKI:  No, Your Honor.

16             THE COURT:  This hearing is adjourned.

17             (Proceedings were concluded at 12:36 p.m.)

18                              - - -

19                    C E R T I F I C A T E

20

21             I, Deborah Rowe, certify that the foregoing is

22  a correct transcript from the record of proceedings in the

23  above-titled matter.

24
   S/Deborah Rowe  _____
25 Certified Realtime Reporter