IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 19-134 |
| ) | |
| TERRY SUGGS, JR., ) | |
| ) | |
| Defendant. ) | |

## **GOVERNMENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

AND NOW, comes the United States of America, by and through its counsel, Stephen R. Kaufman, Acting United States Attorney for the Western District of Pennsylvania, and Rebecca L. Silinski, Assistant United States Attorney for said district, and as directed by this Honorable Court, respectfully submits the following Government's Proposed Findings of Fact and Conclusions of Law with respect to the Defendant's Motion to Suppress Evidence (Doc. No. 59 and 60):

## **I.   INTRODUCTION**

1.   On May 8, 2019, a federal grand jury returned a three-count Indictment, charging the defendant, Terry Suggs, Jr. (the "defendant" or "Suggs"), with conspiracy to distribute 5 kilograms or more of cocaine (Count One) and possession with intent to distribute 5 kilograms or more of cocaine at Count Three.   *See* Doc. No. 19.

2.   On July 8, 2019, Mr. Suggs filed a Motion to Suppress and Brief in Support, arguing that his warrantless arrest was unlawful and the seizure of the Subaru that he was driving was also unlawful.   *See* Doc. Nos. 59, 60.

3.   On August 22, 2019, the government filed its Response in Opposition, maintaining

1

that the warrantless arrest was lawful, based upon probable cause, and the seizure of the vehicle, which Suggs denied any knowledge of, was also lawful. *See* Doc. No. 70.

4. On May 5, 2021, the court held an evidentiary hearing for the pending Motion to Suppress. *See* Doc. No. 169 (Transcript of Proceedings).[1] The Court identified the issues raised by the defendant in his Motion to Suppress, and to be addressed by the parties, now, as follows: 1) that Suggs' arrest on February 25, 2019, on Grant Street in North Braddock, Pennsylvania, was without probable cause; and, 2) that law enforcement did not have probable cause to seize the Subaru from Grant Street following defendant's arrest. Tr. at 6:23-7:5.

5. At the hearing, the government called one (1) witness, North Versailles Township Police Department Detective Mark Hetherington, and admitted several exhibits into evidence. Specifically, Government Exhibits A (DANET Investigative Report – Incomplete) (Doc. No. 70-1), B (DANET Investigative Report – Complete) (Doc. No. 70-2), and C (Allegheny County Laboratory Report) (Doc. No. 70-3). For ease of reference, the government has attached Exhibits A and B.

6. Defendant did not present any witnesses at the hearing. Defendant did, however, seek inclusion of certain exhibits, which were admitted into evidence: Defense Exhibit 1, the transcript of the preliminary hearing in the state court proceeding (referenced herein as Prelim. Hrg. Tr.), and Defense Exhibit 2[2], the transcript of the detention hearing in this matter.

---

1. Citations to the Transcript are set forth throughout this pleading by reference to the specific page number(s) and line number(s) – that is, "Tr. at ___:____.".

2. Defense counsel stated, however, "There was nothing in the detention hearings that pertained to either of the issues today before the Court." Tr. at 59:24-60:1.

7. At the conclusion of the hearing, the Court closed the evidentiary hearing and ordered the parties to file proposed findings of fact and conclusions of law.

## II. GOVERNMENT'S PROPOSED FINDINGS OF FACT[3]

8. Approximately fifteen (15) law enforcement officers were involved in the operation that led to Mr. Suggs' arrest. *See* Exhibit A, p. 1.

9. Detective Mark Hetherington, of the North Versailles Township Police Department (NVTPD), and member of the District Attorney's Narcotics Enforcement Team (DANET), which is a drug investigation task force, testified at the evidentiary hearing. Tr. at 10:6-9.

10. Det. Hetherington was personally involved in the instant investigation and the arrest of Suggs and his co-defendant, Jermaine Clark, on February 25, 2019. Tr. at 10:13-16.

