## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,     )
     )
     v.     )     Crim. No. 19-134
     )
TERRY SUGGS, JR.,     )
     Defendant.     )

### FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESEPCT TO THE MOTION TO SUPPRESS AND OPINION WITH RESPECT TO REQUEST FOR FRANKS HEARING

**CONTI, Senior District Judge.**

I.    **Introduction**

Pending before the court is a motion to suppress evidence (ECF No. 59), and a request for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978) (ECF No. 135), filed by defendant Terry Suggs, Jr. ("defendant" or "Suggs"). Suggs is charged in a two-count criminal indictment with conspiring to possess with the intent to distribute, and possessing with the intent to distribute, 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine and 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii), and 846. (ECF No. 19.) The charges in the indictment are based upon evidence obtained from, among other sources, a confidential informant ("CI") and law enforcement's investigation of Suggs' codefendant, Jermaine Clark ("Clark"), who pleaded guilty in this case. (ECF No. 157.)

According to Suggs, the evidence against him in this case should be suppressed because law enforcement arrested him and seized a vehicle in which he was allegedly present without warrants or probable cause in violation of his rights guaranteed by the

Fourth Amendment to the United States Constitution. Suggs also argues that he is entitled to a hearing pursuant to Franks, because two police officers intentionally and with reckless disregard for the truth omitted material facts from the affidavit of probable cause upon which search warrants were issued for two vehicles in this case. The government argues in response that probable cause existed for Suggs' arrest and, pursuant to the automobile exception to the warrant requirement, police officers lawfully seized Suggs' vehicle. According to the government, Suggs failed to show he is entitled to a Franks hearing, and, therefore, his request for a hearing should be denied.

For the reasons set forth in these findings of fact and conclusions of law and the opinion, the court agrees with the government that probable cause existed for Suggs' arrest, the automobile exception applied to the seizure of Suggs' alleged vehicle, and Suggs failed to show that he is entitled to a Franks hearing. The motion to suppress (ECF No. 59) and Suggs' request for a Franks hearing will, therefore, be denied.

## II.   Procedural History

On May 8, 2019, a federal grand jury returned an indictment against Suggs and Clark charging them with:

(1)   conspiring to distribute and possess with intent to distribute and possessing with intent to distribute 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine and 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine on or about February 24, 2019, to February 25, 2019 in violation of 21 U.S.C. § 846 (count one against Suggs and Clark); and

(2)   possession with intent to distribute 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine and 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine on or about February 25, 2019, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii) and (viii) (count two against Clark and count three against Suggs).

(ECF No. 19.)

On July 8, 2019, Suggs' counsel filed a motion to suppress evidence and brief in support of the motion. (ECF Nos. 59-60.) Attached to the brief in support of the motion to suppress were two exhibits: (1) the transcript of the preliminary hearing held in the Allegheny County Court of Common Pleas; and (2) the search warrant for a gray Subaru with Pennsylvania license plate KBZ3470, including a redacted version of the affidavit of probable cause in support of the warrant. (ECF Nos. 60-1 and 60-2.)

On August 22, 2019, the government filed a response in opposition to Suggs' suppression motion. (ECF No. 70.) On August 30, 2019, Suggs filed a reply brief in support of his suppression motion. (ECF No. 71.) On August 18, 2020, Suggs' new and current counsel filed a motion to amend/correct suppression motion arguing that Suggs was entitled to a hearing pursuant to Franks. (ECF No. 135.)

On May 5, 2021, the court held a suppression hearing. The government presented the testimony of detective Mark Hetherington ("Hetherington") and entered three exhibits into evidence: (1) Exhibit A—Allegheny County's District Attorney's Office Narcotics Enforcement Team ("DANET") Investigative Report—Incomplete (ECF No. 70-1); (2) Exhibit B—DANET Investigative Report—Complete (ECF No. 70-2); and (3) Exhibit C—Allegheny County Laboratory Report (ECF No. 70-3).

Suggs entered two exhibits into evidence: (1) the transcript of the preliminary hearing held in the Allegheny County Court of Common Pleas (Exhibit 1); and (2) the transcript of the detention hearing in this federal case (Exhibit 2). (H.T. 5/5/2021 (ECF No. 166) at 58.)

The court on the record during the suppression hearing granted the motion to amend/correct the suppression motion and permitted the government to file a response in opposition to the motion. The court set a briefing schedule for the parties to submit proposed findings of fact and conclusions of law.

On May 12, 2021, the government filed its response in opposition to the motion to amend/correct and attached to its response a copy of the affidavit of probable cause relied upon for the issuance of a search warrant for a vehicle from which one of the investigating police officers allegedly saw Suggs exit. (ECF Nos. 163 and 163-1.) The court permitted Suggs to file a supplemental brief with respect to the Franks issues raised in the motion to amend/correct, which he filed on July 7, 2021. (ECF No. 175.) On the same day, Suggs filed proposed findings of fact and conclusions of law with respect to the motion to suppress. (ECF No. 178.) On July 8, 2021, the government filed its proposed findings of fact and conclusions of law with respect to the motion to suppress. (ECF No. 177.)

### III.   Motion to Suppress

After considering the parties' submissions and the evidence presented at the suppression hearing, the court makes the following findings of fact and conclusions of law:

#### A. Findings of Fact

FOF 1.        Hethertington has been a police officer for the North Versailles Township Police Department for 22 years. (H.T. 5/5/2021 (ECF No. 166) at 9.) He is a member of the DANET. (Id. at 10.)

FOF 2.        Hetherington became involved in the investigation of Clark in October 2018. (Id. at 10.)

FOF 3.        Ray Bonacci ("Bonacci"), a detective supervisor with the Allegheny County District Attorney's Office and a police officer for 25 years, and other police officers, were also a part of the investigation of Clark. (ECF No. 60-1 at 5.) (The court in this opinion will refer to the police officers, who participated in the investigation, surveillance, and arrest of Clark and Suggs, as the "investigating officers.").

FOF 4.        In October 2018, a confidential informant ("CI") informed Hetherington and other investigating police officers that he could purchase a large amount of cocaine from a man named "Fats" in Philadelphia, Pennsylvania. (H.T. 5/5/2021 (ECF No. 166) at 10-11.)

FOF 5.        The CI reported that over the course of approximately a year, he purchased "[k]ilos of cocaine" from Fats, who traveled from Philadelphia to Pittsburgh, Pennsylvania, to sell cocaine to "multiple customers." (H.T. 5/5/2021 (ECF No. 166) at 11-12.) The CI paid Fats between $30,000.00 to $33,000.00 per kilogram of cocaine. (Id. at 12.)

