IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Crim. No. 19-134 |
| | ) |
| TERRY SUGGS, JR., | ) |
| Defendant. | ) |

**OPINION**

CONTI, Senior District Judge

I.  **Introduction**

Defendant Terry Suggs, Jr. ("Suggs") and his codefendant Jermaine Clark ("Clark") are charged in this case with conspiring to possess with the intent to distribute, and possessing with the intent to distribute, 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine and 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii), and 846. (ECF No. 19.) The charges in the indictment are based upon evidence obtained from, among other sources, a confidential informant ("CI") and law enforcement's investigation of Clark who pleaded guilty, (ECF No. 157), and has been sentenced in this case. The officers investigating Clark's distribution of cocaine in Pittsburgh, Pennsylvania, arrested Clark and Suggs when they saw, among other things, Clark and Suggs at the time and location agreed upon by Clark and the CI for the sale of cocaine. Suggs arrived at the scene in a separate vehicle, i.e., a silver Subaru, exited his vehicle, left the engine running and door ajar, and entered Clark's vehicle, which was already on-scene. The investigating officers

arrested Clark and Suggs, and, after an investigating officer saw, among other things, a stack of cash in the backseat of Suggs' vehicle, towed the vehicles from the scene.

Suggs filed a motion to suppress the evidence upon which the indictment is based and requested that the court hold a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978). Suggs argued that the evidence against him in this case should be suppressed because the investigating officers arrested him and seized the Subaru without warrants or probable cause in violation of his rights guaranteed by the Fourth Amendment to the United States Constitution. Suggs also argued that he was entitled to a hearing pursuant to Franks because two police officers intentionally and with reckless disregard for the truth omitted material facts from the affidavit of probable cause upon which the search warrants were issued for two vehicles in this case.

On August 5, 2021, after holding a suppression hearing and reviewing the submissions of Suggs and the government, the court denied the motion to suppress and request for a Franks hearing and set forth its reasoning in findings of fact and conclusions of law. This court explained, among other things, that the investigating officers in this case had probable cause to arrest Suggs and lawfully seized his vehicle pursuant to the automobile exception to the Fourth Amendment's warrant requirement. The court also held that Suggs failed to show he was entitled to a Franks hearing.

Currently pending before this court is Suggs' motion for reconsideration of this court's order denying his motion to suppress. Suggs in the motion for reconsideration challenges evidence presented by the government that the CI told investigating officers that the CI met with Clark and Clark's cousin, i.e., Suggs, the day before the cocaine sale was scheduled to take place between the CI and Clark. Suggs argues that an

investigating officer, Raymond Bonacci ("Bonacci"), who testified at a state-court preliminary hearing related to this case, did not testify that the CI told him that the CI met with Clark and Clark's cousin the day before the cocaine sale. According to Suggs, under those circumstances, the investigating officers did not have probable cause to effectuate his arrest because there was "[n]o evidence…presented that linked Mr. Suggs to…[Clark] or the alleged deal that was to take place between…[the] confidential informant and…[Clark]."[1] (ECF No. 189 ¶ 13.)

For the reasons set forth in this opinion, Suggs' motion for reconsideration will be denied. The court considered the evidence upon which Suggs relies in his motion for reconsideration when it denied the motion to suppress. The court found, however, that based upon the testimony by investigating officer Mark Hetherington ("Hetherington"), which was supported by the Allegheny County's District Attorney's Office Narcotics Enforcement Team ("DANET") report authored by investigating officer Scott Kucic ("Kucic") on February 26, 2019, it was more likely than not that when the investigating officers arrested Suggs, they knew—among other things—that the day before the arrest, the CI met with Clark and Clark's cousin who drove a Subaru. That information along with the other information known by the investigating officers at the time of Suggs' arrest, which is detailed in the court's findings of fact and conclusions of law, gave the

---

[1] Suggs in the motion for reconsideration challenges the court's conclusion that law enforcement had probable cause to arrest him. He does not argue that if the investigating officers had probable cause to arrest him, they unlawfully seized his vehicle. This court held that the Subaru was lawfully seized pursuant to the automobile exception to the Fourth Amendment warrant requirement. Suggs does not challenge that conclusion.
Suggs also does not challenge this court's conclusion that he failed to satisfy his burden to show that he is entitled to a Franks hearing.

investigating officers probable cause to believe that Suggs was engaged in a conspiracy to traffic cocaine at the time of his arrest. The motion for reconsideration will be denied.