11. Det. Hetherington is an experienced narcotics trafficking investigator, having served approximately twenty-five (25) years in law enforcement – working for twenty-two (22) years with the NVTPD, and approximately three (3) years as a police officer in the Boroughs of North Braddock and Rankin. Tr. at 9:14-10:5.

12. Det. Hetherington knows, based upon his training and experience, among other things, that:

    a. Philadelphia, Pennsylvania, is a source city for cocaine, and Pittsburgh, Pennsylvania, is a distribution city for cocaine. Tr. at 14:11-18.

---

3. The government does not address, herein, any of the conduct following Suggs' arrest and the seizure of the vehicle since those issues were not raised in defendant's Motion to Suppress or identified by the Court at the evidentiary hearing as issues to be addressed by the parties on the issue of suppression.

      b.      Drug traffickers, who are transporting large amounts of narcotics and/or cash, will often utilize two (2) vehicles – one vehicle to keep the narcotics in (load car), and another to keep the cash or additional drugs in (trail car), as a means of watching their co-conspirator's back as they are conducting the drug transactions. Tr. at 21:7-17.

      c.      Large scale drug traffickers commonly utilize a hidden or concealed compartment, within the vehicle they are operating, to transport narcotics and cash, making it more difficult for law enforcement to locate. Tr. at 27:10-21.

      d.      Individuals involved in drug trafficking often possess multiple cell phones. Tr. at 32:7-13.

13.      In October of 2018, a confidential informant (CI) provided information to investigators that the CI had been purchasing kilogram quantities of cocaine from a major cocaine distributor, known to the CI as "Fats." *See* Tr. at. 10: 17-11:9; Exhibit B, p. 1; Prelim. Hrg. Tr., p. 30:6-12.

14.      During the CI's debriefing(s) regarding this cocaine source of supply, the CI informed investigators of the following:

      a.      The CI has known Fats for "a little over a year." Tr. at 12:4-8.

      b.      Fats is from Philadelphia and regularly travels between Philadelphia and Pittsburgh to conduct drug transactions with his cocaine customers. Tr. at 11:18-23.

      c.      Fats sells kilogram quantities of cocaine and sold the CI a kilogram of cocaine for between $30,000-$33,000 per kilogram. Tr. at 11:24-12:3, 12:12-14; Exhibit B, p. 1.Tr. at 12:12-14.

      d.      Fats met the CI, in Pittsburgh, at a residence on Grant Street in North

Braddock to conduct the drug transaction.   Tr. at 12:15-25.

    e. Fats drives a Chevrolet Traverse, bearing PA registration KPH-8669, that contained a "trap" compartment or concealed area to store drugs and money.   Tr. at 13:1-5, 26:3-10; Exhibit A, p. 2; Exhibit B, p. 2; Prelim. Hrg. Tr., p. 23:5-9.

    f. Fats utilized cellular telephone number 267-752-0440.   Tr. at 12:9-11; Exhibit A, p. 2; Prelim. Hrg. Tr., p. 14: 7-11.

  15. Investigators identified "Fats'" legal name as Jermaine Clark, utilizing his telephone number to conduct a reverse look up, which led them to a driver's license photograph of Jermaine Clark.   Tr. at 13:6-19.   Investigators showed this photograph to the CI, who positively identified the individual in the photograph as "Fats."   Tr. a 13:20-14:3.

  16. Then, in February of 2019, the CI informed investigators that the CI could purchases five (5) kilograms of cocaine from Clark, who the CI expected would be traveling to Pittsburgh within the next few days, possibly February 25, 2019 or February 26, 2019.   Tr. 14:19-15:23.

  17. On February 24, 2019, investigators began receiving PING data/information, indicating the whereabouts of Clark, based upon the location of the cell phone utilizing the telephone number 267-752-0440, which revealed that Clark was in the Pittsburgh area of Allegheny County.   *See* Exhibit A, p. 2, Exhibit B, p. 1-2; Prelim. Hrg. Tr., p. 30:15-20.