FOF 6.        Philadelphia, Pennsylvania, is a "source city" for cocaine; Pittsburgh, Pennsylvania, is a "distribution city" for cocaine. (H.T. 5/5/2021 (ECF No. 166) at 14.)

FOF 7.        The CI met Fats at a residence on Grant Street in North Braddock, Pennsylvania, to purchase the cocaine. (H.T. 5/5/2021 (ECF No. 166) at 12.)

FOF 8.        The CI reported that Fats drove a Chevy Traverse and that Fats "operated vehicles with a trap location or a concealed area to store drugs and money[.]" (H.T. 5/5/2021 (ECF No. 166) at 13, 26.)

FOF 9.        The CI provided the investigating officers with Fats' telephone number.[1] The investigating officers used the telephone number to determine[2] that Fats' legal name was "Jermaine Clark." (H.T. 5/5/2021 (ECF No. 166) at 12-13.)

FOF 10.        The investigating officers obtained Clark's driver's license picture and showed it to the CI. The CI confirmed that Clark was Fats. (H.T. 5/5/2021 (ECF No. 166) at 13-14.)

FOF 11.        In February 2019, the CI (acting with the investigating officers) via telephone arranged to purchase five kilograms of cocaine from Clark. (H.T. 5/5/2021 (ECF No. 166) at 14.)

FOF 12.        Within a few days of the initial telephone call, the investigating officers learned that Clark intended to travel to Pittsburgh, Pennsylvania, to sell the cocaine to the CI on or about February 25 or 26, 2019. (H.T. 5/5/2021 (ECF No. 166) at 15.)

FOF 13.        On or about February 24, 2019, the CI called Bonacci and told him that Clark was in Pittsburgh staying at the Westin Hotel. (ECF No. 166 at 16.)

FOF 14.        The CI informed Hetherington and other investigating officers that on February 24, 2019, he met with Clark and Clark's cousin at a restaurant. (H.T. 5/5/2021 (ECF No. 166) at 16.)

---

[1]     At some point during the investigation, the investigating officers obtained a court order for "GPS tracking" of the cellular telephone for which the CI provided the cellular telephone number to the investigating officers and identified that number as belonging to Clark. (ECF No. 60-1 at 37.)

[2]     The investigating officers identified Fats as Clark via the "McLaughlin System," which is "a system that utilizes…phone numbers to do reverse lookups." (H.T. 5/5/2021 (ECF No. 166) at 13.)

FOF 15.     On February 25, 2019, Hetherington and other investigating officers tried, but failed, to locate Clark's Chevy Traverse. (H.T. 5/5/2021 (ECF No. 166) at 16-17.) Bonacci called the CI and asked if "Clark was in his normal vehicle," i.e., the Chevy Traverse. The CI responded that Clark and Clark's cousin were in Clark's cousin's vehicle, i.e., a silver Subaru. (H.T. 5/5/2021 (ECF No. 166) at 17.) Hetherington, however, did not locate a gray or silver Subaru in the "parking deck" of the Westin Hotel. (Id. at 18.)

FOF 16.     Hetherington and other investigating officers recorded telephone calls between the CI and Clark about the time and location of their meeting to effectuate the sale of the cocaine. (H.T. 5/5/2021 (ECF No. 166) at 18.) They agreed to meet at the 1400 block of Grant Street in North Braddock, Pennsylvania, between 3:00 p.m. and 4:00 p.m. (Id. at 18, 33.)

FOF 17.     Based upon his training and experience, Hetherington was aware that drug trafficking activity occurred in or around North Braddock, Pennsylvania. (H.T. 5/5/2021 (ECF No. 166) at 18.)

FOF 18.     After the CI and Clark agreed to meet on Grant Street in North Braddock,[3] Hetherington went to the 1300 block of Grant Street to set up surveillance. (H.T. 5/5/2021 (ECF No. 166) at 19.)

---

[3]     Investigating officers who were part of the surveillance team recorded a call between the CI and Clark at approximately 3:30 p.m. during which Clark indicated he was 20 minutes away from Grant Street. (ECF No. 60-1 at 7, 23.)

FOF 19.        Hetherington saw[4] a Chevy Traverse driven by Clark and a gray or silver Subaru arrive on the scene and park across the street from where the cocaine transaction was set to occur. (H.T. 5/5/2021 (ECF No. 166) at 19.)

FOF 20.        At some point, Bonacci "ran the registration" of the Chevy Traverse and Subaru and learned the vehicles were registered in Philadelphia, Pennsylvania. (ECF No. 60-1 at 9.)

FOF 21.        A large black male (later identified as Suggs) exited the Subaru and entered the passenger side of the Chevy Traverse. (H.T. 5/5/2021 (ECF No. 166) at 20; ECF No. 60-1 at 9.) Hetherington did not see anything in Sugg's hands as he exited the Subaru and entered the Chevy Traverse. (H.T. 5/5/2021 (ECF No. 166) at 38.)

FOF 22.        The Subaru was left running with the keys in the ignition. (H.T. 5/5/2021 (ECF No. 166) at 20, 24.)

FOF 23.         Hetherington believed that the silver or gray Subaru belonged to Clark's cousin with whom the CI met on February 24, 2019. (H.T. 5/5/2021 (ECF No. 166) at 21.)

FOF 24.        It is typical for drug traffickers to use two different vehicles when transporting narcotics or cash. Narcotics may be kept in one vehicle and cash in the other vehicle. The use of two vehicles also permits the drug traffickers to "watch one another's back as they're conducting business." (H.T. 5/5/2021 (ECF No. 166) at 21.)

---

[4]        Bonacci did not know whether any of the investigating officers witnessed the Subaru drive onto the scene. (ECF No. 60-1 at 21.)

FOF 25.    Approximately two or three minutes after Suggs entered the Chevy Traverse, Bonacci decided to "move in and detain the two suspects that were inside the Chevy Traverse." (H.T. 5/5/2021 (ECF No. 166) at 21, 39.)

FOF 26.    Approximately eight law enforcement officers with firearms, vests, and badges were part of the "take-down team." (H.T. 5/5/2021 (ECF No. 166) at 39.)

FOF 27.    The investigating officers instructed the occupants of the Chevy Traverse to exit the vehicle. The occupants of the Chevy Traverse complied and exited the vehicle. (H.T. 5/5/2021 (ECF No. 166) at 22.)

FOF 28.    Suggs was put on the side of the road face down and handcuffed. (H.T. 5/5/2021 (ECF No. 166) at 43.)

FOF 29.    Hetherington and other investigating officers conducted a pat-down and search of the person of each of the occupants of the Chevy Traverse and requested identification. The pat-down and search were "[t]o identify the actors and make sure they had no weapons on them[,]" i.e., "for officer safety purposes and to identify them." (H.T. 5/5/2021 (ECF No. 166) at 22.)