## II.     Factual Background

This court issued findings of fact and conclusions of that law fully set forth the court's factual findings with respect to Suggs' motion to suppress. A non-exhaustive summary of those facts is provided below to provide context to this opinion:

- Hetherington and Bonacci, both of whom are experienced law enforcement officers, were a part of a group of law enforcement officers investigating Clark's distribution of cocaine from Philadelphia, Pennsylvania to Pittsburgh, Pennsylvania (ECF No. 181 Findings of Fact ("FOF") ¶¶ 1-3);

- the investigation of Clark was based upon, among other things, information received from a CI that over the course of approximately a year, he purchased kilograms of cocaine from Clark at a residence on Grant Street in North Braddock, Pennsylvania (id. FOF ¶¶ 4-5);

- Clark used trap compartments in his vehicles (id. FOF ¶ 8);

- in February 2019, the CI (acting with investigating officers) via telephone arranged to purchase five kilograms of cocaine from Clark and Clark planned to travel from Philadelphia, Pennsylvania, to Pittsburgh, Pennsylvania, to conduct the sale on or about February 25 or 26, 2019) (id. FOF ¶¶ 11-12);

- on February 24, 2019, the CI called Bonacci and told him that Clark was in Pittsburgh, Pennsylvania, staying at the Westin Hotel (id. FOF ¶ 13);

- the CI informed Hetherington and other investigating officers that on February 24, 2019, the CI met with Clark and Clark's cousin and Clark's cousin drove a silver Subaru (id. FOF ¶¶ 14-15);

- the investigating officers did not locate Clark's vehicle or the silver Subaru at the Westin Hotel (id. FOF ¶ 15);

- the investigating officers recorded telephone conversations between the CI and Clark during which they agreed to meet between 3:00 p.m. and 4:00 p.m. on February 25, 2019, on Grant Street in North Braddock, Pennsylvania (an

- area known to Hetherington for drug-trafficking activity) to effectuate the sale of cocaine (id. FOF ¶¶ 16-18);

- the investigating officers set up surveillance on the 1300 block of Grant Street and they saw a Chevy Traverse driven by Clark and a gray or silver Subaru arrive on scene and park across the street from where the cocaine sale was set to occur (id. FOF ¶¶ 18-19);

- Bonacci ran the license plates of the Chevy Traverse and Subaru and learned they were registered in Philadelphia, Pennsylvania (id. FOF ¶ 20);

- a large black male (later identified as Suggs) exited the Subaru, left the keys in the ignition, engine running, and door ajar, and entered the passenger side of the Chevy Traverse. (id. FOF ¶ 21-22)

- it is typical for drug traffickers to use two different vehicles when transporting narcotics or cash, e.g., narcotics may be kept in one vehicle and cash in the other vehicle and the drivers of each vehicle may keep watch for each other to ensure their safety (id. FOF ¶ 24);

- two or three minutes after Suggs entered the Chevy Traverse, approximately eight law enforcement officers surrounded the vehicle and arrested Clark and Suggs (id. FOF ¶¶ 25-39);

- one of the law enforcement officers on scene entered the Subaru to shut it off and while the Subaru was still on Grant Street, Hetherington observed a large sum of money sitting on the passenger rear floor of the vehicle (id. FOF ¶¶ 37, 40);

- the Chevy Traverse and Subaru were towed to the Swissvale Police Department, a K9 sniff was conducted, the K9 alerted on both vehicles, and an investigating officer applied for and was granted a search warrant for both vehicles (id. FOF ¶¶ 41-43); and

- the investigating officers searching the Subaru pursuant to the search warrant found 18 kilograms of cocaine inside a trap compartment in the vehicle (id. FOF ¶ 46).