  18. On or about February 25, 2019, the CI contacted Detective Ray Bonacci and informed Det. Bonacci that Clark was in Pittsburgh, that the CI met with Clark, and Clark's cousin, at a restaurant in Pittsburgh on the evening of the 24th, and that Clark was staying at the Westin Hotel in Downtown Pittsburgh.   Tr. at 16:1-15.   Exhibit B, p. 2.

5

19. On the morning of February 25, 2019, investigators attempted to locate the Chevy Traverse, Clark's normal/usual vehicle, but were unable to locate the vehicle in or around the Westin. Tr. at 16:18-17:1; Exhibit B, p. 2. Det. Bonacci contacted the CI, inquiring if Clark was driving the Chevy Traverse. Tr. at 17:2-6; Exhibit B, p. 2. The CI informed Det. Bonacci that when the CI met Clark and Clark's cousin, the prior evening, they were in Clark's cousin's silver/gray Subaru. Tr. at 17:6-10; 16-25. Investigators were unable, however, to locate the silver/gray Subaru either in or around the Westin Hotel. Tr. at 18:1-3.

20. Thereafter, at approximately 11:30 AM, investigators met with the CI to place recorded calls to finalize the arrangements for the five (5) kilogram drug transaction between the CI and Clark – that is, the 1400 block of Grant Street in North Braddock. Tr. at 18:4-18; Exhibit B, p. 2; Prelim. Hrg. Tr., p. 5:21-25, 6:1-3, 7:6-13, 14: 7-11.

21. Det. Hetherington was present, and overheard, one (1) or more of these recorded calls between the CI and Clark, wherein Clark and the CI agreed to meet on Grant Street in Braddock/North Braddock. Tr. at 51:20-52:3.

22. At approximately 1500 hours, after the time and place for the drug transaction was confirmed between the CI and Clark, Det. Hetherington set up surveillance in the area of the 1400 block of Grant Street, wherein he had a view of the area where the drug transaction was scheduled to occur. Tr. at 19:5-14; Exhibit A, p. 2; Exhibit B, p. 2.

23. Det. Bonacci was not present at the time Det. Hetherington was conducting surveillance in the vicinity of 1400 block of Grant Street; Det. Bonacci arrived at the location after Det. Hetherington advised law enforcement that the Chevy Traverse and Subaru arrived at his location. Tr. at 50:8-22.

24. While conducting surveillance, Det. Hetherington observed a Chevy Traverse and silver/gray Subaru arrive in the 1400 block of Grant Street, parking across the street from the residence where the CI and Clark had arranged to meet. Tr. at 19:15-24.

25. Clark informed the CI that he (Clark) was approximately twenty (20) minutes away from the location they agreed to meet at and, then, Clark informed the CI that he (Clark) had arrived at the Grant Street location and was waiting for the CI, Exhibit A, p. 2; Exhibit B, p. 2; Prelim. Hrg. Tr., p. 7:14-20.

26. Det. Hetherington contacted Detective Scott Kucic and advised Det. Kucic that the Chevy Traverse, bearing PA registration KPH-8669, occupied by a black male, and second vehicle, a Subaru, bearing PA registration KPZ-3470, occupied by a large black male, arrived in front of the residence on Grant Street. *See* Exhibit A, p. 2; Exhibit B, p. 2.

27. After the vehicles parked across the street from the residence where Clark arranged to meet the CI, Det. Hetherington observed the large, black male, and operator of the Subaru, exit the Subaru, leave the vehicle running, and enter the Chevy Traverse, operated by Clark. Tr. at 20:4-13; Exhibit A, p. 2. Exhibit B, p. 3; Prelim. Hrg. Tr., p. 8:3-12.

28. Det. Hetherington did not observe any other passenger/occupants in the Subaru and did not observe any other passenger/occupants in the Chevy Traverse. Tr. at 20:14-20.