FOF 30.    The actors did not provide the investigating officers with identification. (H.T. 5/5/2021 (ECF No. 166) at 22.) Hetherington and the investigating officers, however, found identification on Clark's person, which confirmed his identity and that he was from Philadelphia, Pennsylvania. (Id.)

FOF 31.    Hetherington obtained identification from the driver of the Subaru, which indicated the individual was Suggs and that he was from Philadelphia, Pennsylvania. (H.T. 5/5/2021 (ECF No. 166) at 23.)

FOF 32.      Two cellular telephones were found on Clark and two cellular telephones were found on Suggs. (H.T. 5/5/2021 (ECF No. 166) at 23.)[5]

FOF 33.      At some point, Bonacci or another investigating officer dialed the number the CI provided for Clark and one of the cellular telephones recovered from Clark and Suggs began to ring. (ECF No. 60-1 at 12.)

FOF 34.      Based upon Hetherington's training and experience, he was aware that it is common for individuals who are involved in drug trafficking to possess multiple cellular telephones. (H.T. 5/5/2021 (ECF No. 166) at 32.)

FOF 35.      Hetherington and the investigating officers asked Suggs and Clark "if the…[Subaru] was associated with them." (H.T. 5/5/2021 (ECF No. 166) at 24.) They responded that "[t]hey had no knowledge of the vehicle." (Id.)

FOF 36.      The investigating officers determined the owner of the vehicles was an automobile dealership in Philadelphia, Pennsylvania. (H.T. 5/5/2021 (ECF No. 166) at 24, 27, 28; ECF No. 60-1 at 35.)

FOF 37.      One of the investigating officers entered the Subaru to turn the vehicle off. (H.T. 5/5/2021 (ECF No. 166) at 27-28.)

FOF 38.      One of the investigating officers sent a picture of Suggs to the CI, and the CI identified Suggs from the picture. (H.T. 5/5/2021 (ECF No. 166) at 25.)

FOF 39.      Suggs and Clark were placed under arrest and transported to the Swissvale Police Department. (H.T. 5/5/2021 (ECF No. 166) at 25.)

---

[5]      Bonacci testified that he believed four cellular telephones were recovered from Clark and he did not know how many cellular telephones were recovered from Suggs. (ECF No. 60-1 at 9, 32.)

FOF 40.      While the Subaru was still on Grant Street, Hetherington observed "a large sum of money[6] sitting on the passenger rear floor of the vehicle." (H.T. 5/5/2021 (ECF No. 166) at 28, 49.)[7] The money was in "smaller denominations of bills stacked together and tied together or stuck together with rubber bands." (Id. at 28-29.) The stack of money was still in the Subaru when the investigating officers searched the vehicle pursuant to the search warrant. (Id. at 29.)

FOF 41.      The investigating officers towed the Chevy Traverse and Subaru to the Swissvale Police Department. (H.T. 5/5/2021 (ECF No. 166) at 24.)

FOF 42.      Once at the Swissvale Police Department, a K9 sniff was conducted on both vehicles by a police dog named Atlas. The K9 "indicated hits on both of the vehicles in the same area," i.e., "near the gas tank…where you put the gas in the car." (H.T. 5/5/2021 (ECF No. 166) at 25, 45.)

FOF 43.      Detective Keenan applied for and was granted a search warrant for both vehicles. (H.T. 5/5/2021 (ECF No. 166) at 26-27.)

FOF 44.      During a search of the Chevy Traverse pursuant to the search warrant, Hetherington and investigating officers found underneath the third-row seating a "trap," i.e., a "hidden compartment…concealed within the vehicle… that dealers…utilize…to transport narcotics and cash…to make it more difficult to locate for law enforcement." (H.T. 5/5/2021 (ECF No. 166) at 27.)

---

6      Bonacci testified that $8,000.00 or $9,000.00 was recovered from the Subaru. (ECF No. 60-1 at 20.)

7      Bonacci, however, testified that he thought the money in the Subaru was located behind the driver's side seat. (ECF No. 60-1 at 20.) The court credits the testimony of Hetherington—the officer who saw the money in the Subaru.

FOF 45.      It is common for large-scale drug traffickers to use a trap to transport currency and controlled substances. (H.T. 5/5/2021 (ECF No. 166) at 27.)

FOF 46.      During the search of the Subaru pursuant to the search warrant, Hetherington and investigating officers located a trap in the rear of the vehicle near the cargo area. (H.T. 5/5/2021 (ECF No. 166) at 29.) Hetherington noticed that "the carpet was pulled away from the interior wall of the vehicle." (Id.) He "pulled the carpet back a little further,…which…revealed a fresh weld of some type of box underneath the carpet." (Id.) Hetherington based upon his training and experience believed it was a trap compartment. (Id. at 29-30.) Investigating officers found 18 kilograms of cocaine inside the trap compartment. (Id. at 30.)

FOF 47.      Samples of the suspected cocaine recovered from each of the vehicles were field tested. Samples from each vehicle tested positive for cocaine.[8] (H.T. 5/5/2021 (ECF No. 166) at 30-31.)

FOF 48.      Hetherington observed that the cocaine recovered from the Chevy Traverse and the cocaine recovered from the Subaru were "packaged for distribution" in the same manner. They both had "vacuum sealed baggies on the exterior," and layers of electrical tape and green Saran wrap. (H.T. 5/5/2021 (ECF No. 166) at 31.) The cocaine found in both vehicles was stamped with a "K" and a backwards "Z[.]" (Id. at 31.)

### B. Conclusions of Law

Suggs argues that law enforcement violated his rights guaranteed by the Fourth Amendment to the United States Constitution when it arrested him and seized and

---

[8]      Bonacci testified that based upon his experience as a law enforcement officer handling and seizing cocaine, the "[s]trong odor" of the substances once the packages were open for testing lead him to believe it was cocaine. (ECF No. 60-1 at 11, 34.)

searched the Subaru without a warrant or probable cause, and that all evidence resulting from the illegal arrest, seizure, and search should be suppressed.

### 1. The Warrantless Arrest of Suggs

COL 1.        The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause…." U.S. CONST. AMEND. IV.

COL 2.        When a defendant challenges the validity of a warrantless arrest conducted by law enforcement, the government bears the burden to prove the validity of the arrest. United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002) ("[A]n officer's inferences and deductions can only justify a warrantless arrest if the government satisfies its burden of establishing the probable cause necessary to support the arrest.").

COL 3.        "A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." Maryland v. Pringle, 540 U.S. 366, 370 (2003).

COL 4.        "Probable cause exists if there is a 'fair probability' that the person committed the crime at issue." Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000) (quoting Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997)).