Based upon the foregoing factual background, this court concluded that at the time the investigating officers approached the Chevy Traverse to arrest Clark and Suggs, they knew:

- Clark and the CI agreed to meet on that day, i.e., February 25, 2019, between 3:00 p.m. and 4:00 p.m. at that location for Clark to sell the CI 5 kilograms of cocaine;

- drug trafficking activity occurred in or around the location agreed upon by Clark and the CI, i.e., North Braddock;

- Clark lived in Philadelphia, Pennsylvania, but was in Pittsburgh, Pennsylvania, with his cousin on February 24, 2019;

- the CI met with Clark and Clark's cousin at a restaurant in Pittsburgh, Pennsylvania, on the previous day, i.e., on February 24, 2019;

- Clark drove a Chevy Traverse with a trap, which is used by drug traffickers to conceal drugs and money;

- on February 24, 2019, Clark was in a silver or gray Subaru with his cousin;

- Clark arrived on Grant Street driving the Chevy Traverse at or around the time he agreed upon with the CI;

- a gray or silver Subaru arrived on Grant Street at or around the time agreed upon by Clark and the CI and parked within close proximity of the Chevy Traverse;

- the driver of the Subaru (Suggs) exited the vehicle, left the keys in the ignition and engine running, and entered the passenger side of Clark's Chevy Traverse; and

- typically drug traffickers use two different vehicles to conduct drug transactions and keep narcotics in one vehicle and cash in the other vehicle.

The court held that—based upon the foregoing information, which was known to the investigating officers at the time of Suggs' arrest—there existed a fair probability that Suggs was committing a felony offense at the time he was arrested, i.e., engaging in a

conspiracy to traffic cocaine in violation of federal law. (ECF No. 181 Conclusions of Law ("COL") ¶¶ 9-13.) The court explained:

> [T]he investigating officers learned from the CI that Clark, who was from Philadelphia, Pennsylvania, was in Pittsburgh, Pennsylvania, to sell 5 kilograms of cocaine to the CI. The investigating officers learned that the day before the sale was to take place, Clark was with his cousin in Pittsburgh, Pennsylvania, and that the cousin drove a gray or silver Subaru. The CI and Clark agreed upon a location, date, and time for the cocaine sale. At the date, time, and location agreed upon by the CI and Clark, the investigating officers saw Clark's Chevy Traverse at the scene and a gray or silver Subaru driven by another individual. Hetherington saw a man exit the Subaru, leave the engine running and door ajar, and enter Clark's vehicle. Hetherington knew that it is common for drug traffickers to use two vehicles when conducting a drug transaction.
> 
> …
> 
> Under those circumstances, the investigating officers could conclude that there was a fair probability that Clark and Suggs arrived at Grant Street with a shared a unity of purpose, an intent to achieve a common goal, and an agreement to work together toward that goal. In other words, the investigating officers could infer from the information…[they] possessed at the time…[they] arrested Suggs that there was a fair probability that Clark and Suggs agreed to work together to sell cocaine to the CI in exchange for money.

(Id. at COL ¶¶ 12-13.)

### III.     Applicable Law

#### A. Motion for Reconsideration

Though not explicitly provided for in the Federal Rules of Criminal Procedure, "motions for reconsideration may be filed in criminal cases." United States v. Fiorelli, 337 F.3d 282, 286 (3d Cir. 2003). Courts apply the same standards to motions for reconsideration filed in the criminal cases as those used in the civil context. United States v. Jackson, Crim. A. No. 18-216, 2020 WL 2557339, at *1 *W.D. Pa. May 19, 2020); United States v. King, Crim. A. No. 16-321, 2017 WL 3087745, at *2 (M.D. Pa. Jul. 7, 2017); United States v. Lawrence, Civ. Action No. 3:13-41, 2015 WL 9027037, at *8 (W.D.