29. Det. Hetherington believed, based upon his knowledge of the investigation, that the Chevy Traverse that parked across the street from the residence wherein the drug transaction was scheduled to occur, was the vehicle that the CI informed investigators Clark utilized and that the silver/gray Subaru was the vehicle that the CI informed investigators Clark's cousin was driving the night before. Tr. at 20:21-21:6.

7

30. Further, Det. Kucic drove past the Chevy Traverse and confirmed that Chevy Traverse, bearing PA registration KPH-8669, was the same vehicle identified by the CI as the vehicle that Clark used in the past to deliver cocaine to the CI.  Exhibit A, p. 2, Exhibit B, p. 2.

31. Investigators confirmed that the Subaru, bearing PA registration KPZ-3470, was registered to an address out of Philadelphia but that it was not registered to either Clark or Suggs. Exhibit B, p 1; Tr. at p. 28:2-20; Prelim. Hrg. Tr., p. 9:5-9.

32. After observing the two (2) vehicles arrive at the location where investigators had arranged for the CI to meet Clark to purchase 5 kilograms of cocaine, investigators made the decision to move in and detain the two (2) individuals, who were located inside of the Chevy Traverse.  Tr. at 21:18-23; Exhibit A, p. 2; Exhibit B, p. 2.

33. The two (2) individuals, identified as Clark and Suggs, were ordered by investigators to exit the Chevy Traverse, handcuffed, and searched by investigators for officer safety.  Tr. at 21:24-22:12; 43:14-18.

34. Investigators located identification on Clark and Suggs persons, which investigators used to confirm their identity and further determine that both Clark and Suggs' were from Philadelphia.  Tr. at 22:15-23:17.

35. Suggs and Clark each had two (2) cell phones on their persons.  Tr. at 23:18-22; Exhibit A, p. 2; Exhibit B, p. 3.

36. Investigators asked Suggs and Clark if the silver/gray Subaru was associated with either of them, but Suggs and Clark denied any knowledge of the vehicle.  Tr. at 23:23-24:6; Exhibit B, p. 3; Prelim. Hrg. Tr., p. 9:5-9.

37. Having witnessed Suggs exit the Subaru, leave the car running and because no other

8

individual entered or exited the vehicle, investigators entered the vehicle to turn the vehicle off, remove the keys from the ignition, and tow it, along with the Chevy Traverse, to the Swissvale Police Department secure garage.   Tr. at 24:7-25:5; Exhibit A, p. 2; Exhibit B, p. 3.

38.     Upon looking into the Subaru, and entering it to turn the vehicle off, law enforcement, including Det. Hetherington, observed a large sum of money, with the bills stacked together and tied together with rubber bands, sitting on the floor of the rear passenger side.   Tr. at 28:21-29:6; 49:7-14.

39.     Investigators showed the CI a photograph of Mr. Suggs and the CI identified Suggs as Clark's cousin.   Tr. at 25:10-18.

40.     Both Suggs and Clark were transported, along with their vehicles, to the Swissvale Police Department.   Tr. at 25:4-9; Exhibit B, 3.

41.     Thereafter, law enforcement obtained a search warrant to search the vehicles, which resulted in the seizure of five (5) kilograms of cocaine from the Chevy Traverse and eighteen (18) kilograms of cocaine from the Subaru, concealed in nearly identical trap compartments and packaged in an identical manner, as well as $8,060 from the Subaru. Tr. at 29:14-32:3.

### III.    GOVERNMENT'S PROPOSED CONCLUSIONS OF LAW

####    A.    Probable Cause Existed for the Warrantless Arrest of Defendant Suggs

42.     The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." U.S. Const. amend. IV.

43. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009) ("[T]he Fourth Amendment does not prohibit all searches—only those that are unreasonable.").

44. "As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). Once the defendant establishes a basis for his motion, the "burden shifts to the government to show that the search or seizure was reasonable." *Id*.

45. The government must prove by a preponderance of the evidence that "each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005).

46. When law enforcement officers make a warrantless arrest, courts assess whether "at the moment the arrest was made, the officers had probable cause to make it" and if "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information, were sufficient to warrant a prudent man in believing that the [defendant] had been or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *see also Zimmerman v. Corbett*, 873 F.3d 414, 418 (3d Cir. 2017).