COL 5.        "'Probable cause exists where 'the facts and circumstances within…[the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the

belief that' an offense has been or is being committed [by the person to be arrested].'"

Dunaway v. New York, 442 U.S. 200, 208 (1979) (quoting Brinegar v. United States,

338 U.S. 160, 175–76 (1949)); United States v. Thomas, 797 F. App'x 730, 732–33 (3d

Cir. 2020).

COL 6.      The Third Circuit Court of Appeals has instructed that "'[t]he

collective knowledge of the investigating officers is measured in determining probable

cause[.]'" United States v. Whitfield, 634 F.3d 741, 745 (3d Cir. 2010) (quoting United

States v. Belle, 593 F.2d 487, 497 n. 15 (3d Cir.1979).

COL 7.      Suggs argues, and the government does not dispute, that he was

arrested him "immediately upon the officers' approach to the [Chevy] Traverse." (ECF

No. 178 ¶ COL 1.)[9] Under those circumstances, the court must determine whether *at*

---

[9]      One district court has explained the relationship between a Fourth Amendment
seizure and an arrest as follows:

> While court decisions often use the terms "stop" and "arrest" when
> discussing Fourth Amendment principles, these should be understood not
> as different types of seizures, but as shorthand references for the
> permissible purpose of the seizure and the "quantum of individualized
> suspicion" necessary to justify it. California v. Hodari D., 499 U.S. 621, 627
> n. 3, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). A "seizure" occurs whenever
> police detain a person through show of authority—regardless of the manner,
> purpose, or length of the detention—whereas an "arrest" is normally defined
> under common law and state law as physically taking a person into custody.
> See id. at 624–29, 111 S.Ct. 1547; Sibron, 392 U.S. at 60–62 n. 20, 88 S.Ct.
> 1889. A seizure, once it occurs, does not become any more of a "seizure"
> when police formally arrest the suspect. In this way, arrests and seizures
> are somewhat like squares and rectangles: an "arrest" is invariably a
> "seizure" but a "seizure" is not always an "arrest." Whether a seizure is
> classified as a "stop" or an "arrest" may impact on the level of suspicion
> necessary to justify continued detention, but it does not affect the fact that
> a seizure has occurred. Hodari, 499 U.S. at 624–29, 111 S.Ct. 1547; see
> also Atwater, 532 U.S. at 347 n. 16, 121 S.Ct. 1536. But cf. Clancy, supra
> note 11, at 174–88 (arguing for constitutional definition of "arrest").

*that point in time* the investigating officers had probable cause to believe that Suggs

committed a felony offense.

COL 8.        At the time Bonacci and the investigating officers approached the

Chevy Traverse to arrest Suggs and Clark, i.e., on February 25, 2019, at approximately

4:00 p.m., they knew or learned from the CI that:

- Clark and the CI agreed to meet on that day, i.e., February 25, 2019, between 3:00 p.m. and 4:00 p.m. at that location for Clark to sell the CI 5 kilograms of cocaine;

- drug trafficking activity occurred in or around the location agreed upon by Clark and the CI, i.e., North Braddock;

- Clark lived in Philadelphia, Pennsylvania, but was in Pittsburgh, Pennsylvania, with his cousin on February 24, 2019;

- the CI met with Clark and Clark's cousin at a restaurant in Pittsburgh, Pennsylvania, on the previous day, i.e., on February 24, 2019;

- Clark drove a Chevy Traverse with a trap, which is used by drug traffickers to conceal drugs and money;

- on February 24, 2019, Clark was in a silver or gray Subaru with his cousin;

- Clark arrived on Grant Street driving the Chevy Traverse at or around the time he agreed upon with the CI;

- a gray or silver Subaru arrived on Grant Street at or around the time agreed upon by Clark and the CI and parked within close proximity of the Chevy Traverse;

- the driver of the Subaru (Suggs) exited the vehicle, left the keys in the ignition and engine running, and entered the passenger side of Clark's Chevy Traverse; and

- typically drug traffickers use two different vehicles to conduct drug transactions and keep narcotics in one vehicle and cash in the other vehicle.

---

Christopher v. Nestlerode, 373 F. Supp. 2d 503, 517 (M.D. Pa. 2005), aff'd, 240 F. App'x 481 (3d Cir. 2007).

COL 9.        Based upon the foregoing, at the time Bonacci and investigating officers arrested Suggs, there existed a fair probability that Suggs was committing a felony offense, i.e., engaging in a conspiracy to traffic cocaine in violation of federal law.

COL 10.        To prove that Suggs was a member of a conspiracy with Clark to traffic cocaine in violation of 21 U.S.C. § 846, the government must prove: "(1) a shared unity of purpose between the alleged conspirators, (2) an intent to achieve a common goal, and (3) an agreement to work together toward that goal." United States v. Bailey, 840 F.3d 99, 108 (3d Cir. 2016).

COL 11.        The Third Circuit Court of Appeals has explained that a conspiracy in violation of § 846 can be inferred

> **when evidence of related facts and circumstances make clear that the defendants could not have carried out their activities " 'except as the result of a preconceived scheme or common understanding.' "**…The government "need not prove that each defendant knew all of the conspiracy's details, goals, or other participants."…Furthermore, the government is entitled to prove these elements entirely through circumstantial evidence….Indeed, " '[i]t is not unusual that the government will not have direct evidence. Knowledge is often proven by circumstances. A case can be built against the defendant grain-by-grain until the scale finally tips.' "

Id. (footnotes omitted and emphasis added).

COL 12.        Here, as detailed above, the investigating officers learned from the CI that Clark, who was from Philadelphia, Pennsylvania, was in Pittsburgh, Pennsylvania, to sell 5 kilograms of cocaine to the CI. The investigating officers learned that the day before the sale was to take place, Clark was with his cousin in Pittsburgh, Pennsylvania, and that the cousin drove a gray or silver Subaru. The CI and Clark agreed upon a location, date, and time for the cocaine sale. At the date, time, and location agreed upon by the CI and Clark, the investigating officers saw Clark's Chevy

Traverse at the scene and a gray or silver Subaru driven by another individual. Hetherington saw a man exit the Subaru, leave the engine running and door ajar, and enter Clark's vehicle. Hetherington knew that it is common for drug traffickers to use two vehicles when conducting a drug transaction.

COL 13.    Under those circumstances, the investigating officers could conclude that there was a fair probability that Clark and Suggs arrived at Grant Street with a shared a unity of purpose, an intent to achieve a common goal, and an agreement to work together toward that goal. In other words, the investigating officers could infer from the information it possessed at the time it arrested Suggs that there was a fair probability that Clark and Suggs agreed to work together to sell cocaine to the CI in exchange for money.