Pa. Dec. 15, 2015); United States v. Torres-Moreno, 28 F. Supp. 3d 136, 137 (D.P.R. 2014); United States v. Korbe, Crim. Action No. 2:09-05, 2010 WL 2891509, at *1 (W.D. Pa. July 21, 2010); United States v. Croce, 355 F. Supp. 2d 774, 775 n.1 (E.D. Pa. 2005).

Here, Suggs seeks reconsideration of the court's order denying his motion to suppress, which is an interlocutory order. United States v. Williams, 413 F.3d 347, 354 (3d Cir. 2005).  As noted, motions for reconsideration filed in criminal cases are analyzed under the standards applicable to motions for reconsideration in civil cases. Reconsideration of *final* judgments are analyzed under Federal Rule of Civil Procedure 59(e) or Federal Rule of Civil Procedure 60(b), and "the appropriate Rule under which to file motions for reconsideration of an *interlocutory* order is Rule 54(b)." Cezair v. JP Morgan Chase Bank N.A., Civ. Action No. 13-2928, 2014 WL 4955535, at *1 (D. Md. Sept. 30, 2014) (emphasis added); see Qazizadeh v. Pinnacle Health Sys., 214 F.Supp.3d 292, 298 (M.D. Pa. 2016) ("[M]otions for reconsideration of interlocutory orders—whether denials of summary judgment, grants of partial summary judgment, or any other non-final orders—are motions under Federal Rule of Civil Procedure 54(b)."). Federal Rule of Civil Procedure 54(b) provides, in pertinent part:

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

FED. R. CIV. P. 54(b).

A motion for reconsideration with respect to a final order or judgment must rely on one of three grounds: (1) an intervening change in the law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice. N.

River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995). The purpose of such a motion is "to correct manifest errors of law or fact or to present newly discovered evidence." Bootay v. KBR, Inc., 437 F. App'x 140, 146-47 (3d Cir. 2011) (citing Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985) ). A motion for reconsideration is not to be used to relitigate or "rehash" issues the court already decided, or to ask a district court to rethink a decision it, rightly or wrongly, already made. Williams v. City of Pittsburgh, 32 F.Supp.2d 236, 238 (W.D. Pa. 1998); Reich v. Compton, 834 F.Supp. 753, 755 (E.D. Pa. 1993), aff'd in part, rev'd in part, 57 F.3d 270 (3d Cir. 1995); Keyes v. Nat'l R.R. Passenger Corp., 766 F.Supp. 277, 280 (E.D. Pa. 1991). In order to be successful on a motion for reconsideration, the movant must demonstrate a "definite and firm conviction that a mistake has been committed," or that the court overlooked arguments that were previously made. United States v. Jasin, 292 F.Supp.2d 670, 676 (E.D. Pa. 2003).

" 'While the standards articulated in Rule[ ] ... 60(b) are not binding in an analysis of Rule 54(b) motions, courts frequently look to these standards for guidance in considering such motions.' " Ampro Computers, Inc. v. LXE, LLC, Civ. Action No. 13-1937, 2016 WL 3703129, at *2 (D. Del. July 8, 2016) (quoting Cezair, 2014 WL 4955535, at *1). Reconsideration of interlocutory orders, however, "may be had even if the movant cannot show an intervening change in controlling law, the availability of new evidence that was not available when the court issued the underlying order, or the 'need to correct a clear error of law or fact or to prevent manifest injustice.' " Qazizadeh, 214 F.Supp.3d at 298 (quoting Max's Seafood Café v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999) ). "[T]he court may permit reconsideration whenever 'consonant with justice to do

so.' " Qazizadeh, 214 F.Supp.3d at 298 (quoting St. Mary's Area Water Auth. v. St. Paul Fire and Marine Ins. Co., 472 F.Supp.2d 630, 632 (M.D. Pa. 2007) ); United States v. Jerry, 487 F.2d 600, 604 (3d Cir. 1973) (" '[I]f an interlocutory decree be involved, a rehearing may be sought at any time before final decree, provided due diligence be employed and a revision be otherwise consonant with equity.' ") (quoting John Simmons Co. v. Grier Bros. Co., 258 U.S. 82, 90-91 (1922) ).