47. The Third Circuit has repeatedly held that "[t]he collective knowledge of the investigating officers is measured in determining probable cause for an arrest." *United States v. Whitfield*, 644 F.3d 741 (3d Cir. 2010)(internal citations omitted)(where the collective knowledge of one law enforcement officer is imputed to the officer who actually conducted the seizure). Therefore, "the immediate apparency of criminality should be measured, *at a minimum*, by the collective knowledge of the officers on the scene." *Id* (emphasis added).

10

48. Review of probable cause determinations should be conducted based on the totality of the circumstances. *D.C. v. Wesby*, 138 S.Ct. 577, 588 (2018) (citation omitted). This approach recognizes "that the whole is often greater than the sum of its parts." *Id*. This approach also recognizes that otherwise innocent or innocuous facts when viewed in isolation can nevertheless add up to probable cause because "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Id*. (citation omitted). Probable cause cannot be negated by reviewing facts in isolation because such a divide-and-conquer approach is the opposite of the proper totality-of-the-circumstances approach. *Id*.

49. Here, the collective knowledge of the investigating officers, rather than the knowledge of just one[4] of the approximately fifteen (15) officers involved in the operation, shows that there was probable cause to arrest Suggs.

50. As this Court has already summarized, even before hearing the evidence presented by the government at the evidentiary hearing, in its Memorandum Opinion regarding defendant's request for release:

---

4. The defendant continues to rely upon Det. Bonacci's testimony at the state court preliminary hearing for his suppression motion. In his initial Motion to Suppress, the defendant "summarizes" the testimony of Detective Ray Bonacci "to show the Government's evidence against Mr. Suggs." The document speaks for itself and the government disputes the defendant's characterization of his testimony. With that being said, the defendant also states that "[a] state-court preliminary hearing provides the best evidence of the evidence underlying the prosecution of Mr. Suggs." Doc. No. 60, p. 2. The basic principle of a preliminary hearing, however, is not to determine guilt beyond a reasonable doubt but rather to protect the individual's right against an unlawful arrest and detention, thus it is hardly the "best" evidence. *Stewart v. Abraham*, 275 F.3d 220, 238 (3d Cir. 2001)(holding the standard, under Pennsylvania law, for the preliminary hearing is to "insure that the government can establish sufficient facts to justify further detention").

> As reflected in the DANET report (ECF No. 70-2), the CI informed officers that Clark was in Pittsburgh with his cousin (later identified as Suggs) on February 24, 2019. The CI related that Suggs was driving a gray Subaru. The next day, officers observed Clark arrive at the time and place arranged for the drug deal. Officers also saw Suggs drive a gray Subaru to the same location, park in front of Clark, leave the engine running, and enter the passenger seat of Clark's vehicle. Suggs was the only person in the Subaru. When the officers arrested Clark and Suggs, they denied any knowledge of the Subaru.
>
> [O]ver $8,000 in cash was found on the floor behind the driver's seat [of the Subaru].
>
> Suggs and Clark both lived in Philadelphia. The vehicles driven by Suggs and Clark were both registered in Philadelphia.

Doc. No. 152, p. 7-8 ("Suggs argues that the evidence presented against him has been meager, attenuated and highly circumstantial.   Suggs argues the CI never mentioned him, points out that the CI's arrangements were with Clark, and contends there is no evidence that Suggs knew anything about the drugs seized from his car.   The court does not agree.").

51.     In addition to the exhibits provided to the Court, via the Government's Response in Opposition to Defendant's Motion to Suppress (Doc. No. 70), at the hearing, the Court was given the first-hand account of Det. Hetherington, who was on scene at the time the decision was made to converge on the vehicles, arrest Clark and Suggs, and seize the vehicles.

52.     Det. Hetherington provided the Court with credible testimony, explaining in detail, the events leading to Suggs' arrest.