COL 14.    Suggs' motion to suppress based upon his warrantless arrest will, therefore, be denied.

**A.  The Search of the Subaru**

COL 15.     Suggs asserts that law enforcement conducted a "search" of the Subaru while it was still on Grant Street. (ECF No. 178 ¶ 11.) The evidence presented, however, shows that it is more likely than not that Hetherington saw a stack of money in the backseat of the Subaru while the car was parked on Grant Street and not during a "search" of the vehicle; indeed, there is no evidence of record to show that Hetherington entered the Subaru on Grant Street.

COL 16.    For the Fourth Amendment to be implicated there must be a "search" or "seizure" by government agents. Maryland v. Macon, 472 U.S. 463 (1985).

COL 17.     "A search occurs 'when an expectation of privacy that society is prepared to consider reasonable is infringed.' " Id. at 469.

COL 18.     "The Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. 347, 351, (1967).

COL 19.     The Fourth Amendment does not require that a public official be viewed any differently than a member of the public. Thus, the Fourth Amendment does not protect against observation by a public official of what is observable by the general public. See Ehlers v. Bogue, 626 F.2d 1314, 1315 (5th Cir.1980) (citing Marshall v. Barlow's, Inc., 436 U.S. 307 (1978)).

COL 20.     The observation of items knowingly exposed to public view is not a "search" under the Fourth Amendment because there is no reasonable expectation of privacy in their contents.

COL 21.     Hetherington during the suppression hearing was asked if he "located" anything in the Subaru before law enforcement searched the vehicle pursuant to the search warrant. He testified that: (1) while the Subaru was still on Grant Street, he "looked inside the Subaru" and *saw* "a large sum of money sitting on the passenger rear floor of the vehicle[;]" and (2) the money was still in the vehicle when law enforcement searched it pursuant to the search warrant. (H.T. 5/5/2021 (ECF No. 166) at 28-29.) At the preliminary hearing, Bonacci testified as follows:

> Q After Mr. Clark and Mr. Suggs were taken into custody and you got the cell phones, what was done with the vehicles that were involved, the Subaru and the Traverse?

A   They   were   impounded   and   taken   back   to   the   Swissvale   Police
Department.   Once   secured   at   the   Swissvale   Police   Department,   search
warrants were obtained.

(ECF No. 60-2 at 10.)

COL 22.      Under those circumstances, the court finds that it is more likely than
not that Hetherington observed the stack of money in the back seat of the Subaru while
it was on Grant Street. In other words, the money was exposed to the public and
Hetherington saw it without infringing upon Suggs' reasonable expectation of privacy.

### B. The Seizure of the Subaru

COL 23.         "The automobile exception to the warrant requirement permits law
enforcement to seize and search an automobile without a warrant if 'probable cause
exists to believe it contains contraband.'" United States v. Burton, 288 F.3d 91, 100 (3d
Cir. 2002) (quoting Pennsylvania v. Labron, 518 U.S. 938, 940 (1996)).

COL 24.      Pursuant to the automobile exception, "'[i]f probable cause justifies
the search ..., it justifies the search of every part of the vehicle and its contents that may
conceal the object of the search.'" Id. (quoting United States v. Ross, 456 U.S. 798, 825
(1982)).

COL 25.      Importantly to this case, "probable cause does not dissipate after
the automobile is immobilized because the exception does not include an exigency
component." Id. (citing Maryland v. Dyson, 527 U.S. 465, 466 (1999)).

COL 26.      Under those circumstances, "the government can search an
impounded vehicle without a warrant even though it has secured the vehicle against the
loss of evidence and it has the opportunity to obtain a warrant for the search." Id.

COL 27.      In other words, "if the police have probable cause to justify a warrantless seizure of an automobile on a public roadway, they may conduct either an immediate or a delayed search of the vehicle." California v. Acevedo, 500 U.S. 565, 570 (1991).

COL 28.      For example, in United States v. Thompson, 545 F. App'x 167, 169 (3d Cir. 2013), a police officer received a tip from a reliable confidential informant that the defendant asked him for a ride in his van for the defendant to sell an AK-47 rifle. The police officer acted on the tip and set up several cars to monitor the whereabouts of the confidential informant's van. The police officers conducted a traffic stop on the van and removed the confidential informant and defendant from the vehicle and placed them in separate police cars. A police officer on the scene "decided not to search the van for the gun at the time of the stop because the van was stopped in the middle of the street and a large crowd had begun to form." Id. A detective on-scene drove the van to "a secure police parking lot about two minutes away, and immediately searched it." Id. The officers found the AK-47 in a side panel of the vehicle and the defendant was federally indicted for two violations of 18 U.S.C. § 922(g)(1). Id.

COL 29.      The defendant filed a motion to suppress arguing, among other things, that the search of the van violated his Fourth Amendment rights. Thompson, 545 F. App'x at 169. The district court denied the suppression motion and held the automobile exception applied to the police officers' search of the van and that the search of the van was a search incident to arrest. Id.

COL 30.      On appeal, the defendant argued that that the police officers did not have probable cause to stop the confidential informant's van, and, even if they did, "they

20

were required to obtain a warrant to search the van once they removed it from the street to their secure garage." Thompson, 545 F. App'x at 170.

COL 31.      The Third Circuit Court of Appeals held that the police officers had probable cause to stop the van and that the police officers lawfully searched the van at their secure garage, pursuant to the automobile exception to the warrant requirement.

Id. The court explained:

> The automobile exception permits police to search and seize a vehicle so long as they have probable cause to believe that the vehicle contains contraband or evidence of a crime. Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996). Since Chambers v. Maroney, 399 U.S. 42, 52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the Supreme Court has repeatedly held that the automobile exception does not evaporate once the vehicle has been taken away from the place of the initial stop to the police station. "[P]olice officers with probable cause to search an automobile at the scene where it was stopped [can] constitutionally do so later at the station house without first obtaining a warrant.... [T]he probable-cause factor that developed at the scene still obtain[s] at the station house." Texas v. White, 423 U.S. 67, 68, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975) (per curium) (citation to Chambers, 399 U.S. at 52, 90 S.Ct. 1975 omitted); see also California v. Acevedo, 500 U.S. 565, 570, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991) ("Following Chambers, if the police have probable cause to justify a warrantless seizure of an automobile on a public roadway, they may conduct either an immediate or a delayed search of the vehicle.").

Thompson, 545 F. App'x at 170–71.

COL 32.      Applying the foregoing law to the facts of the case before it, the court of appeals held:

> For the same reasons the DBPD had probable cause to stop the vehicle, they had probable cause to search it. T.W.'s tip validly led the police to believe that there was a "fair probability that contraband or evidence of a crime" was to be found in the van's side panel. Burton, 288 F.3d at 103 (quotation marks omitted). Lieutenant Gibney made the decision that rather than search the van in the middle of the street while a crowd grew, it was more prudent to conduct the search at the police station. The automobile exception permitted the police the same latitude to conduct the search without a warrant back at the station as it did at the place of the stop.