### B.  Fourth Amendment

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause…." U.S. CONST. AMEND. IV.  When a defendant challenges the validity of a warrantless arrest conducted by law enforcement, the government bears the burden to prove the validity of the arrest. United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002) ("[A]n officer's inferences and deductions can only justify a warrantless arrest if the government satisfies its burden of establishing the probable cause necessary to support the arrest."). "A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." Maryland v. Pringle, 540 U.S. 366, 370 (2003).

"Probable cause exists if there is a 'fair probability' that the person committed the crime at issue." Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000) (quoting Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997)).  "'Probable cause exists where 'the facts and circumstances within…[the officers'] knowledge and of which they had reasonably

trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed [by the person to be arrested].'" Dunaway v. New York, 442 U.S. 200, 208 (1979) (quoting Brinegar v. United States, 338 U.S. 160, 175–76 (1949)); United States v. Thomas, 797 F. App'x 730, 732–33 (3d Cir. 2020). The Third Circuit Court of Appeals has instructed that "'[t]he collective knowledge of the investigating officers is measured in determining probable cause[.]'" United States v. Whitfield, 634 F.3d 741, 745 (3d Cir. 2010) (quoting United States v. Belle, 593 F.2d 487, 497 n. 15 (3d Cir.1979).

IV.  Discussion

A. The Parties' Arguments

In Suggs' motion for reconsideration, he challenges this court's conclusion that the CI told investigating officers that on February 24, 2019, i.e., the day before the planned cocaine sale between the CI and Clark, the CI met with Clark and Clark's cousin. According to Suggs, Bonacci testified at the state-court preliminary hearing related to this case that Suggs did not have any involvement in conversations with the CI and the investigating officers did not know that Suggs was going to be present on Grant Street in North Braddock, Pennsylvania during Clark's sale of cocaine to the CI. Suggs asserts that Bonacci did not testify that the CI told him the CI met with Clark and Clark's cousin on February 24, 2019. Suggs argues that under those circumstances, Hetherington's testimony and the DANET report authored by Kucic, which both indicated that the CI met with Clark and Clark's cousin on February 24, 2019, are unworthy of belief. Suggs argues that if the CI did not tell the investigating officers that he met with Clark and Clark's cousin on February 24, 2019, the investigating officers did

not have probable cause to arrest Suggs. The government argues in opposition that this court properly relied upon the collective knowledge of the investigating officers to determine whether there was probable cause of Suggs' arrest, which included consideration of Bonacci's testimony from the state-court preliminary hearing related to this case.

### B. The Evidence Relied Upon by Suggs in the Motion for Reconsideration

During a preliminary hearing related to this case held in Allegheny County, Pennsylvania on March 5, 2019, the following exchange took place on cross-examination of Bonacci by Suggs' counsel (for that state case):

> Q       At this point in time during the course of however long this investigation has been going on, you had information about another individual being a participant, correct?
>
> A       As far as I know, Mr. Clark was supposed to be alone.
> …
> Q       Nevertheless, despite Mr. Suggs not having any involvement in any of these conversations with the confidential informant, a decision was made to take him into custody?
>
> A       There was.

(H.T. 3/5/2019 (ECF No. 60-1) at 40-41.)

During the suppression hearing held in this federal case, the following exchange took place during Hetherington's direct examination:

> Q. Okay. Did you learn based upon your involvement in this investigation that Mr. Clark was intending to come to the Pittsburgh area to effectuate the drug deal on or about either Monday or Tuesday, which would be February 25 or 26 of 2019?
>
> A. Yes.
>
> Q. And what happened next as it relates to the investigation?

A. The CI had contacted Detective Bonacci and informed him that Fats was currently in Pittsburgh and staying at the Westin Hotel.

Q. Do you recall what day the CI contacted Detective Bonacci?

A. I believe it was the 24th, the day prior to.

Q. As it relates to the communication between the CI and Detective Bonacci, how did the CI know that Mr. Clark was in Pittsburgh?