53.     Based upon the evidence presented to the Court and made a part of the record, investigators had the following information prior to arresting Suggs:

      a)     Clark lives in Philadelphia and drives a Chevy Traverse.

  b)  Clark and the confidential source made arrangements for Clark to supply the confidential source five (5) kilograms of cocaine.

  c)  Clark previously provided the confidential source with his telephone number to contact him regarding drug transactions.

  d)  Clark and the confidential source agreed to meet at a residence located on the 1400 block of Grant Street in North Braddock, between 3:00 and 4:00 PM on February 25, 2019, to conduct the drug transaction, the same residence they previously met at for this purpose.

  e)  Clark's "cousin" was in Pittsburgh with Clark and the CI met them both at a restaurant the day before the transaction occurred – that is February 24, 2019.

  f)  Clark's "cousin" was driving a Subaru, which Clark and his "cousin" used on February 24, 2019.

  g)  At the time and place the CI and Clark agreed upon, Clark, driving the Chevy, registered to an address out of Philadelphia, PA, arrived and parked across from the predetermined location on the 1400 block of Grant Street.

  h)  A Subaru arrived at the same time as the Chevy and parked in front of the Chevy, also in front of the residence on the 1400 block of Grant Street.

  i)  The Subaru was registered to an address out of Philadelphia.

  j)  The driver of the Subaru exited the vehicle, left the keys in the ignition and engine still running, and entered the passenger side of Clark's Chevy.

  k)  When asked by law enforcement, Suggs, who was identified by the CI as Clark's cousin, via a photograph, denied any knowledge of the Subaru.

54.  Based upon the information presented to the Court, investigators had probable cause to arrest Suggs and his warrantless arrest was reasonable and lawful.  Thus, his motion to suppress on this issue, should be denied.

### B.      The Warrantless Seizure of the Subaru, was Lawful.[5]

55.     The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." U.S. Const. amend. IV.

56.     "The touchstone of the Fourth Amendment is reasonableness." *Jimeno*, 500 U.S. at 250; *Price*, 558 F.3d at 277 ("[T]he Fourth Amendment does not prohibit all searches—only those that are unreasonable.").

57.     "As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." *Johnson*, 63 F.3d at 245. Once the defendant establishes a basis for his motion, the "burden shifts to the government to show that the search or seizure was reasonable." *Id*. The government must prove by a preponderance of the evidence that "each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *Ritter*, 416 F.3d at 261.

58.     A basic premise of the search and seizure doctrine is that searches undertaken

---

5.     The government, initially, asserted two exceptions (addressed in its response and herein – automobile exception and community caretaking doctrine) to the requirement that the government obtain a search warrant to seize the vehicle.  The government noted that the issue raised by the defendant was the issue of whether the *seizure* of the Subaru was lawful, not the lawfulness of the search warrant.  Tr. at 5:2-21.  At the conclusion of the suppression hearing, two additional exceptions were discussed – that is, the inventory search and search incident to arrest.   While the government asserts that these two (2) additional exceptions could have applied (search incident to arrest and inventory search), investigators seized the vehicle, pursuant to the other two exceptions (automobile exception and community caretaking doctrine), and then sought to obtain a search warrant after the K9 alerted to the presence of narcotics in both vehicles.  The Subaru was not searched until *after* a search warrant was obtained and an inventory search was not conducted.  Thus, those two (2) exceptions (search incident to arrest and inventory search) are inapplicable.

14

without judicial oversight and a warrant issued upon probable cause are "per se unreasonable," subject only to a few specifically established exceptions.  *Katz v. United States*, 389 U.S. 347, 357 (1967).

59. When law enforcement have probable cause to believe that a container – or in this case, a car – holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the Fourth Amendment to permit seizure of the property pending the issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it.  *United States v. Richardson*, No. CR 15-0176, 2016 WL 223705, at *5. (D.N.J. Jan. 19, 2016).