Id.

COL 33.        The government bears the burden by a preponderance of the evidence to establish the applicability of the automobile exception to the search or seizure of a vehicle. Donahue, 764 F.3d at 300.

COL 34.        Here, the investigating officers towed[10] the Subaru from Grant Street to the Swissvale Police Department without a warrant. Suggs argues the seizure of his vehicle in that respect violated his Fourth Amendment rights.

COL 35.        The evidence presented to the court, however, shows that while the Subaru was parked on Grant Street, Hetherington saw "a large sum of money sitting on the passenger rear floor of the vehicle." (H.T. 5/5/2021 (ECF No. 166) at 28, 49.)

COL 36.        As discussed above, Hetherington knew that drug traffickers commonly use two vehicles when conducting business and drug trafficking took place in North Braddock, where Grant Street is located. Under those circumstances, the investigating officers had probable cause to believe that Suggs, who the CI met with

---

[10]        Suggs did not explicitly argue that his Fourth Amendment rights were violated when an investigating officer entered the Subaru to turn off the engine and shut the door of the vehicle. Had Suggs raised that argument, it would not be a basis upon which to suppress evidence in this case. First, turning the engine off was necessary to tow the vehicle, which the investigating officers were permitted to do, pursuant to the automobile exception to the warrant requirement because the investigating officers had probable cause to believe Suggs conspired to traffic cocaine **and** Hetherington saw the cash in the backseat of the vehicle. Second, the investigating officers' entry into the Subaru was lawful under the Fourth Amendment, pursuant to the community caretaking exception to the warrant requirement, which permits law enforcement to take reasonable action to, among other things, ensure public safety. United States v. Smith, 522 F.3d 305, 313 (3d Cir. 2008); Mawson v. Pittson City Police Dep't, Civ. A. No. 16-400, 2017 WL 4324840, at *10-11 (M.D. Pa. Jan. 20, 2017). The investigating officers' actions were reasonable because the Subaru was left in an area known for drug trafficking activity with the door ajar, keys in the ignition, and cash in the backseat. Under those circumstances, the Subaru was likely to be stolen or vandalized if the investigating officers did not enter the vehicle to turn off the engine and shut the door.

Clark for dinner the night before, arrived in the Subaru on Grant Street at the time Clark agreed to sell cocaine to the CI, exited the Subaru, and entered Clark's Chevy Traverse, was engaged in a conspiracy with Clark to traffic cocaine. The investigating officers had information that Clark sold kilograms of cocaine for approximately $30,000.00 to $33,000.00. Thus, when Hetherington saw the stack of cash in the backseat of the Subaru, he had probable cause to believe the vehicle contained evidence of Suggs' participation in the conspiracy to traffic cocaine.

COL 37.     Under those circumstances, the investigating officers could search or seize the Subaru without first obtaining a warrant, pursuant to the automobile exception.

COL 38.     Instead of searching the vehicle on Grant Street in North Braddock, which was known by Hetherington for drug trafficking activity, the investigating officers seized the Subaru and had it towed to the police station.

COL 39.     Based upon the foregoing, the investigating officers' seizure of the Subaru, i.e., the towing of the Subaru to the Swissvale Police Department, pending the issuance of a search warrant was lawful.

COL 40.     In other words, the automobile exception applies in this case and a warrant was not required for the investigating officers to seize the Subaru from Grant Street and tow it to the Swissvale Police Department.[11]

---

[11]     The court having concluded the automobile exception applies to the investigating officers' seizure of the Subaru from Grant Street need not decide whether the community caretaking exception applies to the towing of the vehicle to the Swissvale Police Department.

COL 41.      The investigating officers had probable cause to arrest Suggs, and had probable cause to believe that the Subaru contained evidence of his criminal activity. Suggs' motion to suppress will, therefore, be denied.

IV.   **Request for a Franks Hearing**

    A.  **The Parties' Arguments**

Suggs argues that he is entitled to a <u>Franks</u> hearing because the investigating officers who authored the affidavit of probable cause recklessly omitted material facts from the affidavit of probable cause upon which the search warrant for the Subaru was issued. The government argues that Suggs failed to make a substantial preliminary showing under <u>Franks</u>, and, therefore, his request for a <u>Franks</u> hearing should be denied.

    B.  **The Search Warrant and Affidavit of Probable Cause**

On February 25, 2019, Justin Keenan ("Keenan"),[12] an investigator for the Swissvale Police Department who was assigned to DANET, and Aaron Borello ("Borello"),[13] a Pennsylvania State Police ("PSP") Trooper assigned to the PSP bureau

---

[12]      The affidavit of probable cause provided, among other things, the following with respect to Keenan's training and experience:
-   he began employment for Swissvale in September 2006;
-   he received specialized training in multiple fields relating to illegal drug trafficking, including classes on wiretap investigations;
-   he had experience in conducting surveillance, interviewing witnesses, writing affidavits for and executing search warrants, and working with undercover officers and confidential informants.
(ECF No. 60-2 at 2.)

[13]      The affidavit of probable cause provided, among other things, the following with respect to Borello's training and experience:
-   he participated in numerous investigations of drug trafficking organizations involving, among other substances, cocaine; and

of Drug Law Enforcement, jointly applied for and were granted search warrants for the

Chevy Traverse and the Subaru. (ECF No. 60-2 at 2; ECF No. 163-1.)[14] Law enforcement

intended to search for the following items in the Subaru:

> Cocaine, or any other controlled substance. Paraphernalia used in the packaging, transportation, sale, distribution, processing, or use of Crack Cocaine. Proceeds of narcotics trafficking to include but not limited to US Currency. Owe Sheets, records, or bookkeeping associated with the distribution of narcotics. Any other contraband commonly associated with the distribution of narcotics to include any firearms or cellular telephones. Indicia of ownership for listed vehicle.

(ECF No. 60-2 at 1.) The affidavit of probable cause provided:

- Keenan was involved in a criminal investigation of Clark, who was identified as a "large scale distributor of cocaine in Allegheny County;"

- in Fall 2018, DANET interviewed a CI who stated that he or she purchased cocaine from Clark;

- the CI reported Clark is from Philadelphia, Pennsylvania, and travels to Pittsburgh, Pennsylvania in a gray Chevy Traverse with license plate number KPH8669, which contains a trap compartment under the third row of seats to conceal drugs;

- Keenan obtained a court order to track Clark's cellular telephone to determine his location;

---

- he was familiar with the methods, including language and terminology, utilized by individuals engaged in the distribution of controlled substances.
(ECF No. 60-2 at 2-3.)