A. The CI informed us that he had met Mr. Clark on the evening of the 24th.

Q. And when you indicate he met Mr. Clark, did the CI provide a location as to where the meeting occurred?

A. He said that he met him at a restaurant, and that he was with his cousin.

Q. Now, did Mr. -- I'm sorry -- did the CI provide any information related to -- strike that. Earlier you mentioned that Mr. Clark -- the CI had informed you that Mr. Clark drove a Chevy Traverse; is that correct?

A. Yes.

Q. Did law enforcement try to locate the Chevy Traverse in advance of the drug transaction?

A. Yes.

Q. Did law enforcement locate the Chevy Traverse?

A. We did not.

Q. Okay. Having not located the Traverse, what did law enforcement do?

A. Detective Bonacci then contacted the CI again and asked if Clark was in his normal vehicle, which would be the Chevy Traverse. And the CI informed Bonacci that on Sunday when he had met with him, they were in his cousin's Subaru.

Q. Did the CI provide a color or what he thought was the color of the Subaru?

A. I believe he stated it was a silver Subaru.

> Q. Now, as far as the timing -- so you mentioned that on February 24, that evening, the CI indicated that he had met with Mr. Clark and who was identified at that time to him as Mr. Clack's cousin; correct?
>
> A. Correct.
>
> Q. And the following day, just to make sure I understand and the record is clear, was it the following day that you tried to locate the vehicle?
>
> A. Yes.
>
> Q. Okay. So that is the morning of the 25th?
>
> A. Yes.
>
> Q. And on the morning of the 25th, law enforcement was advised that the night before at least, Mr. Clark and his cousin were using his cousin's gray Subaru; correct?
>
> A. Yes.
>
> Q. All right. Were you able to locate the gray Subaru in the Westin parking deck?
>
> A. No.

(H.T. 5/5/2021 (ECF No. 166) at 15-18.)

Kucic's DANET report dated February 26, 2019, i.e., the day after Suggs' arrest, provided, in pertinent part:

> [The CI] did see and speak with CLARK and another unknown black male whom CLARK stated was is [sic] cousin. (later positively identified as Terrance SUGGS).
> …
> [W]hile searching the parking garage of the Westin Hotel for the vehicle that CLARK is known to operate (Chevrolet Traverse), Detective REDACT REDACTED asked if CLARK was driving his normal/usual vehicle with him last evening. [The CI] stated that there were in his cousins [sic] Gray Subaru.

(ECF No. 70-2 at 2.)

### C. Analysis

Upon review of this court's findings of fact and conclusions of law, the parties' submissions, and the evidence of record, the court cannot discern a basis upon which to find that reconsideration of the court's order denying the motion to suppress is consonant with the interest of justice. Suggs did not point to an intervening change of law or new evidence that was not available to him at the time the court rendered its decision; indeed, the court already considered the evidence relied upon by Suggs when it denied the motion to suppress.

Suggs' motion for reconsideration appears to be based upon a need to prevent manifest injustice or is in the interest of justice under Rule 54(b), which standard is applied in criminal cases as discussed above. For the reasons set forth below, reconsideration of the court's order in the interest of justice is not warranted. This court properly relied upon Hetherington's testimony, which was supported by Kucic's DANET report, to find that it was more likely than not that the CI told the investigating officers in this case that the CI met with Clark and Clark's cousin on February 24, 2019, i.e., the day before the cocaine sale. The investigating officers relied upon that information, among other information, to conclude that there was a fair probability that Suggs was engaged in a conspiracy to sell cocaine.