60. One such exigency is the automobile exception to the warrant requirement, which provides that "[a] vehicle's inherent mobility creates circumstances of such exigency." *See California v. Carney*, 471 U.S. 386, 393 (1985); *S. Dakota v. Opperman*, 428 U.S. 364, 367 (1976). Thus, an officer may seize the vehicle to prevent it from being driven away or stolen while law enforcement obtain a search warrant.

61. Moreover, the Third Circuit explained that an officer's community caretaking duty provides another reason that an officer may believe it reasonable to impound a vehicle. *U.S. v. Smith*, 522 F. 3d 305, 314. (3d Cir. 2008). The court explained that, in that case, both occupants of the vehicle were arrested and there was no one to move the vehicle or ensure its safekeeping. *Id*. Of particular concern to the officer was that this vehicle was parked in a dangerous area and subject to being damaged, vandalized or even stolen. *Id*.

62. Here, the Subaru was left by Suggs with the engine running and keys in the ignition, after he parked it on the side of the road in a residential neighborhood in North Braddock.

63.     While Suggs denied any knowledge of the vehicle, Det. Hetherington observed Suggs exit the vehicle, leave the vehicle running, and then enter the Chevy Traverse driven by Clark.

64.     Since Suggs denied any knowledge of the vehicle, he did not provide law enforcement with the name of a person who could come and pick the vehicle up or secure the vehicle and the keys while they were under arrest.

65.     Both Clark and Suggs were from Philadelphia, PA, and the Subaru was registered in the name of a third party, who also was, purportedly, located in Philadelphia, PA, based upon the vehicle's registration.  By seizing the vehicle, law enforcement could have contacted the registered owner to arrange for its return.

66.     Further, investigators observed, in plain view, a large stack of US currency, laying on the floor of the rear of the Subaru.

67.     Investigators had probable cause to obtain a search warrant for the Subaru (even without the canine alerting to the presence of narcotics).  As such, the automobile exception permitted investigators to seize the vehicle until they had a warrant to search it, which they obtained thereafter, while Clark and Suggs were in custody.

68.     Det. Hetherington testified that, based upon his twenty-five (25) years of training, it is common for large-scale drug traffickers to utilize two (2) vehicles to transport and effectuate drug transactions – that is, one vehicle to hold the drugs and another to hold the money. Investigators observed Clark driving the Chevy Traverse, a vehicle he normally used to meet the CI, and the CI had arranged to buy 5 kilograms of cocaine from Clark at that location. Investigators also knew that Clark's cousin was in town with him and driving the Subaru.

16

69. Moreover, when investigators looked into the vehicle and then entered it to turn the ignition off, they observed a large stack of US Currency, stacked together and wrapped with rubber bands.

70. Further, the investigator's community caretaking duty provides another basis for this Court to find that it was reasonable for investigators to impound the Subaru, transporting it to the SPD garage.

71. Here, there was no one present to move the vehicle or take the keys. The vehicle had been left running, unlocked and accessible to anyone. Had officers left the vehicle where it was, without towing it, the vehicle would have been left in a residential area of the North Braddock neighborhood of Pittsburgh susceptible to theft but, even worse, to a child entering the vehicle and attempting to drive it.

72. Moreover, the Subaru had a large amount of US currency laying on the floor of the vehicle – money that anyone could have stolen from the vehicle. Certainly, if the money had been the proceeds of lawful activity, anyone, including Suggs, would have been grateful that investigators towed the vehicle, thereby securing its contents, including the over $8,000, from the wayward passersby.

73. As such, investigators seizure of the Subaru was reasonable, under both the automobile exception and community caretaker doctrine as set forth above.

## IV. CONCLUSION

WHEREFORE, for the reasons set forth herein, the United States respectfully submits that the defendant's motion to suppress should be denied.

        Respectfully submitted,

        STEPHEN R. KAUFMAN
        Acting United States Attorney

By:   */s/ Rebecca L. Silinski*
        REBECCA L. SILINSKI
        Assistant United States Attorney
        PA ID No. 320774