[14]    The search warrant and affidavit of probable cause were attached to Suggs' brief in support of his motion to suppress and the affidavit of probable cause was attached to the government's response in opposition to Suggs' motion to amend/correct suppression motion. The copy of the affidavit attached to the government's response contained fewer redactions that the copy of the affidavit provided by Suggs. The parties did not enter the search warrant or the affidavit of probable cause into evidence. (H.T. 5/5/2021 (ECF No. 166) at 58.) The court, therefore, does not rely upon their contents to decide Suggs' motion to suppress. The court will consider the search warrant and affidavit of probable cause to determine whether Suggs made a substantial preliminary showing that he is entitled to a Franks hearing at which the search warrant and affidavit of probable cause may be offered into evidence.

- the CI ordered cocaine from Clark;

- the CI and Clark met in person and Clark informed the CI that he had cocaine for the CI and set a price for the cocaine;

- the CI reported that during the in-person meeting, Clark was accompanied by a black male who was approximately six feet tall and had short black hair and Clark told the CI the man was his cousin;

- the CI reported that Clark's cousin was driving a gray Subaru SUV;

- the CI met with Borello, Bonacci, and Keenan to place a recorded telephone call to Clark to arrange for the delivery of cocaine and the CI and Clark agreed to meet each other for the sale;

- on February 25, 2019, Clark arrived at the 1400 block of Grant Street in North Braddock, Pennsylvania, in a gray Chevy Traverse;

- a gray Subaru was parked across the street with the keys in the ignition and engine running;

- Heatherington observed Suggs exit the driver's seat of the Subaru and enter the passenger seat of the Traverse;

- the investigating officers removed Clark and Suggs from the vehicle and detained them;

- Clark and Suggs said the Subaru was not theirs;

- the Chevy Traverse and Subaru were towed to the Swissvale Police Department where they were secured in a locked facility;

- "Officer Zacchia" and his "K9" partner "Atlas" conducted an exterior sniff of both vehicles;

- Atlas alerted at the rear of the Chevy Traverse and near the fuel door and rear passenger door of the Subaru;

- there was probable cause to believe that Clark and Suggs committed and continued to commit offenses involving controlled substances, including conspiracy to commit those offenses; and

- there was probable cause to believe that the Chevy Traverse and Subaru were and would continued to be used in the facilitation of those crimes and that

evidence obtained from those vehicles would be used in ongoing investigations by DANET and the PSP.

(ECF No. 163-1 at 1-4.)

### C. Applicable Law

The Supreme Court has recognized that there is "a presumption of validity with respect to the affidavit supporting…[a] search warrant." Franks, 438 U.S. at 171-72. Under Franks, however, when a warrant is obtained based upon a false statement made in a supporting affidavit, the fruits of the search warrant must be excluded if the remaining material, following the excision of the falsity, is independently insufficient to support a finding of probable cause. United States v. Frost, 999 F.2d 737, 742-43 (3d Cir. 1993) (citing Franks, 438 U.S. at 155-56). If the falsity is based upon an omission rather than a misstatement of facts, the court must remove the falsehood "by supplying the omitted information to the original affidavit" and determine if the affidavit with the added information contains probable cause. Sherwood, 113 F.3d at 400. If probable cause exists after the affidavit has been "corrected," then the deficiency, i.e., the falsity or omission, is not material. United States v. Yusuf, 461 F.3d 374, 383-84 (3d Cir. 2006).

In order to obtain a Franks hearing to challenge a presumptively valid affidavit, the defendant must first make a "substantial preliminary showing" that (a) the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, and (b) the false statement is material to the finding of probable cause. Yusuf, 461 F.3d at 383. To make a substantial preliminary showing, defendant must present more than conclusory statements or arguments. Id. at 383 n. 8 ("In order to make this preliminary showing, the defendant cannot rest on mere conclusory allegations or a 'mere desire to cross-examine,' but rather must present an offer of proof contradicting

the affidavit, including materials such as sworn affidavits or otherwise reliable

statements from witnesses.").

The Court of Appeals for the Third Circuit has explained the "substantial

preliminary showing" required by the defendant as follows:

> To obtain a <u>Franks</u> hearing, the defendant must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause."…To meet this threshold, a challenger must present more than conclusory statements that the affidavit contains false statements or omissions….The challenger must specifically identify allegedly false statements or omissions in the affidavit and provide a statement of reasons supporting the argument….The challenger must also provide an offer of proof or give a satisfactory explanation for the absence of proof….Sworn affidavits or reliable statements from witnesses are examples of offers of proof sufficient to satisfy the substantial preliminary showing…. When demonstrating that the affiant omitted a material fact or included a false statement with the requisite mens rea, it is insufficient to prove the affiant acted with negligence or made an innocent mistake….If the challenger provides sufficient proof and obtains a <u>Franks</u> hearing, the challenger must prove by a preponderance that (1) the affiant made false statements or omissions intentionally, knowingly, or with reckless disregard for the truth, and (2) such statements were material to the probable cause determination….If the challenger satisfies this burden, we will excise the false statements and omissions from the affidavit and assess whether the corrected affidavit establishes probable cause.

<u>United States v. Heilman</u>, 377 F. App'x 157, 177 (3d Cir. 2010) (citations omitted).

If the substantial preliminary showing is made, and a hearing is granted, defendant

must prove by a preponderance of the evidence that: (a) the affiant knowingly and

deliberately, or with a reckless disregard for the truth, made false statements or omissions

that create a falsehood in applying for a warrant; and (b) such statements or omissions

were material, or necessary, to the probable cause determination. <u>Yusuf</u>, 461 F.3d at 383.

28

### D.  Analysis

Here, Suggs does not dispute that the affidavit authored by Keenan and Borello contains probable cause that evidence of drug trafficking would be found in the Subaru; rather, he argues that Keenan and Borello "intentionally…and with reckless disregard for the truth" omitted from the affidavit of probable cause the following information:

1) law enforcement during its investigation of Clark "was not aware of…[Suggs'] existence[;]"

2) law enforcement did not have any recorded telephone calls between the CI and Suggs;

3) there was no evidence that Suggs set up a drug transaction or had knowledge about the drug transaction between the CI and Clark;

4) there was no evidence that Suggs knew there was a controlled substance in the Chevy Traverse or Subaru;

5) a controlled buy did not occur before Suggs was arrested; and

6) neither the Chevy Traverse nor the Subaru was registered to Suggs.

(ECF No. 175 at 4.) According to Suggs, if the foregoing information was included in the affidavit, it would not contain sufficient information to support the issuing judge's finding of probable cause.