Bonacci did not testify at the suppression hearing. Suggs' argument that Bonacci's testimony at the preliminary hearing in state court rendered Hetherington's testimony and Kucic's report unreliable is unconvincing. First, Hetherington's and Kucic's statements that the CI met with Clark and Clark's cousin on February 24, 2019, are not contradicted by Bonacci's statement that he believed that Clark was going to show up on Grant Street in North Braddock, Pennsylvania, to conduct the cocaine sale alone. The CI told the

investigating officers that he purchased cocaine from Clark for approximately one year and there is no evidence that the CI told the investigating officers that Clark's cousin had any involvement in those transactions. Under those circumstances, Bonacci's testimony that he believed Clark was going to show up at the cocaine sale alone does not render Hetherington's and Kucic's statements that the CI met with Clark and Clark's cousin on February 24, 2019, unreliable or false. In other words, the CI could have told Bonacci and the investigating officers that he met with Clark and Clark's cousin on February 24, 2019, and Bonacci could still believe—based upon the past information provided by the CI— that Clark was going to attend the sale of cocaine to the CI alone.

Suggs' request for reconsideration is also based upon Bonacci's alleged testimony that Suggs "had no 'involvement in any of these conversations with the confidential informant.'" (ECF No. 189 ¶ 4 (quoting H.T. 3/5/2019 (ECF No. 60-1) at 41.) Suggs reading of Bonacci's testimony, however, is not supported by the record. At the preliminary hearing in Allegheny County, Bonacci testified on behalf of the Commonwealth of Pennsylvania. He was subject to direct examination by the Commonwealth's counsel and cross-examination by Clark's counsel and Suggs' counsel. Suggs' counsel questioned Bonacci about a telephone call between the CI and Clark that occurred on February 25, 2019, between 11:30 a.m. and 12:00 p.m. (H.T. 3/5/2019 (ECF No. 60-1) at 37.) Next, Suggs' counsel questioned Bonacci about the events that occurred on Grant Street on February 25, 2019, e.g., the arrests of Clark and Suggs and the investigating officers' observations about the Chevy Traverse and Subaru. (H.T. 3/5/2019 (ECF No. 60-1) at 40-41.) Suggs' counsel changed course and the following exchange took place:

> Q       Nevertheless, despite Mr. Suggs not having any involvement in any of these conversations with the confidential informant, a decision was made to take him into custody?
>
> A       There was.

(H.T. 3/5/2019 (ECF No. 60-1) at 40-41.) It is unclear to which "conversations with the confidential informant" Suggs' counsel is referring. Four pages earlier in the transcript Suggs' counsel questioned Bonacci about the telephone call from February 25, 2019, which took place between the *CI and Clark*. Suggs' counsel, however, does not refer to any calls placed on February 24, 2019 between the *CI and Bonacci*. According to Hetherington's testimony, the CI told Bonacci and the investigating officers that he met with Clark and Clark's cousin *during a telephone conversation with Bonacci*. Despite Suggs' arguments to the contrary, the court cannot conclude based upon the transcript portion quoted above that Bonacci testified that the CI did not tell him that the CI met with Clark and Clark's cousin on February 24, 2019. In any event, Bonacci's answer to Suggs' counsel's question confirms only that a decision was made to take Suggs into custody. His answer "[t]here was" is not sufficient for the court to reach the conclusion argued by Suggs. It remains more likely than not that the CI told the investigator he met with Clark and Clark's cousin on February 24, 2019.

Based upon the foregoing, the court concludes that Bonacci's testimony from the preliminary hearing—which this court considered when it made its findings of fact and conclusions of law—does not render Hetherington's testimony, which was supported by Kucic's report (that the CI told Bonacci he met with Clark and Clark's cousin on February 26, 2019) unworthy of belief. Under those circumstances, reconsideration of the court's findings by a preponderance of the evidence that the CI told Bonacci and the investigating

officers that he met with Clark and Clark's cousin on February 24, 2019, and the cousin drove a gray or silver Subaru is not warranted. The investigating officers, therefore, properly relied upon that information when they determined probable cause existed to arrest Suggs on February 25, 2019. In other words, the court cannot discern any basis in the interest of justice upon which to reconsider its order denying Suggs' motion to suppress.

### V.     Conclusion

For the foregoing reasons, reconsideration of this court's order denying Suggs' motion to suppress is not warranted in the interest of justice. Suggs' motion for reconsideration (ECF No. 189) will be denied.  An appropriate order will be entered.

BY THE COURT,

Dated: September 29, 2021

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
Senior United States District Court Judge