### 1.  Alleged Omissions 1-3

With respect to the first three allege omissions about what the investigating officers knew about Suggs' role—or lack thereof—in the conspiracy, even if that information was added to the affidavit, the affidavit would contain probable cause that evidence of cocaine trafficking would be found in the Subaru. The affidavit of probable cause is clear that the investigating officers were investigating *Clark* as a large-scale distributor of cocaine in Pittsburgh, Pennsylvania. Keenan and Borello wrote that Clark

was the *target of their investigation*, the CI had experience purchasing cocaine *from Clark*, the CI *and Clark* spoke on the telephone, and the CI arranged to meet *with Clark* to purchase cocaine. The affidavit also clearly explained Suggs' role in the conspiracy and how the investigating officers learned about Suggs. Keenan and Borello explained that when the CI first met with Clark, Suggs was with Clark, and Clark told the CI that Suggs was his cousin.[15] The affidavit provides that the CI told the investigating officers that Suggs was in a gray Subaru, the investigating officers saw a gray Subaru on Grant Street when they were conducting surveillance of Clark, and Hetherington saw Suggs exit the Subaru and enter Clark's vehicle (which the CI reported had a trap compartment for concealing drugs). Under those circumstances, the affidavit of probable cause accurately provides that the investigating officers targeted Clark to investigate his criminal conduct and that during its investigation, it learned information that led them to believe the Suggs conspired to traffic cocaine with him. Thus, Suggs did not make a preliminary showing that Keenan and Borello knowingly and intentionally, or with reckless disregard for the truth, omitted information from the affidavit of probable cause about what they knew about Suggs' role in the conspiracy. In other words, Suggs did not make a substantial preliminary showing that adding that information to the affidavit of probable cause would preclude a judge from finding probable cause existed to search the Subaru.

### 2. Alleged Omission 4

---

[15]     Suggs asserts that he is not Clark's cousin, but did not cite to evidence of record in support for that assertion. (ECF No. 178 at 3.)

With respect to the fourth alleged omission identified by Suggs, whether the investigating officers lacked evidence that Suggs *knew* there were controlled substances in the vehicles, is not material to a finding of probable cause. The affidavit included information about Suggs that showed there was probable cause he was involved in the conspiracy, i.e., the CI agreed to purchase cocaine from Clark, the CI met with Clark and Suggs and saw Suggs in the Subaru, Suggs parked the Subaru in proximity to Clark's Chevy Traverse (which the CI identified as Clark's vehicle in which he transported cocaine in a trap), Suggs went into the Chevy Traverse around the time the sale was to occur, and the K9 officer alerted at both vehicles. The investigating officers were looking for evidence of drug trafficking and conspiracy to commit drug trafficking. Keenan and Borello wrote on the application for the search warrant that they intended to search for the following items in their search of the vehicles:

> Cocaine, or any other controlled substance. Paraphernalia used in the packaging, transportation, sale, distribution, processing, or use of Crack Cocaine. **Proceeds of narcotics trafficking to include but not limited to US Currency.** Owe Sheets, records, or bookkeeping associated with the distribution of narcotics. Any other contraband commonly associated with the distribution of narcotics to include any firearms or cellular telephones. Indicia of ownership for listed vehicle.

(ECF No. 60-2 at 1 (emphasis added).)

Evidence of drug trafficking that may be found in a vehicle is not limited to actual controlled substances; rather, evidence of drug trafficking can be, among many other things, cellular telephones, stacks of cash, baggies, and scales. United States v. Triana, 477 F.3d 1189, 1195 (10th Cir. 2007) (recognizing that "scales, glass pipes, and ziplock baggies…[are] so called 'tools of the drug trade'); Jackson v. Byrd, 105 F.3d 145, 149 (3d Cir. 1997) (recognizing that "weight scales, a heat sealer, thousands of empty vials

and packets" are drug paraphernalia); <u>United States v. Kaplan</u>, No. CRIM. 06-719, 2010 WL 3620345, at *2 (E.D. Pa. Sept. 13, 2010), <u>aff'd</u>, 526 F. App'x 208 (3d Cir. 2013) (recognizing that scales, baggies, and cash are indicia of drug activity). Under those circumstances, even if Keenan and Borello wrote in the affidavit that they did not have any evidence that Suggs *knew* that controlled substances were in the vehicles, a judge could still find there was probable cause that the vehicles contained evidence of a crime.

### 3. Alleged Omission 5

The fifth alleged omission, i.e., a controlled buy did not occur before Suggs was arrested, is not material to a finding of probable cause. Whether the vehicles contained evidence of a crime is not dependent upon whether a controlled buy occurred before the arrest; indeed, the investigating officers had information that Clark drove to Grant Street to sell cocaine, the sale was interrupted by the arrests, and, thereafter, a police K9 alerted on both vehicles. Based upon that information, and, even if the fifth alleged omission was included in the affidavit, the issuing judge could find there was a fair probability that evidence of cocaine trafficking would be found in the Subaru.

### 4. Alleged Omission 6

Likewise, the sixth allege omission, i.e., that neither vehicle was registered to Suggs, is not material to a finding of probable cause. The affidavit of probable cause explained that: (A) on February 24, 2019 (the day before the sale), the CI saw Clark's cousin's driving a gray Subaru; and (B) on February 25, 2019, Hetherington saw Suggs exit a gray Subaru and enter Clark's Chevy Traverse right before the drug sale was to

take place. Under those circumstances, Suggs' presence in the Subaru renders it immaterial that neither the Subaru nor the Chevy Traverse were registered to Suggs.

### E.  Conclusion with Respect to the Request for a <u>Franks</u> Hearing

Based upon the foregoing, Suggs did not make a substantial preliminary showing that any of the six alleged omissions, whether considered individually or collectively, are material to a finding of probable cause. Thus, the court need not consider whether those omissions were  made knowingly or with reckless disregard for the truth. Suggs—having failed to make a substantial preliminary showing—is not entitled to a <u>Franks</u> hearing. His request for a <u>Franks</u> hearing will be denied.

### V.      Conclusion

The government satisfied its burden to show that the investigating officers had probable cause to arrest Suggs and that the automobile exception applied to its seizure of the Subaru. Suggs' motion to suppress (ECF No. 59) will, therefore, be denied.

Suggs failed to make a substantial preliminary showing that the investigating officers made a false statement or omission in the affidavit of probable cause supporting the search warrant issued for the Subaru. His request for a <u>Franks</u> hearing will, therefore, be denied.

An appropriate order will be entered.

BY THE COURT,

Dated: August 5, 2021                    /s/ JOY FLOWERS CONTI
                                         Joy Flowers Conti
                                         Senior United States District Court Judge